EXHIBIT C

Great Lakes Insurance SE

vs.

Sea 21-21 L.L.C.

---

Deposition of:

Jose Figueroa

August 25, 2021

*Vol .01*

---



PHIPPS REPORTING

*Raising the Bar!*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
SOUTHERN DIVISION

Civil Action No. 1:20-CV-22865-UU

GREAT LAKES INSURANCE SE,

Plaintiff,

-vs-

SEA 21-21, LLC,

Defendant.
_____/

DEPOSITION OF
JOSE FIGUEROA

Pages 1 Through 119

Wednesday, August 25, 2021
9:35 a.m. - 12:34 p.m.

Held remotely via Zoom Web Conference

Stenographically Reported By:
Barbara L. Kent, RMR, RPR, FPR, CSR-MI

Job No.:   204952

Jose Figueroa
August 25, 2021

Page 2

```
 1   APPEARANCES:  (Appearing remotely via Web Conference)
 2   On behalf of the Plaintiff:
 3        GOLDMAN & HELLMAN, P.A.
          8751 West Broward Boulevard
          Suite 404
 4        Fort Lauderdale, Florida 33324
          (954) 832-0878
 5        BY:  JACQUELINE GOLDMAN, ESQUIRE
          jacquie@goldmanandhellman.com
 6
 7
     On behalf of the Defendant:
 8        Law Office of Henry Marinello, P.A.
          700 Old Dixie Highway
 9        Suite 550
          Miami, Florida 33156
10        (305) 670-5688
11        BY:  HENRY E. MARINELLO, P.A.
          hmarinello@hemlegal.com
12        CHRISTOPHER L. LYNCH, P.A.
          6915 Southwest 57th Avenue
13        Suite 208
          Miami, Florida 33143
14        (305) 443-6200
          BY:  CHRISTOPHER J. LYNCH, ESQUIRE
15        clynch@hunter-lynchlaw.com
16
     On behalf of the Witness:
17        Campbell Johnston & Clark, LLP
          Douglas Centre
18        2600 South Douglas Road
          Suite 508
19        Coral Gables, Florida 33134
          (786) 204-3784
20        BY:  NEIL BAYER, ESQUIRE
          neil@cjclaw.com
21
22
23
24
25
```

Page 3

```
 1                INDEX OF PROCEEDINGS
 2   WITNESS                                       PAGE
 3   JOSE FIGUEROA
 4   Direct Examination by Mr. Marinello             4
 5   Cross-Examination by Ms. Goldman               70
 6   Redirect examination by Mr. Marinello         113
 7
     CERTIFICATE OF OATH                           116
 8
     CERTIFICATE OF REPORTER                        117
 9
     NOTIFICATION LETTER                           118
10
     ERRATA SHEET                                  119
11
12
13     PLAINTIFF EXHIBITS PREMARKED AND IDENTIFIED
14   EXHIBIT        DESCRIPTION                    PAGE
15     1  DOCUMENT: Concept Special Risk Application 73
          2  DOCUMENT: Email, 3/21/19               87
16        3  DOCUMENT: Email, 3/20/19               93
          4  DOCUMENT: Email, 5/14/18               97
17        5  DOCUMENT: Email, 5/26/21              105
18
                    DEFENSE EXHIBITS
19
     EXHIBIT        DESCRIPTION                    PAGE
20
          22  DOCUMENT: Concept Special Risk Application 20
21        6  DOCUMENT: Email, 5/24/21              33
          5  DOCUMENT: Email, 3/4/18               34
22        17  DOCUMENT: Bill of sale, 2/17/16      42
          9  DOCUMENT: Email, 5/21/21              47
23        8  DOCUMENT: Email, 5/14/21              50
          25 DOCUMENT: Policy Renewal              54
24
25
```

Page 4

```
 1   Thereupon,
 2   the following proceedings began at 9:35 a.m.:
 3        THE STENOGRAPHER:  Raise your right hand,
 4   please.
 5        Do you solemnly swear or affirm the
 6   testimony you are about to give in this matter
 7   will be the truth, the whole truth and nothing but
 8   the truth?
 9        THE WITNESS:  Yes, I do.
10   Thereupon,
11            JOSE FIGUEROA,
12   having been first duly sworn or affirmed, was examined
13   and testified as follows:
14            DIRECT EXAMINATION
15   BY MR. MARINELLO:
16        Q.   Good morning, Mr. Figueroa.  I want to
17   introduce myself.  My name is Henry Marinello and I am an
18   attorney in Miami, Florida.  I have with me co-counsel in
19   this case, Christopher Lynch.  He is with us today, only
20   you're not seeing his image in this session, but he is
21   logged on.
22        MR. MARINELLO:  I would like the other
23   attorneys to please enter their appearances, if
24   you don't mind.
25        MR. BAYER:  This is Neil Bayer.
```

Page 5

```
 1        I'm here as Mr. Figueroa's personal
 2   attorney.
 3        MS. GOLDMAN:  This is Jacqueline Goldman,
 4   counsel for the plaintiff, Great Lakes Insurance
 5   SE.
 6        MR. MARINELLO:  Thank you.
 7   BY MR. MARINELLO:
 8        Q.   Mr. Figueroa, in the business that you're
 9   in, I'm sure you've previously given your deposition.
10        A.   No, sir.  Excuse me, this is 66 years
11   alive, this is the first time ever I have to give a
12   deposition.
13        Q.   Well, I am amazed, so I'm going to have to
14   give you a few depo instructions.
15        A.   Okay.
16        Q.   We are currently doing depositions by way
17   of Zoom, which makes it a little bit more difficult than
18   being live, in person, everyone in one room and,
19   therefore, it is very important that we each speak at one
20   time before the other person starts speaking again.  And
21   I'm guilty of violating that rule at times, and I'm sure
22   someone in the room will correct me or someone on Zoom
23   will correct me, and I will try my best not to speak over
24   you when you're speaking.  If you would kindly do the
25   same, I would greatly appreciate that and so would the
```

Page 6

1   court reporter.
2           At the same time, I do fully understand
3   that you are also a Spanish speaker, is that correct?
4       A.   That's correct.
5       Q.   All right.  So am I.  I don't know what
6   nationality you are and I'm going to assume that you
7   might be Cuban.
8       A.   No.  I'm from Puerto Rico.
9       Q.   Oh, you're Puerto Rican.
10      A.   Born in Puerto Rico.
11      Q.   The same thing.  Caribbean.  I am Cuban
12  from Cuba, from the Caribbean, so we have a tendency to
13  misbehave when we speak and sometimes use Spanish words
14  instead of English words.
15          In this case today, actually, we'll deal
16  with a few Spanish words that we're going to need to
17  address, but the court reporter needs to take everything
18  down in English.  So you can fully appreciate that
19  whatever you say, if you say a Spanish word, you might --
20  might want to spell it out and then, you know, give what
21  you would intend the English meaning to be.  Okay?
22      A.   Okay.
23      Q.   Additionally, as your attorney said, we
24  will absolutely provide you with as many breaks as you
25  need.  At any time, if you need a break, just simply say,

Page 7

1   I need a break and that will be that.
2           Additionally, I'm sure that you have family
3   and possibly business.  We are here interrupting your --
4   your life, so if you receive a phone call and have to
5   answer it, please, feel free to do so.  We will go off
6   the record, you may go off and mute your screen so that
7   we don't hear what you're saying.
8           I have family, I have children and young
9   children, and whenever I get one of their phone calls, my
10  heart goes through the throat, thinking they had been in
11  a car accident.  I know, because I've experienced it with
12  all three of my children.
13          So if you need to take a call, feel free to
14  do so.  All right?
15      A.   Okay.  Thank you.
16      Q.   Additionally, you have an attorney present
17  representing you, and I'm sure representing your
18  business.  You also have Ms. Goldman here and at times,
19  they're going to be objecting to my questions.
20          You may hear something like objection,
21  form, or objection, predicate, but those are pretty much
22  the only two objections that you totally need to ignore.
23  Just blow by and keep going forward with answering the
24  question with one exception.  If your attorney instructs
25  you not to answer the question, and that would be an

Page 8

1   instruction based on an attorney/client privilege and I'm
2   not saying that this other one applies to you, but in
3   some cases, people invoke their Fifth Amendment rights.
4   If he instructs you not to answer, please listen to him
5   very carefully and do not answer the question.  All
6   right?
7       A.   Okay.
8       Q.   The only reason for those objections is so
9   that later on, if necessary, we take it up with the judge
10  to see if the question was appropriate, and that's pretty
11  much it.
12          I think I have covered everything.  Do you
13  have any questions before we begin?
14      A.   No.
15      Q.   Okay.  Do you need a break right now?
16      A.   No.  No, I'm good.
17      Q.   Very good.
18      A.   Thank you.
19      Q.   All right.  I don't -- we have you set for
20  four hours.  I know your attorney has something that he
21  needs to do at 1:30 today and I hope that I'm done well
22  before four hours.  Okay.
23          Mr. Figueroa, I think you stated your full
24  name, is that correct?
25      A.   Yeah.  Jose E. Figueroa.

Page 9

1       Q.   And what is your place of business?
2       A.   Fort Lauderdale, Florida.
3       Q.   And what is the name of the company for
4   which you work?
5       A.   Global Insurance Brokers, Inc.
6       Q.   Who owns Global?  Who -- and I'm going to
7   refer to it from this point forward as Global.  Who owns
8   Global?
9       A.   Myself.
10      Q.   You're a hundred percent shareholder --
11      A.   Yes.
12      Q.   -- or managing member?
13      A.   Yes.
14      Q.   How long have you owned Global?
15      A.   2018, it was formed.
16      Q.   Did you work before for another company?
17      A.   Yes, I did.
18      Q.   What's the name of that other company?
19      A.   Specialty Broker Corporation.
20      Q.   And were you the sole owner of that
21  company?
22      A.   Yes, I was.
23      Q.   And is there a particular reason why you no
24  longer work for that company?
25      A.   There -- it's still active, both

Jose Figueroa
August 25, 2021

Page 10

1  corporations are active.
2      Q.     Okay.  And do you sell or do you promote
3  selling insurance policies under both companies?
4      A.     Yes.
5      Q.     How long have you been in the insurance
6  industry?
7      A.     In the industry, I would say 1987 as a --
8  in the capacity of Chief Examiner of the Virgin Islands
9  Insurance Department.
10     Q.     And --
11     A.     And -- and after Hurricane Hugo hit the
12 Virgin Islands, I moved back to Florida, and I started my
13 own insurance agency and business.
14     Q.     You are licensed in Florida as an insurance
15 agent?
16     A.     Yes, I am.
17     Q.     Is the company licensed as an insurance
18 brokerage?
19     A.     Yes, I am.
20     Q.     Do you have other agents that work under
21 your insurance brokerage at this time?
22     A.     We have re -- I have a network of retailers
23 that produce business for me in the Virgin Islands, in
24 Puerto Rico.
25             I am licensed in the Virgin Islands and in

Page 11

1  Florida, my daughter, Beatriz Watson, is also licensed
2  for the Florida business.
3      Q.     Is the license -- in the real estate
4  industry, an agent has their license associated with a
5  real estate brokerage.  Is that the same way it works in
6  the insurance industry?
7      A.     An agent can be independent, can be totally
8  independent.  Does not have to work for an agency.
9  They're called independent agents.  Sometimes the
10 majority of -- of the cases, agents will attach to an
11 agency because the agency has a variety of products that
12 otherwise as an independent agent they would not have
13 access to.
14             So the reason, usually, why they gravitate
15 to an agency is to be able to have a -- a variety of
16 products to offer.
17             MS. GOLDMAN:  Sorry, Henry.  I'm sorry to
18 interrupt.  Is anyone else hearing a beeping, a
19 buzzing?
20             MR. BAYER:  I have a slight buzz.
21             MR. MARINELLO:  I'm not.
22             THE STENOGRAPHER:  I do hear it, too.  I
23 don't know where it's coming from.
24             MS. GOLDMAN:  I mean, the only thing I can
25 think of to do is everyone, could you please, if

Page 12

1  at all possible, put your electronics in your
2  pocket, maybe away from the laptop or computer
3  that you're using.  I think it might be
4  interference.  It's very distracting.
5             Sorry to interrupt.
6             MR. MARINELLO:  That's okay.
7             I think it just went away.
8             MS. GOLDMAN:  I think that worked.
9             THE WITNESS:  If -- if it was my phone --
10 probably it was my phone, because I wasn't hearing
11 it.  So it must have been my cell phone.
12             MS. GOLDMAN:  I don't want to accuse
13 anybody, just -- thank you very much.
14 BY MR. MARINELLO:
15     Q.     Mr. Figueroa, although you own Global, are
16 you considered an independent agent where you can sell to
17 other brokers?
18     A.     No, I don't sell through other brokers.
19     Q.     Okay.  And is Global a -- strictly a
20 property and casualty company or do you also sell life
21 and health?
22     A.     Property and casualty.
23     Q.     Only?
24     A.     Only.
25     Q.     Okay.  I'm assuming you also sell various

Page 13

1  types of property casualty.  Would that include
2  homeowner's insurance?
3      A.     Yes.
4      Q.     How about vehicle insurance?
5      A.     No.
6      Q.     Obviously, you sell marine insurance.
7      A.     Yes.
8      Q.     Why don't you sell vehicle?  Is that
9  something by choice?
10     A.     Yes.  Yes, the vehicle insurance process is
11 very, very hour intensive, work intensive.  The premiums
12 are low, and at the end of the day, you end up losing
13 money for placing an auto insurance.  I'm talking
14 private, private auto insurance.  So we decided years ago
15 not to sell auto insurance in Florida.  It would have to
16 be here in Florida domestically because there's no
17 economic benefit to it.  Actually, it's a loss.
18     Q.     And so you do sell homeowner's?
19     A.     Yes, I do.
20     Q.     Do you sell commercial real estate
21 insurance as well?
22     A.     In Florida, no.
23     Q.     How about your other company?
24     A.     Neither.  We sell insurance for -- as a
25 wholesaler for condominiums in Puerto Rico through a

Jose Figueroa
August 25, 2021

Page 14

1  licensed agent in Puerto Rico that cannot place the
2  business. And they come to -- to -- in this case, to
3  Global and write the business with us. I place it for
4  them. I'm an intermediary. Okay? I am neither. If --
5  if I'm a retailer, I am strictly between the insured. He
6  provides the information to me and I provide it to an
7  insurance company.
8        The insurance company provides the
9  information and I just forward it to the insured with
10  my -- with the only obligation of explaining what --
11  what -- what -- what was obtained for him.
12     Q.    How long have you known a gentleman by the
13  name of Jorge Fernandez?
14     A.    Jorge, I met, I would say, maybe '19 --
15  '16, '17.
16        I think that was the first policy I did for
17  him.
18     Q.    Okay. You said '19, '16 '17?
19     A.    I'm sorry. I'm sorry, 2006 -- I'm so
20  sorry, 2016. Yes.
21     Q.    Okay. And he came to you for insurance
22  purposes?
23     A.    Yeah. He called. He called.
24     Q.    Any particular reason? Do you know why he
25  may have called you specifically?

Page 15

1     A.    Yes, he was referred -- somebody told him
2  about our company being in the water sports industry. So
3  he called, he -- he actually sent me an email. That
4  first contact was an email and we provided applications
5  they filled in and we placed his first policy.
6        By the way, I've only meet Jorge Fernandez
7  once. Physically, once. And that was when the
8  underwriters of the water sports program came to Florida,
9  and he was the biggest water sports operation in South
10  Florida -- in, you know, Dade County, tri-county. So we
11  drove there and we spent one -- you know, half a day
12  with the underwriters reviewing his operation,
13  personally.
14        That's the only time -- that's the only
15  contact that I've had in person with Jorge Fernandez.
16     Q.    And what underwriting company was that?
17     A.    That was -- it was Rockstone Marine.
18     Q.    Did you say -- I am sorry, what were you
19  saying?
20     A.    Yeah. It's a broker -- it's a broker that
21  has our water sports program. They broker it with
22  Lloyd's.
23     Q.    Would that have been Specialty Broker
24  Corporation?
25     A.    At that point, it was Specialty Broker

Page 16

1  Corporation.
2     Q.    And --
3     A.    Initially.
4     Q.    -- that was your prior company?
5     A.    Correct.
6     Q.    And do you recall that particular
7  application?
8     A.    No.
9     Q.    No?
10     A.    No.
11     Q.    How long have you been working in
12  submitting applications to Concept Special Risk or Great
13  Lakes Insurance?
14     A.    I can -- I don't recall the year, but it's
15  been quite a few years. It's been many years. Quite a
16  few.
17     Q.    Okay. And in those years, have you ever
18  received any training from either Concept Special Risk or
19  Great Lakes Insurance on --
20     A.    No.
21     Q.    -- on -- no training whatsoever?
22     A.    No.
23     Q.    Have you ever received training from any
24  other insurance companies on applications and what kind
25  of information to include in those applications?

Page 17

1     A.    No.
2     Q.    Have you ever received any training
3  independently of insurance companies on what information
4  underwriters would be seeking for purposes of
5  underwriting an insurance policy?
6     A.    Let me clarify something. A formal
7  training, I think that's what you're referring to, where
8  I go and I sit down and they come to my office and they
9  explain how to do an application. That's not common in
10  the brokerage business, it's not. It doesn't occur.
11  Okay.
12        When -- when one attaches through an
13  appointment, appointment as -- as intermediary with a
14  broker in London that has access to markets, they provide
15  their forms. The forms are self-explanatory. And those
16  forms are completed by the insured and forwarded to, in
17  this case, Concept. Concept Underwriters or Concept
18  Group reviews their forms -- their forms, and if they
19  have any questions or they want clarification or they
20  want additional documentation, they request it. And we
21  go to the insured who provides the additional
22  information.
23        But that is there like a seminar, ongoing
24  training? No, the agents in Florida, and in my
25  territory, the Virgin Islands and Puerto Rico, they have

Jose Figueroa
August 25, 2021

Page 18

1  to take continued education to revalidate the license
2  every three years. That's the training that we get.
3  It's from the Department of Insurance in -- where you are
4  licensed. They provide a ongoing education and training
5  but the application of Concept's are -- are different
6  from the ones of Rockstone Marine.
7           They're totally different. And, I guess,
8  you get to know what the broker is expecting when you do
9  an application. And over the years, you -- you know
10  what -- exactly what questions they're going to be
11  asking. If you don't get the documentation that usually
12  they require -- it's very subjective. Each broker, each
13  Concept -- you know, the equivalent of Concept in London
14  has a subjective approach to doing applications.
15       Q.    When you say "subjective approach," what do
16  you mean?
17       A.    Okay. It means that the ones that they
18  have entered an agreement with insurers, the insurers
19  specifically for this -- that type of business requests
20  certain underwriting information for them to do the
21  underwriting. And -- and the broker in London, which is
22  the one that has access to that insurance company,
23  prepares their own applications. So it's subjective.
24  It's according to the type of category of insurance, and
25  the requirements of the insurance company which they

Page 19

1  represent.
2       Q.    So you said that these insurance companies
3  have different applications and they ask for different
4  information. Have you ever compared Concept Special Risk
5  applications to those of other insurance companies?
6       A.    No.
7       Q.    As you sit here today, can you make
8  reference to anything in Concept Special Risk
9  applications that are different than any other
10  application for any other insurance company?
11       A.    They're very comprehensive, extremely
12  comprehensive.
13       Q.    Which ones?
14       A.    They ask a lot of questions.
15       Q.    Which ones? Or extremely --
16       A.    Concept, Concept.
17           Concept is a very comprehensive -- they
18  have been in business for many, many, many, many, many
19  years. And they have developed a -- an approach to doing
20  business, which is very comprehensive, very detailed.
21  And, therefore, their applications are very extensive
22  compared to other -- to other insurance companies.
23       Q.    Okay. So I would like to show you a
24  document.
25           (Screen shared.)

Page 20

1  BY MR. MARINELLO:
2       Q.    Can you see that?
3       A.    Yes.
4       Q.    Okay. This is what I have labeled as
5  Exhibit 22 for this deposition, but I jumped right to it.
6           (Defendant's Exhibit No. 22 was
7  identified.)
8  BY MR. MARINELLO:
9       Q.    This purports to be the original
10  application for -- for insurance for La Bestia. You see
11  here the vessel named La Bestia?
12       A.    Yes.
13       Q.    Do you remember this application at all?
14       A.    Can you tell the date? Because I don't see
15  the date of that application on the top. Usually there
16  is a date on the top. It's not there.
17       Q.    It's April 12, 2018.
18       A.    Okay. Yes.
19       Q.    Okay. And any chance you recall this
20  application, specifically?
21       A.    Do I recall it? It looks -- it looks
22  exactly like the one that is processed. I'm assuming
23  it's exactly the same one. I don't recall exactly all
24  the details, but it -- it is a format. It is the -- the
25  handwriting, you know, so I would say yes, I -- it is the

Page 21

1  one that was submitted by Jorge.
2       Q.    Okay. Do you know whose handwriting that
3  is?
4       A.    No, I don't.
5       Q.    That isn't -- that isn't your handwriting,
6  correct?
7       A.    No.
8       Q.    Do you recognize Ms. Watson's, your
9  daughter's handwriting?
10       A.    No, I would not know if she -- if she
11  completed the application.
12       Q.    Okay. And is this what you mean by
13  comprehensive? It looks like it does ask for a lot of
14  questions.
15       A.    Well, I will tell you what I mean by
16  comprehensive. You see most carriers in vessel -- vessel
17  applications would ask for the date, you know, the amount
18  purchased, the year built. But if you go -- if you
19  scroll downwards on the application, see? It starts
20  asking for -- for all that -- hold it. Hold it.
21  Before --
22           Okay. See, this part here, about all the
23  manufacturer, the date it was processed, all that
24  additional information is usually not in most yacht
25  applications. That's what I was referring to, you know.

Jose Figueroa
August 25, 2021

Page 22

1  Like, well, what the engines are, what the serial numbers
2  are, that type of information is really not commonly
3  requested.
4      Q.  Okay.  How about the place where the --
5  where it is primarily moored?  Would that be something
6  asked in many polices?
7      A.  Yes, it has to be.  It's mandatory.
8      Q.  Okay.  And navigational waters that that
9  particular vessel navigates?
10     A.  Yes.  Mandatory.
11     Q.  Okay.  And these particular questions, like
12 number 1, it says, "Is this vessel used for fare paying
13 passengers?"  That's something else also that is asked?
14     A.  No, that whole -- that whole section there,
15 in most yacht applications, is not included.  It just
16 says, you know, what is the use of the vessel.  That's
17 basically one line.  Is it a chartered.  Is it -- are
18 employees paid.  Crew.  Not -- usually it's not included
19 on other yacht applications.
20     Q.  Okay.  And like you said, you've never been
21 instructed by Great Lakes or Concept Special Risk on how
22 to better complete these forms, right?
23     A.  No.
24     Q.  Okay.  So we're going to go down a little
25 further.  Let's go down to this section here where it

Page 23

1  says, "All operators must be detailed.  If there are more
2  than two operators, please request additional operator
3  sheets."  You do see that, correct?
4      A.  Yes.
5      Q.  All right.  So this is the original
6  application where, for the first time, Mr. Fernandez
7  submits an application to be written through -- to go
8  through Concept Special Risk.  Why is it that -- I do
9  believe that before this particular application -- well,
10 La Bestia was insured by a different carrier.
11     A.  That's correct.
12     Q.  Do you remember the name of that carrier?
13     A.  Yes.  It was a Lloyd's -- it was a Lloyd's
14 policy.
15     Q.  And what happened to that policy?  Why
16 wouldn't this -- why wouldn't you just rewrite it through
17 Lloyd's again?
18     A.  They withdrew from -- from that class of
19 business in Florida.
20     Q.  Okay.  So now, Mr. Fernandez has to go out
21 and find a new underwriter, right?  Who selected Concept
22 Special Risk to be the -- for purposes of submitting an
23 application?  Was it you or was it Mr. Fernandez?
24     A.  Mr. Fernandez does not have access to
25 Concept.  Only brokers, appointed brokers do.  So it

Page 24

1  would be me for that.  That was one of the markets that
2  was available, and it was submitted to Concept.  They
3  completed the application package and Concept accepted
4  the risk.  And bonded it and bound it and issued a
5  policy.
6      Q.  Were there other insurance companies
7  that -- where La Bestia would have qualified if an
8  application had been submitted to them?
9      A.  I don't know.  To be honest, I don't -- I
10 don't recall if -- if there were other markets available
11 in Florida for -- for this type of risk.
12     Q.  Are there any markets currently available
13 in Florida for this type of risk?
14     A.  Very few.  There's very, very few.  One
15 thing, if you -- if you scroll upwards, if you scroll
16 upwards on the application, because the market is a very,
17 very hard market, the year built makes -- disqualifies it
18 for most Florida admitted insurance companies.  So,
19 therefore, you have to go into the service line markets,
20 which Great Lakes and Concept and Lloyd's are the line
21 markets that we use.
22     Q.  Do you use any others, like GEICO,
23 Progressive, State Farm?
24     A.  No.
25     Q.  No?

Page 25

1      A.  No.
2      Q.  Would this vessel qualify with any of
3  those, if you know?
4      A.  I wouldn't know.  GEICO and Progressive are
5  insurance companies that an insured can go online and
6  place their business.  It's a direct placement.
7      Q.  So they wouldn't have to go through a
8  broker like yourself?
9      A.  No, no.  Mr. Fernandez could have gone
10 online to these companies which we don't have an
11 appointment with because it's a direct business with the
12 insured.  It's an insurer would be insured and it's done
13 online.
14     Q.  Okay.  I'm going to go down here to this
15 section, and if you see the first name of the operator
16 says Gustavo Castillo.  Do you know who Gustavo Castillo
17 is?
18     A.  No, I don't.
19     Q.  Let's go down to Jorge Fernandez, down
20 here.  (Indicating.)  And it asks of the operator.  "Have
21 you been involved in a loss in the last ten years,
22 insured or not."  Do you see that down here?
23     A.  Yes.
24     Q.  What does that mean to you?
25     A.  It could be -- it could be referring to --

Jose Figueroa
August 25, 2021

Page 26

1  it -- to the insured.  It's basically the insured has to
2  make a declaration if he has had a personal loss in the
3  past ten years.
4       Q.    Well, the insured here, they're insuring
5  the vessel that's owned by Sea 21-21.  But in this
6  particular section, it appears that it's about the
7  operators.
8            So like what it says here on top, "all
9  operators must be detailed."  See that?
10      A.    That's what -- that's why I said Jorge
11  Fernandez.  That's exactly what I said.  Jorge Fernandez
12  would not have had a loss within the prior ten years.
13      Q.    And is that your position -- do you know
14  whether Mr. Fernandez, himself, has had a loss in the
15  last ten years?
16      A.    No.
17      Q.    No?
18      A.    No.
19      Q.    And would you know if he had?
20      A.    No.
21      Q.    Would you know if he --
22      A.    Other than -- other than what he states on
23  an application, that's what we know.  According to what
24  he is declaring, you know, on an application.
25      Q.    There are certain claims that were

Page 27

1  submitted by Mr. Fernandez through your brokerage that
2  dealt with other claims of other businesses, such as the
3  Sea 20-20 and Jet Boat Miami.  Do you remember those two
4  companies?
5       A.    Yes.
6       Q.    Do you remember the names of the people who
7  submitted claims against those companies?
8       A.    No, I don't remember.
9       Q.    But you do remember claims being submitted,
10  is that correct?
11      A.    That's correct.
12      Q.    And Mr. Fernandez always let you know
13  whenever he received a letter from an attorney or an
14  incident that occurred dealing with any of those two
15  companies, did he not?
16      A.    That's correct.  However, I want to
17  interject something right now.  Jorge Fernandez is not
18  Jet Boat Miami, that's a corporation.
19      Q.    Right.
20      A.    Okay.  He did not, you know, what -- what
21  you're referring to, claims file, whereby a specific
22  insured corporation performing a certain operation that
23  is covered, insured by a given policy, that's what the --
24  the claims were against, that -- that entity.
25      Q.    For instance, there was a claim by a woman

Page 28

1  by the name of Maria Cardoza who claimed that while
2  riding a banana boat being pulled by a jet ski that was
3  owned by Sea 20-20 that she suffered an incident.  Do you
4  remember that claim?
5       A.    No, I don't.
6       Q.    All right.  I'll show it to you in a
7  minute.  It is a letter that was copied to your broker.
8       A.    Let me -- let me explain why I don't.  I
9  will explain to you how -- how our operations are.
10           Again, we are intermediaries.  An incident
11  is reported.  We receive it and our job is to submit it
12  to the broker that has a facility or the -- represents
13  the insurer.
14           From that moment on, Global Insurance
15  Specialty Broker is completely out of the claim.  We are
16  kept totally out of the claim.  The insurance company
17  appoints an adjuster and the adjuster deals directly with
18  the insured and the claimant.
19           So that's why I don't recall all the claims
20  that have come through our office, because we don't get
21  involved in the details of a claim.  We never have.
22      Q.    Okay.  Now, when does a claim ultimately
23  transition into a loss?
24      A.    Like I said, it starts with an incident, it
25  goes up to underwriters or the insurance companies.  The

Page 29

1  adjuster reports back to them based on their review of
2  the terms and conditions of the policy and they determine
3  if there is a basis for a claim against the policy based
4  on the terms and conditions of the policy.  That's when
5  it's established.
6       Q.    That the claim is established?
7       A.    Exactly.  And the claim -- and then the
8  loss -- the loss is when there's actually a -- a -- a
9  disbursement of defense expenses that is a loss or an
10  indemnification to a claimant.
11      Q.    That information would never get reported
12  back to you, would it?
13      A.    No.  Well, some -- if they need something
14  from me.  Since I am here, you know, I am close to the
15  insured, they -- they may -- they may refer something to
16  me, you know.  But usually we -- we don't even know what
17  the -- what the end result of claims are.  And I'll
18  explain how we know it.
19           Every year when we renew the policy, the
20  insurance companies know what claims they have had.  They
21  know how much defense they've spent.  They know how much
22  indemnification that they have on closed claims are.
23  They have all that information.  So when they do the
24  underwriting, they don't request us to find out anything
25  about the claim other than, you know, if it is the same

Jose Figueroa
August 25, 2021

Page 30

1  company, if it's a renewal, they have all the information
2  on file.
3       Q.  Well, Great Lakes -- Great Lakes and
4  Concept Special Risk, through their director of
5  underwriting, Mr. Usher, testified that there is no way
6  at the time of underwriting a policy, whether Concept
7  Special Risk, can find out if any claims were submitted
8  to it.  But Mr. Fernandez, by Sea 21-21 or Sea 20-20 or
9  Jet Boat Miami, they -- there's too much volume going on
10 for them to be able to track it through their system.
11      Do you agree with that statement?
12      MS. GOLDMAN:  Objection.
13      MR. BAYER:  I'm just going to object --
14      A.  I don't know -- I'll answer.  I'll
15 answer.  I don't know --
16      MR. BAYER:  One sec.  Just for the record,
17           you're asking my client to comment on another
18           client's testimony without even asking him, you
19           know, if he has any knowledge of this.  There's no
20           predicate for the question.
21      MR. MARINELLO:  Okay.  Object to the form.
22      MR. BAYER:  Objection, form.  Predicate.
23 BY MR. MARINELLO:
24      Q.  But if you know the answer, you may go
25 ahead and answer.

Page 31

1       A.  No.  The only thing -- I don't know how the
2  Concept system works, I don't know how much volume they
3  have.  I don't want -- I don't know anything about their
4  operation.  So my answer is I don't know.
5       Q.  Well, the way that you describe how a claim
6  is processed indicates to me that you believe that there
7  is a difference between what is a claim and what is a
8  loss, is that correct?
9       MR. BAYER:  Form.
10      A.  Yes.  A claim is when somebody comes
11 against a policy.  It starts as a claim.  The incident is
12 reported -- is reported, but at that point, there's no
13 claim.  But -- but there is an obligation of the insured
14 to report the incident.
15 BY MR. MARINELLO:
16      Q.  And a loss comes in where the insurance
17 pays out something?
18      A.  No, no, no.  The claim begins when there is
19 a claimant, when there is a third party that files
20 documentation to the insured.  Usually they do it with an
21 attorney and that attorney's letter comes to us and we
22 forward it to the insurance company.  And they will then
23 assign an adjusting company -- an adjuster to analyze the
24 claim being made by a third party to see if there is a
25 liability according to the terms and conditions of the

Page 32

1  existing policy.
2       Q.  A liability or potential liability, would
3  you agree with that?
4       A.  Well, yes, it could be potential.
5       Q.  Okay.  And then this particular question
6  here says, "Have you been involved in a loss?"  So if he
7  had been involved in a claim, that question doesn't ask
8  whether he's been involved in a claim.
9       MS. GOLDMAN:  Objection.
10 BY MR. MARINELLO:
11      Q.  Does it?
12      A.  No.  It doesn't.
13      Q.  You see down here on this page at the
14 bottom where it says the date, signature date?
15      A.  Yes.
16      Q.  Mr. Fernandez testified that he's not sure
17 whether that is his original signature, because it seems
18 to be broken lines, whereas, his is a continuous
19 signature.  How would Mr. Fernandez -- how would
20 Mr. Fernandez sign this application?
21      A.  I don't know.  I don't know how he signed
22 it.  But that's what was submitted to us.
23      Q.  I'm going to take this off now.  I'm
24 going -- let me ask you another question.
25      Now, you know you wrote an email --

Page 33

1       (Screen shared.)
2       (Defendant's Exhibit No. 6 was identified.)
3  BY MR. MARINELLO:
4       Q.  Can you see that document?
5       A.  Yes.
6       Q.  Okay.  This is an email from you dated
7  Monday, May 24th, 2021, sent to Jacqueline Goldman.  See
8  that?
9       A.  Yes.
10      Q.  You copied your attorney, you copied me,
11 you copied Mr. Lynch, his secretary and so on, and then
12 it goes to the third paragraph -- actually the second
13 paragraph.
14      It says, "A review of the 2016 application
15 signed by Mr. Fernandez on February 29th, 2016, indicates
16 his answer was..." we answered -- was, "no," to the
17 question pertaining to if he had a marine loss in the
18 prior ten years.  Do you see that?
19      A.  Yes.
20      Q.  The next paragraph says, "To the best of my
21 recollection, the July 2016 incident mentioned in 2018 by
22 Mr. Fernandez..."  and it says, "related to minor damage
23 sustained when vessel went over a small sandbar raising
24 up at low tide."
25      Do you remember writing that?

Jose Figueroa
August 25, 2021

Page 34

1       A.      Yes.
2       Q.      Where did you get that information?
3       A.      Jorge told me that.
4       Q.      He told you that or he sent you an email
5  saying that?
6       A.      I don't recall if it was an email, but I
7  know the information came from Jorge.
8       Q.      Okay.  And do you remember whether that
9  email came to you in Spanish or English?
10      A.      I don't -- I don't recall that, to be
11 honest.
12      Q.      Okay.  And do you remember what that email
13 said, anything to you about this particular loss?
14              MS. GOLDMAN:  Objection.
15 BY MR. MARINELLO:
16      Q.      Well, let me stop.  Let me stop.
17              I'm going to go ahead and -- and pull up
18 the actual email.
19              MR. MARINELLO:  Okay.  By the way, I'm
20         pulling up what we're marking as Exhibit 5.
21              (Defendant's Exhibit No. 5 was identified.)
22              (Screen shared.)
23 BY MR. MARINELLO:
24      Q.      This was filed by Ms. Goldman in a motion
25 for summary judgment and here is that email.  You see

Page 35

1  it's from Jorge, Jet Boat Miami?
2       A.      Yeah.
3       Q.      And it says March 4, 2018, and it's sent to
4  you.  Do you see that?
5       A.      Yes.
6       Q.      It's Specialty Broker?
7       A.      Correct.
8       Q.      Your daughter's copied, Beatriz Watson?
9       A.      Yes.
10      Q.      And you see where it says -- you read
11 Spanish, don't you?
12      A.      Yes, I do.
13      Q.      Mr. Fernandez uses the word Varada.
14 V-A-R-A-D-A.  Do you know what that means in English?
15      A.      To be honest, I don't, no.
16      Q.      Okay.  So I'm going to then go to the top,
17 to the next document above, which is what --
18      A.      Can I just say something?  That word
19 Varada, it's not commonly used in Puerto Rico or in -- I
20 believe that is a term used in Venezuela, where Jorge
21 Fernandez is from.
22      Q.      Right.
23      A.      Spanish varies from place to place.
24      Q.      Correct.  And I'm going to go to the top.
25 This document, it says Certification of Translation.

Page 36

1  This was filed, attached to a motion for summary judgment
2  as Exhibit 5.  And you see here that -- right from the
3  top, and it says, "This is to certify that the attached
4  translation is, to the best of my knowledge and belief, a
5  true and accurate translation from Spanish into English
6  of the attached document."
7               And the attached document is the email that
8  we saw in Spanish, okay.  So I'm going to go to the
9  translation in English.  And here it is.  Same day, same
10 person, same people.
11              And it says, "Hello, Jose.  I am attaching
12 the list with all the repairs done on La Bestia,
13 including the dry docking that was carried out in
14 July 2016."  Sounds like Varada is translated to dry
15 docking?
16      A.      Correct.
17      Q.      Not hitting a sandbar.
18              MS. GOLDMAN:  Objection.
19 BY MR. MARINELLO:
20      Q.      Right.
21      A.      So what's the question, Henry?
22      Q.      Well, would you -- now that you understand
23 that someone has translated this into English and -- by
24 the way, this is a -- someone who translated that
25 particular document and it's a company that deals with --

Page 37

1  what is called Linguistic Systems, Inc., provided by
2  Ms. Goldman.
3               Would you agree that what was happening
4  here is that the repairs that were being made to
5  La Bestia were actually being made while the vessel was
6  dry docked and not while -- because the vessel somehow
7  hit a sandbar and was beached.  Would you agree with
8  that?
9               MR. BAYER:  Form.  You're asking him to
10        speculate.
11      A.      Yeah.  Well -- well, I believe the contents
12 of this email of 2018 was all the work that was done to
13 La Bestia, which was a major, major improvement to that
14 vessel, which resulted in a higher value, hull value
15 based on a survey conducted after that date.
16              In other words, La Bestia -- Jorge put the
17 La Bestia into dry dock and they did a major, major
18 renovation on the vessel.  And after that renovation was
19 done, it was -- he provided a survey for a new valuation.
20              So that -- that particular dialogue, I do
21 not believe has anything to do with the sandbar incident
22 that I mentioned to Ms. Goldman.  They're two different
23 things.  This is a major -- this is the major overhaul
24 and he provided everything, invoices and all -- all --
25 all the things that were done.

Jose Figueroa
August 25, 2021

Page 38

1  BY MR. MARINELLO:
2      Q.    Mr. Figueroa, do you have an email from
3  Mr. Fernandez that addresses what you have said with
4  respect to La Bestia having gone over a sandbar?
5      A.    I -- I don't recall if I do have an email.
6  It -- it may be a conversation that Jorge had because he
7  wanted to come -- come, you know, up clean when -- about
8  anything that happened to La Bestia.  And he did mention
9  it to me in one of the process of either renewing or
10  originally.  And he just mentioned as a -- as a -- I
11  think a declaration, he said, yeah, the only thing has
12  happened with this vessel is that I ran over a sandbar,
13  but it was just minor, minor.  And it was never reported
14  or never -- a claim filed or any loss paid on it, you
15  know.  It was something minor.  But there was an
16  incident.  And he mentioned it to me and -- and I
17  mentioned to Jacqueline.
18      Q.    Well, you mentioned it to Jacqueline in
19  2021.
20      A.    Correct.
21      Q.    And you recall a conversation you had with
22  Mr. Fernandez that -- dating back to 2016 with respect to
23  him saying to you, that he went over a sandbar, but for
24  the first time ever, not documented in any email or in
25  any other application for insurance submitted from your

Page 39

1  organization, you don't have any written documentation
2  whatsoever that Mr. Fernandez said to you that he had
3  gone over a sandbar with La Bestia?
4          MR. BAYER:  Form.  You're mischaracterizing
5      his prior testimony.  He said, he did not recall
6      whether he had such an email, and he did not say
7      that one does not exist.
8          MR. MARINELLO:  Form is sufficient.
9      Mr. Bayer, form is sufficient, please.
10      Let's keep it to the rule.
11  BY MR. MARINELLO:
12      Q.    Go ahead.
13      A.    You know, let me tell you, you know how --
14  how I view this whole thing?  If -- if my wife backs up
15  and bumps her -- the bumper of our car, when I do an
16  application for the renewal of my policy, auto, that's
17  not reported.
18          It's -- it's nonconsequential.  It's never
19  reported.  It was an incident.  Yes, it was an incident.
20  But were there major damages?  Were -- were there things
21  involved that required it?  And that's how this came
22  down.  It came down as a -- just a mentioning of an
23  incident.  It was not a major sin or anything.  We're --
24  we're blowing this into something that it isn't.
25          Many times the propellers will hit a low --

Page 40

1  because they're lower, and when you're coming into the
2  Miami, you know, area, you may hit a sandbar, but it's
3  nothing consequential.  It's usually nothing happens to
4  the hull and it's not reported because there isn't an
5  incident, a real loss or a claim or something that's
6  consequential to the risk, to analyzing the risk.
7      Q.    Mr. Fernandez has indicated that he never
8  said any such thing to you.
9      A.    Well --
10      Q.    Would he be lying?
11      A.    Well, what I -- I'm not going to say if
12  he's lying or not.  I know -- I'm telling you exactly how
13  it happened.
14      Q.    Well, you don't recall exactly how it
15  happened and are you saying that five years later, you
16  recall exactly the words that Mr. Fernandez said to you?
17      A.    I -- I recall exactly what he told me.  And
18  that's what I put on my email to Ms. Goldman.
19      Q.    All right.  Could you please tell me what
20  he said to you in Spanish because he wrote it in English.
21          MR. BAYER:  Form.
22      A.    I don't recall exactly the words that he
23  said.  But it, basically, was that he -- he had run over
24  a -- a small -- he even mentioned, you know, a small
25  sandbar.  But there was no damages done to the vessel

Page 41

1  whatsoever.  No damages.
2  BY MR. MARINELLO:
3      Q.    All right.  So why then is the vessel dry
4  docked and receiving substantial repairs and improvement
5  if there was no damage done to the vessel?
6      A.    Because, like I said, the dry docking
7  occurred two years afterwards and has nothing to do with
8  the incident of the sandbar.  That was a major overhaul.
9          He bought the vessel and it was valued at
10  $400,000.  When he finished that dry dock that we're
11  talking about, the vessel was appraised by a certified
12  appraiser to be over $700,000.
13      Q.    Well --
14      A.    So that's -- that's -- that's the dry dock
15  that -- that he -- that we're talking about in that
16  email.  It's a major improvement.  It has nothing to do
17  with the sandbar that happened before 2016.
18      Q.    So the dry dock happened in July of 2016,
19  right?
20      A.    I don't recall that being that way.
21      Q.    Do you know when Mr. Fernandez bought the
22  vessel?
23      A.    I can tell you in one second.
24          I don't recall the year exactly.
25          I can go by what the policy was, the first

Jose Figueroa
August 25, 2021

Page 42

1  policy that I did for him.  And I think it was -- I don't
2  recall exactly the year.
3           I don't recall what year it was.
4       The other thing I want to mention is this.
5  Every year Mr. Fernandez took La Bestia and did
6  preventive maintenance and improvement.  This was his
7  practice.  Okay?
8       Q.   Right.
9       A.   That was standard.  That was a standard
10  thing that he would do.  He would put it into dry dock
11  and -- and maintain it.  And I'm sure there is record of
12  that, of his practice.  It was a practice of putting a
13  vessel into dry dock, doing major repairs.
14           The one that he did where -- in 2018, where
15  he got a surveyor to -- to attest to the -- to the now
16  values was a different type of dry docking.  It was a
17  major renovation and improvement to the vessel.
18           (Defendant's Exhibit No. 17 was
19  identified.)
20           (Screen shared.)
21  BY MR. MARINELLO:
22       Q.   I'm showing you on the screen now a bill of
23  sale.  Do you see that?
24       A.   Yeah.
25       Q.   Do you see a date down here on the bill of

Page 43

1  sale?
2       A.   Yes.
3       Q.   February 17th, 2016?
4       A.   Yep.
5       Q.   It says the seller was Riva Azul, Inc., the
6  buyer as Sea 21-21, LLC.  Do you see that?
7       A.   Yes.
8       Q.   The line 3 of box 3, box 4.
9           Now, the dry locking happened in July of
10  2016.  Sounds like four months after Mr. Fernandez
11  purchased the vessel through Sea 21-21, right?
12       A.   Yeah.
13       Q.   But you said that you just testified that
14  the beaching or the -- the sandbar incident, occurred
15  on -- a couple years before?
16       A.   No, that's not what I -- go back to my
17  email to Ms. Goldman.
18           See.  He mentioned it to me in 2018.
19  July 2016 was the incident, not two years before he got
20  the vessel, no.
21           In 2018, he did mention that incident of
22  the sandbar, and it was in no way related to that dry
23  docking.  Absolutely, they're two separate issues
24  completely.
25       Q.   Okay.  And what you also said was, assuming

Page 44

1  this is true, that there was absolutely zero damage to La
2  Bestia as a result of going over the sandbar.
3       A.   No, that's not what I said.  I said minor
4  damages.
5       Q.   What were the minor damages that he told
6  you about?
7       A.   Well, that's the -- that those were the
8  words that he used, minor damages, propeller scraped,
9  paint, that type of thing.  Very minor.
10       Q.   The propeller what?
11       A.   The propeller, the propeller, paint, the
12  paint on the propellers were -- were -- were scratched
13  or -- or something was scratched under the vessel.  But
14  it was really, really minor repairs.  There was no --
15  there was no functional problem with the vessel.  It was
16  just cosmetic.  That's what I -- that's a good
17  description.  Cosmetic repairs were done.
18       Q.   And that happened in 2016?
19       A.   The cosmetic repairs?  I don't know when
20  they happened.  I'm just saying, I'm talking about the
21  incident was in 2016.
22           When -- when the cosmetic repairs were
23  done, I don't know when they were done.  He never said.
24  He just reported that he did have that -- that situation.
25       Q.   Mr. Figueroa, Mr. Usher, from Concept

Page 45

1  Special Risk testified that -- obviously, they were never
2  provided with any underwriting manual so that you have a
3  better idea as to the type of information that Concept
4  Special Risk would be looking for in an application.
5  That's correct?  Would that be a correct statement?
6       A.   Yeah.  I believe that that's not provided
7  to anyone, not just to -- to Global or Specialty Brokers.
8  That's not common practice.
9       Q.   Have you written -- have you submitted
10  other applications to Concept Special Risk, other than --
11       A.   Yes, I have.
12       Q.   Do you know of any claims that have been
13  submitted by any other persons or companies to Concept
14  Special Risk other than that of Mr. Fernandez?
15       A.   That I know what claims they have been
16  receiving from other brokers and -- I don't know.
17       Q.   No, no, no.  Claims.
18       A.   Okay.
19       Q.   Of the people or companies that -- where
20  applications have gone through your offices.  Do you know
21  whether any of those people or companies have submitted
22  any claims against those policies that were underwritten
23  by Concept -- by Great Lakes Insurance?
24       A.   Let me clarify.  I write very little yacht
25  insurance in Florida.  I can count them with this.  I

Jose Figueroa
August 25, 2021

Page 46

1  don't have -- I'm not a yacht broker.  Okay?  So there
2  are very few.
3         There was one -- one incident that also
4  happened -- I'm trying to remember the name of the --
5  of -- Pedro Uribe.  Pedro Uribe.  He has a yacht and he
6  did have wind damages to his vessel and we received the
7  information.  We submitted it to Concept, and Concept
8  dealt with that.  That's the only other -- of my
9  policies -- of my policies that I can remember pertaining
10  to Concept.
11     Q.   Do you know whether that claim was denied
12  by Concept or by -- or by Great Lakes?
13     A.   No, it was not denied.  It was withdrawn by
14  the insured.
15     Q.   He withdrew the claim?
16     A.   Yes.
17     Q.   Any particular reason that you know of?
18     A.   The deductible on the policy was -- was
19  higher than the actual damages sustained.
20     Q.   Do you, as -- would you agree that you
21  acted -- for purposes of submitting an application for
22  insurance for Sea 21-21, would you agree that you acted
23  as an agent for Sea 21-21?
24     A.   I am the agent of record of Sea 21-21 in
25  the state of Florida.  According to the insurance code, I

Page 47

1  am the agent.  I placed it for him.
2     Q.   As the agent for Sea 21-21, do you have a
3  responsibility to disclose to Concept Special Risk or
4  Great Lakes Insurance of any information that you would
5  consider to be material to the application?
6     A.   Yes.  It has to be material, though.
7     Q.   Okay.  And could you please define for me
8  what you consider information to be material.
9     A.   It has -- it has to do with the -- with the
10  qualification of the risk that the insurance company will
11  assume.
12         It has all -- all information that will
13  affect their acceptance of an account, okay?  That --
14  that would be -- major consideration would have to be
15  notified to the insurance company.
16         In other words, if -- if there is -- if the
17  applicants are -- are unqualified or -- I would need to
18  advise that type of information, because they are
19  increasing the liability of the insurance company.
20         (Defendant's Exhibit No. 9 was identified.)
21         (Screen shared.)
22  BY MR. MARINELLO:
23     Q.   Okay.  And I have on the screen, this is a
24  document that you forwarded to Ms. Goldman on May 21st,
25  2021.  And this document is to you, but why -- why is --

Page 48

1  from here, there's no name on it.  Why is that?
2     A.   I don't know.
3     Q.   Now, this was sent to you on
4  September 26th, 2017.  And it says, Subject:  Mache
5  Lanier's incident.  Do you see that?
6     A.   Yeah.
7     Q.   Okay.  And it says in the body, "I am
8  attaching the letter from the lawyer, the waiver and the
9  accident report for the Mache Lanier case."
10         And it says, "The customer was on the
11  banana boat on May 26, 2017 at 4:00 p.m."
12         Let's go down to the letter.  Here's the
13  incident report that was also sent to you.
14     A.   Yeah.
15     Q.   Here's the incident report actually sent to
16  you, and here's the letter from the attorney.
17     A.   Correct.
18     Q.   Do you see all that?
19     A.   Yeah.
20     Q.   Now, Great Lakes Insurance is claiming that
21  this particular incident was never reported in the
22  application for insurance for Sea 21-21 for the
23  La Bestia.  Why not?
24     A.   It's a different company.
25     Q.   So is it your opinion that this particular

Page 49

1  incident is not material to the Sea 21-21 application for
2  insurance?
3     A.   Correct.  The -- the application of Sea 21,
4  La Bestia, has to do with that exposure.  The risk of
5  that asset, of that yacht, that's that application.  All
6  the other companies that are related to the insured has
7  nothing to do with the risk pertaining to the La Bestia.
8  That is, that application, that is, that policy,
9  everything was provided to Concept and then to Great
10  Lakes as to that risk.  Period.
11         Okay.  Anything related -- if Jorge
12  Fernandez, on the application of La Bestia as an
13  operator, said that he personally has never had a loss,
14  that stays with that policy.  This has to do with another
15  type of operation, which is not related to La Bestia's
16  policy.  And that's why it's not material.
17         It's like -- if he were to include a loss
18  according to his -- his vehicle, an automobile, you know,
19  it doesn't apply.  It doesn't apply.  To be material, it
20  has to apply to the -- to the policy and terms and
21  conditions that are being insured.  This has nothing to
22  do with his operation and his ownership of La Bestia.
23         Actually, Jet Boat Miami is a different
24  corporation to Sea 21-21.
25         (Defendant's Exhibit No. 8 was identified.)

Jose Figueroa
August 25, 2021

Page 50

1           (Screen shared.)
2    BY MR. MARINELLO:
3           Q.   Okay.  And I'm showing you another document
4    which, at the top it says, Jose Figueroa.  Sent to Jackie
5    Goldman on May 14, 2021, and here's a letter from an
6    attorney.
7           His name is Benjamin Dowers.  This letter
8    was sent on May 10th, 2018.
9           It's sent to your former company -- or your
10   same company, Specialty Broker Corporation.  You remember
11   seeing this document?
12          A.   I -- until this moment, I don't remember
13   it.  I -- I hadn't remembered but I'm looking at it.
14          Q.   And it says, "We represent the interests of
15   Ms. Maria Cardoza and Mr. Jadiel Cardoza in a lawsuit
16   against Sea 21-21, LLC, and Jet Boat Miami."
17          Would you consider this particular claim to
18   be material to what should have been disclosed to Concept
19   Special Risk in the application?
20          A.   Okay.  Again, the application was asking
21   for an operator named Jorge Fernandez, and it said if he
22   had had any losses.  Jorge Fernandez is not implicated in
23   any of these two claims that you just have mentioned.
24   This is Jet Boat Miami, Sea 21-21, LLC, who also own La
25   Bestia, but they're totally different risks.  They're

Page 51

1    totally different operations.  So they are independent
2    from each other.
3           Q.   I will represent to you that Ms. Cardoza
4    claimed that she fell off a banana boat.  Sea 21-21
5    wasn't insured for banana boat rides, was it?
6           A.   I -- I believe that at that time, Sea 21
7    was the company that was linked to Jet Boat Miami.
8    Subsequent to that date -- subsequent to that date, a new
9    corporation was formed, Sea 20-20.  And after that --
10   after that moment when that new company was formed, all
11   the policies related to Jet Boat Miami were linked to
12   Sea 20, LLC.
13          Q.   Do you know that for sure or are you
14   speculating?
15          A.   I know that for sure.
16          Q.   Okay.  And if I showed you documents that
17   would show something to the contrary --
18          A.   Well, show it to me.
19          Q.   Okay.  Let --
20          A.   Because I have -- I have policies, Henry, I
21   have policies made out to Sea 20-20.  I got tons of -- I
22   got two or three policies.  After 2018, right around
23   there, a name change was done to the -- when we renewed
24   the policies, because Jorge Fernandez instructed us to
25   name Sea 20-20 with Jet Boat Miami, for the Jet Boat

Page 52

1    Miami and all water sports operations, he instructed it.
2    He completed a new application at renewal and until
3    today, until today, his -- well, he sold -- he sold the
4    Jet Boat Miami, but until the last moment, the -- the
5    company was operating under one of my policies, it was
6    Sea 20-20, LLC.
7           Q.   So it's your position that this particular
8    claim is not material to the application to ensure
9    La Bestia.  That is what you said, right?
10          A.   That's correct.  La Bestia is a separate
11   policy and it is an operator that said there was no
12   losses.  He has not had any losses in the past ten years
13   as an operator of a vessel.  That's what that application
14   is all about.
15          It's about a vessel called La Bestia.  And
16   he has declared that in his -- as an individual operator,
17   he has not had any losses in the past ten years.
18          Q.   Mr. Figueroa, what do you base your
19   position on with respect to that question in the
20   application about the operator?  That only deals with the
21   operator.
22          A.   Yeah.  The operators that are put on
23   Concept's yacht applications, means the actual persons
24   that are going to be operating the vessel to be insured.
25   They are scheduled.  Those two are the only operators of

Page 53

1    the La Bestia that were covered.  They have to be
2    scheduled operators based on the approval of Concept,
3    Great Lakes.
4           Q.   And you see there on the bottom, it says --
5    of the document that I put up on the screen, it says,
6    "Warning, this is a named operator only policy."
7           A.   Correct.
8           Q.   And so these particular questions is not
9    whether La Bestia had suffered any kind of grounding or
10   damage or incident, but rather, the operators at the time
11   that are listed as operator have been involved in any
12   losses over the last ten years, right?
13          A.   That's how I interpret it, those
14   applications.  It's talking about -- it's trying to
15   qualify the -- the operator that they're going to cover
16   under this particular policy.
17          Q.   Do you know who was piloting the vessel at
18   the time that -- of the alleged vessel going over a
19   sandbar?
20          A.   No.
21          Q.   You don't know whether it was Gustavo
22   Castillo or Jorge Fernandez?
23          A.   No.  I believe it happened, not under this
24   policy.  It -- that incident happened during -- like I
25   mentioned on my email, during the AURA policy, the first

Jose Figueroa
August 25, 2021

Page 54

1 policy that we placed for -- for -- for La Bestia.
2       Q.    And you don't know back then who the
3 operator is listed for La Bestia?
4       A.    They were not scheduled.
5       Q.    Okay.  But Mr. Fernandez never said to you,
6 "I was piloting the vessel at the time it went over the
7 sandbar" or "Mr. Castillo was piloting the vessel at the
8 time that it went over the sandbar," right?
9       A.    No, he never said it happened or who was --
10 who was navigating the vessel.  No, he did not.
11            (Defendant's Exhibit No. 25 was
12 identified.)
13            (Screen shared.)
14 BY MR. MARINELLO:
15       Q.    I'm showing you the renewal policy.  This
16 is the renewal for the 2018-2019 policy period.  I may be
17 wrong.  2019 to 2020 policy period.  Okay.
18            Now, he discloses, again, all operators
19 must be detailed.  And it says at the bottom, "Warning,
20 this is a named operator only policy."  Do you see that?
21       A.    Correct.  Correct.
22       Q.    And it asks, again, boating experience.
23 And then it says, "Have you been involved in a loss in
24 the last ten years?"
25            Now, Mr. Fernandez is at the top of the

Page 55

1 number one operator, and now his brother, Alejandro
2 Fernandez is listed as the number two operator, right?
3       A.    Yes.
4       Q.    Are you aware of, or familiar with, any
5 claim or loss specifically against or for any nonreported
6 claim or loss specifically dealing with Jorge Fernandez
7 or Alejandro Fernandez?
8       A.    No.  I would not know unless it was
9 reported to us.
10       Q.    And so any loss dealing with anybody else
11 whatsoever or any other company, in your opinion, would
12 not be material to having to be disclosed in this renewal
13 application, would that be correct?
14       A.    That is correct.
15       Q.    And you know what it means, material?
16       A.    Yes, it -- it has to do with something that
17 would change the exposure to the insurance company so
18 that they have the opportunity to decide if they want to
19 cover an insured or not cover an insured.  It has to be
20 something consequential to increasing the risk to them.
21 So they need to know everything.  And if they decide, if
22 there is something that needs to be -- if they want to --
23 if they want to insure the vessel -- in this case, it's a
24 vessel.
25            If -- if this -- you know, we can -- we --

Page 56

1 I'm sure that the intention of the loss that he's talking
2 about here applies to a vessel loss that he has had.  It
3 doesn't include a homeowner's loss that he may have had,
4 an automobile loss that he may have had in his life in
5 the last ten years, that's not what's being contemplated
6 in this application.  It has to do with direct
7 information as a navigator of a marine vessel, of a
8 yacht.  That's what is material to this -- to this
9 insurance.
10            You know, have you had any -- any yacht
11 losses before?  Not auto, medical insurance, homeowner's,
12 all those are losses that you generate to insurance
13 companies, but that's not what's being considered in this
14 application.
15            It just has to do -- the scope of this
16 application has to do with -- with a yacht.  That's the
17 maximum, you know, material.  Anything that has to do
18 with -- with his capability and history in navigating a
19 yacht.  That's what this application is -- is -- is
20 intended to inform the insurance company.
21       Q.    Okay.  You would agree that the insurance
22 company would know -- would want to know whether
23 Mr. Fernandez was ever arrested for drunk driving, right?
24       A.    It is -- it is included.  That is a
25 material -- that is a material issue.

Page 57

1       Q.    Right.  And you don't know -- you have no
2 information whether Mr. Fernandez or Mr. -- either
3 Mr. Fernandez was ever arrested for drunk driving, do
4 you?
5       A.    No.  If I would be insuring his auto, auto
6 insurance, that's part of the process.  You request
7 what's called a motor vehicle record and it gives you
8 all -- all the -- all the violations that an individual
9 driver has had.  That is for an auto policy.  For a
10 vessel policy, it's a warranty statement that the insured
11 or operators are giving the insurance company.
12            I don't have a means of determining if they
13 did have violations or did not have violations.  We just
14 take it based on a declaration.
15       Q.    And if you knew of any such thing -- you,
16 in spite of Mr. Fernandez' application, you would have
17 forwarded that to Concept Special Risk, would you not?
18       A.    If I would have known that -- that what he
19 put on the application was not true, I would definitely
20 have stated to Concept.
21            And to be honest, I'll tell you, I've been
22 doing this business for over 25 years.  My reputation is
23 impeccable.  And I will walk away from an insured that
24 would do that to me, that would knowingly put on an
25 application I never had a violation, a moving violation.

Jose Figueroa
August 25, 2021

Page 58

1  And I know, personally, because he mentioned it to me
2  that he was in an accident.  That type of insured, Global
3  Insurance, Specialty Broker, Jose Figueroa, Beatriz
4  Watson, we do not have as clients.  We walk away from
5  them.  We don't -- we don't have them as a client.
6      Q.   And you -- you believe that Mr. Fernandez
7  was -- when he submitted or filled out these
8  applications, that he was being totally forthcoming in
9  responding accurately to what he believed was required
10 information.  Would you agree with that?
11     A.   Like I mentioned before, I only talked to
12 Jorge Fernandez once for about four hours in a -- in a
13 visit.  We did not have any type of relationship or I
14 know what's going on with his life.  All we know is what
15 he provides to us in emails and in writing.  That is the
16 scope of my knowledge of what is going on with his life,
17 his family, and -- and so forth.
18          So if he says to me -- and I don't have a
19 basis to -- to distrust him.  I will accept what he says.
20 There's no other way of me verifying it.  It's not
21 necessary.  It's -- it's -- he understands what an
22 application is.  He knows that if there is a
23 misrepresentation, the policy is void.  He understands
24 that.  He is a very, you know, intelligent person.  But
25 that I know what was going on with his life?  I never --

Page 59

1  I never -- I've talked to him on the phone, just strictly
2  business.  And every phone conversation, I asked him
3  if -- if it was material that he needed to put it in
4  writing to me.
5      Q.   Let's go back for a minute to the
6  organization of Sea 20-20, LLC.  Remember you said that
7  Sea 20-20 was organized later for purposes of
8  transferring other business into that name.  You remember
9  that you said that?
10     A.   Yeah.  I did not say that it was organized
11 before, after -- I just said that when a renewal came up,
12 Jorge requested that the operation of the Jet Boat Miami
13 be put under Sea -- under Sea 20-20 as the named insured.
14 And he put it on an application and we submitted it.
15     Q.   That -- when did that occur, do you
16 remember?
17     A.   I don't recall, no.
18     Q.   Was it before 2018?
19     A.   I -- I -- I don't -- I don't recall.  I
20 have -- I have all the files.  I could -- you know,
21 obviously, I could go back to the policy when that change
22 was and -- and pull the -- the correspondence related to
23 that change.  There was a lot of emails that were written
24 on that change.
25     Q.   Because I'm looking right now at the

Page 60

1  Florida Department of State Division of Corporations, and
2  it shows that Sea 20-20, LLC, was -- became effective on
3  December 19th, 2013.  So it existed well before you even
4  got involved with Mr. Fernandez, would that be correct?
5      A.   Well, that's -- if that's what the record
6  shows, then that is correct.
7      Q.   Okay.
8      A.   Like I said, when -- when the corporation
9  was formed is not really my interest.  My interest is
10 that an insured requested an intermediary, like myself,
11 to change the name of the named insured on a renewal
12 policy.  Now, changing from Sea 21 to Sea 20-20, and we
13 did it.  And it was instructed to Concept.  Concept
14 instructed it to Great Lakes, and Great Lakes -- at that
15 point, it wasn't Great Lakes.  Great Lakes was out of it
16 already.  It was Rockstone Marine.
17          We did a name change with another
18 corporation, another insurance company where Jet Boat
19 Miami and all the water sports operation, at the request
20 of Jorge Fernandez, was based under Sea 20-20, LLC.
21     Q.   Mr. Figueroa, we have now been going for an
22 hour and a half, and I think I broke my record --
23     A.   Yeah.
24     Q.   -- for a break.  Would you mind if we take
25 a ten-minute break?

Page 61

1      A.   No, no.  Actually, I need a break.  I'm
2  dry, my throat is very dry already.  So I thank you for
3  the break.
4          MR. MARINELLO:  Mine is dry too.  Thank
5      you, we'll take a ten-minute break and be back at
6      11:15 and I will tell you that I'm almost done.
7          THE WITNESS:  Thank you.  Okay, very good.
8          MR. MARINELLO:  Thank you.
9          MR. BAYER:  All good.  Thanks.  So we'll be
10     back at 11:15.
11         MR. MARINELLO:  That is correct.  11:15.
12         (Proceedings recessed at 11:04 a.m.)
13         (Proceedings reconvened at 11:16 a.m.)
14         (Screen shared.)
15 BY MR. MARINELLO:
16     Q.   Okay.  Mr. Figueroa, I'm actually almost
17 done.
18          I'm turning --
19     A.   I'm good.  I'm good.
20     Q.   All right.  I'm turning to what has been
21 filed as Great Lakes' motion for summary judgment in this
22 particular case, and here is -- on paragraph 51 are the
23 five matters in which they are considering that the judge
24 should deny Mr. Fernandez' claim for indemnity as a
25 result of the loss of the La Bestia.

Jose Figueroa
August 25, 2021

Page 62

1    You're familiar with the loss of La Bestia,
2 are you not?
3         A.    Yes, I am.
4         Q.    You know that it caught fire and it sank in
5 the Florida Straits, right?
6         A.    Yes, I know.
7         Q.    Great Lakes claims, specifically,
8 Mr. Fernandez and/or (audio distortion) he owned,
9 suffered the following losses.  Number 1, in July of
10 2016, La Bestia suffered a grounding for which it had to
11 undergo repair.
12         We've already covered that.  The grounding
13 was -- the email was referenced as Varada, which was
14 translated into dry dock, and not beaching or grounding,
15 right?
16         A.    Correct.
17         Q.    Okay.  And by the way, you're Puerto Rican.
18 I'm Cuban.
19         If I was piloting a vessel or navigating a
20 vessel and I grounded that vessel, in Spanish, I would
21 say en cayo.  Are you familiar with that word?
22         A.    Those were the words he used.  Those were
23 the words he used.
24         Q.    En cayo?
25         A.    Yeah.  But, you know, like he hit

Page 63

1 something.  Like en cayo is when you get stuck.
2         Q.    Right.
3         A.    You know, you get stuck and you can't get
4 out.  You know, sometimes you hit loose debris on the
5 ocean and -- and that's -- that's normal.  You know, you
6 can hit loose debris, a drifting log or something.
7 And -- and that's -- you know, that's very different from
8 an en cayo, you know.
9         THE STENOGRAPHER:  Can you spell that word
10    for me.
11         A.    E-N, C-A -- I believe it's Y or double
12 L-L-O.  Either Y or double L-O.  It's the same sound, Y
13 or L-O.
14         By the way, I -- my -- my primary language
15 is English.  I studied it at the Virgin Islands.
16         I speak only English.  I learned Spanish at
17 home so my grammar is not all there.  You know, it's --
18 my spelling is -- this is my second language.
19 BY MR. MARINELLO:
20         Q.    Welcome to my nightmare.
21         A.    Yeah.  Yeah.
22         Q.    That's something that --
23         A.    One -- one thing that I want to mention
24 regarding this statement.  You know, I don't know if
25 Mr. Fernandez was the pilot or was piloting the vessel

Page 64

1 when it was grounded.  That was never said to me.  It was
2 never said that it was him personally, you know, driving
3 the vessel.
4         Q.    Him or his brother?
5         A.    Or his brother.  No, no.
6         Q.    Got it.
7         A.    It was never stated.  You know, a name was
8 never given.
9         Q.    Okay.  In fact, it could have been the
10 prior owner.
11         A.    Could be.  Could be.
12         Q.    Okay.  Now, let's look at number two.  It
13 says, "In August 2016, passenger Maria Cardoza was
14 injured."
15         I want you to know that they say nothing
16 about a passenger on a banana boat --
17         A.    Right.
18         Q.    -- was injured.  They say nothing like
19 that.  They want to make it seem like she was a passenger
20 on La Bestia.  Do you see that?
21         A.    It could be con -- yeah.
22         Q.    Yeah.  But I --
23         A.    What I can see is this, I don't want to see
24 that it was on La Bestia.  What I can see is just a
25 statement, and it doesn't include where this loss

Page 65

1 happened.  It had nothing to do with La Bestia.  It
2 actually happened in Jet Boat Miami Corporation.
3         Q.    Okay.  And if you look at Number 3, it
4 says, "In May 2017, passenger Mache Lanier was injured."
5 Makes no mention of where, right?
6         A.    I know for a fact it wasn't onboard
7 La Bestia.  I can testify to that.  It was not aboard
8 La Bestia.
9         Q.    Or related to?
10         A.    Or related -- or related to that policy,
11 absolutely.
12         Q.    And then it says, "In October 2017,
13 passenger Andrianna Diaz was injured."  Doesn't say
14 where, how, right?
15         A.    Correct.
16         Q.    But we also know for a fact it wasn't on
17 La Bestia?
18         A.    No.  I know for a fact, and I'll go on
19 record, that has to do with the Sea 20-20 water sports
20 operation, that included a banana boat.  It included a
21 jet -- two jet boats, one of which was insured by Concept
22 the years before, the Orange Twister.  But they're
23 totally different operations.  They're totally different.
24         La Bestia was a privately owned yacht.
25 That's what La Bestia was.  It was never involved in the

Jose Figueroa
August 25, 2021

Page 66

1   water sports operation that these claims were -- are
2   related to.
3            Q.   And -- and you have no information or
4   knowledge as to whether Mr. Fernandez ever piloted any
5   vessel dealing with these losses, right?
6            A.   I -- I can state for a fact that he was not
7   piloting any vessels because this is a water sports
8   operation.  A banana boat is pulled by a jet ski by an
9   employee of Jet Boat Miami.  If it was on the jet ski
10  that somebody got allegedly thrown about, Mr. Fernandez
11  doesn't operate those vessels.  Absolutely, he does not
12  operate anything, any vessels related to the Jet Boat
13  Miami operations.
14           Q.   And you see number 5, it says, "In
15  May 2018, Crewman Erick Largacha was injured."  Erick
16  Largacha dealt with the Orange Twister.
17           A.   Exactly.
18           Q.   Nothing to do with La Bestia?  Orange
19  Twister was not being piloted by Mr. Fernandez, was not
20  piloted by Mr. Fernandez' brother?
21           A.   No.
22           Q.   Was not being piloted by Mr. Castillo?
23           A.   Yeah.
24           Q.   Right?
25           A.   That's correct.

Page 67

1            Q.   Totally independent, different claims.  And
2   we don't know -- you don't know the results of any of
3   those claims, do you?
4            A.   That's correct.  I do not know.
5            Q.   And, therefore, none of this, as listed in
6   51, would be material to the application submitted to
7   Concept Special Risk where Mr. Fernandez needs to
8   disclose it?
9            A.   I -- I -- I agree a hundred percent because
10  I was aware of these claims.  I was aware.  But it had
11  nothing to do with a privately owned yacht.  It had
12  nothing to do with it.
13               If -- if he had medical expenses, you know,
14  claims and car accident has nothing to do with the
15  insurance of La Bestia.  A yacht, a private yacht policy.
16           Q.   And do you know the law, the maritime law
17  with respect to vessel applications that required you to
18  disclose anything, no matter how remote it might be?
19           A.   No, I don't know the maritime law.  What we
20  are concerned about and we must know are the terms and
21  conditions of the policy.  All the rest is of that
22  doesn't -- that the insurance -- if that -- the insurance
23  company doesn't include in the policy, we don't need to
24  know it.  It's massive.  That's a massive law.
25           Q.   So if Mr. Fernandez came to you and said,

Page 68

1   "I want to renew the La Bestia policy for 2018-2019
2   and" -- but, in fact, prior to him submitting the renewal
3   application, La Bestia had been stolen, that is something
4   that Mr. Fernandez needs to report, right?
5            A.   That would be, definitely.
6            Q.   Okay.  But certainly not being that it's so
7   remote in time where he has nothing to do with the
8   operation, right?
9            A.   That's correct.  Again, the application of
10  Concept that he said, no, pertain to him as a vessel
11  operator, personally.  They're going to schedule him, yes
12  or no.  If, according to his record -- and one of the
13  criterias is, the vessel operator cannot have a personal
14  loss in that capacity, in -- in that -- that risk.  That
15  is the requirement.  Cannot have a loss.
16               And according to him, and I don't have any
17  means of proving it otherwise, he never has had a
18  personal loss while operating a vessel, a private yacht.
19           Q.   Do you have any idea why it is that if that
20  is the case, why it is that Great Lakes would be denying
21  this claim?
22           A.   I don't know.
23           Q.   Would you agree with their denial of the
24  claim?
25           A.   I -- I don't -- I don't want to give a

Page 69

1   comment because there's -- like I said, I am not privy to
2   all the information regarding this claim.  Okay?
3               I am not privy to what Great Lakes has --
4   has found out in their, you know, due diligence, what you
5   have done with Jorge.  I don't know if the claim is --
6   you know, should be declined or not.  I ref -- I don't
7   have the means of stating a position on that, on that
8   issue.
9            Q.   Okay.  I will tell you, I will represent to
10  you that nothing that is being done by Great Lakes has
11  anything to do with the fire and the sinking of
12  La Bestia.  It has to do with Great Lakes claiming that
13  Mr. Fernandez made material misrepresentations in the
14  renewal application with respect to prior losses.  That's
15  all it has to do with.
16               And as such, they're attempting to -- or
17  they want to void the policy.  Void the policy is not a
18  denial of the claim.  It's the policy doesn't exist at
19  all.  Would you be in agreement with that?
20           A.   Like I said, I don't know what other
21  information Great Lakes may have found out.  I don't
22  know.  I'm just going on what -- and I -- you know, what
23  you're saying.  But, personally, I don't know.  I really
24  don't know if there's other misrepresentations that --
25  that -- that -- that they have found out.  I have been

Jose Figueroa
August 25, 2021

Page 70

1  kept out of the loop, which is common.
2          That is the normal operating procedure when
3  there is a claim.  The agent is kept out.  So I -- I
4  don't -- I can't say, you know, either way.
5      Q.    I will represent to you that everything
6  listed in paragraph 55 [sic], are their only grounds for
7  voiding the policy for the year 2018-2019.
8      A.    Okay.  I don't see number 55 in my screen.
9      Q.    No, 51.
10     A.    Oh, 51, 51.  Well, again, you know, that --
11  that is -- that is the -- that determination is going to
12  be made by a judge basically, not -- not by me.  I
13  don't -- like I said, I don't understand all the
14  ramifications that are involved with these five items.
15  You know, based on -- on what I know, I -- it's very
16  limited.  I don't have a -- a means of answering that
17  question.
18          MR. MARINELLO:  I get it.  Mr. Figueroa, I
19      want to thank you for your time.
20          Ms. Goldman might have some questions for
21      you.
22          MS. GOLDMAN:  Yes, I do.
23               CROSS-EXAMINATION
24  BY MS. GOLDMAN:
25     Q.    Mr. Figueroa, my name is Jacqueline

Page 71

1  Goldman.  I'm counsel for Great Lakes.  As Mr. Marinello
2  said, thank you very much for making yourself available
3  today on such short notice.  I don't have a lot of
4  questions.  It won't take long to get through but I do
5  have a few.
6          Are you a licensed underwriter?
7      A.    No.
8      Q.    Had you ever been an underwriter?
9      A.    No.
10     Q.    Have you ever taken classes in
11  underwriting?
12     A.    No.
13     Q.    Have you ever been trained as a
14  underwriter?
15     A.    No.  And the reason why I haven't is, I
16  don't need it to do the business I am involved with.  The
17  Department of Insurance and the Commissioner of Insurance
18  of the territories that I represent, they provide us the
19  training, and I have to recertify myself every three
20  years.
21          So to -- to get into that function, that is
22  done by insurance companies, it's not my prive -- privy.
23  I don't -- I don't do that -- that type of work.
24     Q.    Are you trained in what information is
25  considered material by underwriters?

Page 72

1      A.    Usually, the material that's required
2  that's considered by underwriters are on the policy --
3  policy wording and they are on the application.  They
4  make it -- it's -- it's their -- their role -- their --
5  their role to require the information that is needed for
6  their underwriting.  That's why I mentioned initially,
7  each company has different applications because there's
8  different underwriting guidelines, philosophies, it
9  varies, and each company has their own.
10     Q.    Right.  And so in the case of Great Lakes
11  or Concept, as their managing general agent, what they
12  consider material -- strike that.
13          MS. GOLDMAN:  I would like to pull up the
14      original application, which I think was Exhibit 2
15      to this deposition, Henry, or Exhibit 1?
16          MR. MARINELLO:  Well, I -- I had it marked
17      as Exhibit 20 --
18          MS. GOLDMAN:  Exhibit 22 --
19          MR. MARINELLO:  Yeah.
20          MS. GOLDMAN:  -- from a different
21      deposition.
22          MR. MARINELLO:  No, no.
23          MS. GOLDMAN:  I'll just do it myself as
24      Plaintiff's Exhibit 1.
25          MR. MARINELLO:  Okay.

Page 73

1          MS. GOLDMAN:  I would like to mark this as
2      Plaintiff's Exhibit 1.
3          MR. MARINELLO:  Okay.
4          (Plaintiff's Exhibit No. 1 was marked for
5      identification.)
6  BY MS. GOLDMAN:
7      Q.    Mr. Figueroa, can you see the document on
8  the screen?
9      A.    Yes, I can.
10     Q.    It's that same application that we were
11  discussing earlier, wasn't it?
12     A.    Right.  It's 2018, correct.
13     Q.    Yes.
14     A.    Okay.
15     Q.    And do you see under insured's name on the
16  first page, what does it say?
17     A.    Sea 21-21, LLC.
18     Q.    And do you see under beneficial owner, what
19  does it say?
20     A.    Jorge Fernandez.
21     Q.    What is a beneficial owner, do you know?
22     A.    It's the one that has the interest,
23  controlling interest or -- or the owner of -- of the --
24  in this case, of the vessel, the asset.
25     Q.    Scrolling down to page 3.  Do you see

Jose Figueroa
August 25, 2021

Page 74

1   question 11?
2        A.    Yes.
3        Q.    I'm going to read it.  It says, "Have you
4   or any named operator been involved in a loss in the last
5   ten years, insured or not?"  Do you see that question?
6        A.    Yes.
7        Q.    And the answer that is marked on the
8   application, it says, "no."  Correct?
9        A.    No.  Correct.
10       Q.    Who is being asked this question?
11       A.    Named operator.  It applied to named
12   operators scheduled under this policy.
13       Q.    And what about this question makes you
14   think that?
15       A.    Well, it says, "if any named operator" --
16   and then it is followed by a section which has the
17   details of all the operators.
18       Q.    But doesn't question 11 say, "Have you or
19   any named operator?"  Is it limited to only named
20   operators, is it?
21       A.    The way it's always been construed, they're
22   talking about the named operator.
23       Q.    That's how you read that question?
24       A.    That's correct.  And because he is -- he is
25   a named operator, usually the owner of a vessel is a

Page 75

1   named operator.
2        Q.    They can be the same person.  I see what
3   you mean.
4        A.    Yeah.
5        Q.    In this instance, though, do you think that
6   the beneficial owner is being asked this question.  "Have
7   you or a named operator been involved in a loss in the
8   last ten years, insured or not?"
9        A.    On a personal basis, this is a personal
10   question, because it has to do with scheduled operators.
11       Q.    What do you mean "on a personal basis?"
12       A.    It has to be on an individual, not a
13   corporation.  That's not a -- a question directed to an
14   entity.  It is an entity -- an entity -- entity cannot
15   navigate a vessel.  This application is -- is focused on
16   obtaining underwriting information about the ones that
17   are going to be moving this vessel, or where is a vessel
18   moored, what marina, is it safe.  It's all related to
19   this vessel.  That's the way a vessel application is, it
20   applies.
21       Q.    Is that what you think Concept considers
22   this question to mean?
23       A.    Yes.
24       Q.    What makes you think that?
25       A.    Because all other insurance companies that

Page 76

1   cover yacht insurance are referring to the actual
2   operator who is the one that they're evaluating is this a
3   good risk or is this not a good risk for us.  That's a
4   material information, you know, who is operating the
5   vessel, not the paper name on a -- on a certificate, no.
6   It's who are the operators.  And then the whole package
7   of -- of Concept's policies of applications emphasizes
8   that.
9             So there's other supplementals that go with
10   this.  This is just a first part.  There is a captain
11   supplemental, a paid crew supplemental and an operator
12   supplemental.  So there's three other supplementals,
13   because the focus is who is navigating this vessel.
14   That's the -- that's the key thing of a marine -- of a
15   yacht insurance policy.
16       Q.    Okay.  Do you think that's the only
17   material information, who is going to be operating the
18   vessel?
19       A.    No, no, there's others.  There's, for
20   instance, the marina, where is it kept, what are the
21   navigation territories it's going to be in, what -- what
22   are the -- the windstorm hurricane plan, what are you
23   going to do with the vessel when the hurricane is
24   barreling down, you know, what are the measures?  All of
25   these -- it's a -- it's a --

Page 77

1             Multiple areas of information that
2   underwriters need to know to see if they're going to
3   accept it or not.
4        Q.    Do you think an owner's loss history could
5   be material to underwriters?
6        A.    Yeah.  Yeah, it is.  An owner as an
7   individual operator, yes, it is.
8        Q.    Not as an operator, allow me to clarify.
9             As an owner, not necessarily as an
10   operator, do you think underwriters would consider their
11   loss history to be material?
12       A.    I don't know what underwriters would
13   consider.  I know operator, that would be what is being
14   asked for.  That's what their application requires,
15   that's what was answered.
16       Q.    But it does ask who the beneficial owner is
17   of Sea 21-21, correct?
18       A.    That's correct.
19       Q.    It doesn't just say who are the operators
20   of this vessel.  It asks who owns this vessel.
21       A.    Right.  And I will explain why that is
22   necessary.
23             Whenever there is a loss, the insurance
24   company wants to know who is the one benefitting from the
25   claim, who are they going to issue the claim payments to.

Jose Figueroa
August 25, 2021

Page 78

1   That's why they need to know the ownership, who is the
2   owner.  You know, who will be liable in the event of a
3   claim.
4        Q.    But you said earlier, you're not sure
5   exactly what underwriters consider material.
6        A.    That's correct.
7        Q.    Right?
8        A.    I'm answering the question of beneficiary.
9   Why -- why Mr. Fernandez is listed there and the reason
10  why, not only Concept always wants to know, it's
11  basically who will we be, you know, responsible towards.
12  Operators are separated that's why they have all these
13  other supplemental forms.  That's another issue.
14       Q.    Right.  I see that there are questions
15  specifically to each named operator later in the
16  application.  But question 11 is prior -- comes before
17  the operators section, correct?
18       A.    Yeah.
19       Q.    So could question 11 be read to mean the
20  owner and not an operator?  Do you think?  Is it unclear?
21       A.    Well, here's the thing.  The owner of this
22  vessel is Sea 21-21, that's the owner.  That is the
23  owner.  In a private yacht, usually, Jose Figueroa can
24  own the vessel, and I'm the named insured, and I am the
25  owner.  Okay.  And that's where I would apply it with

Page 79

1   you, the owner, but this ownership is Sea 21-21.  It's a
2   corporation.  So when this is applied to any named
3   operators, it's extended to a marine loss.  Okay.
4             That's -- that's how I've always
5   interpreted, and that's how it's -- it's -- it's common
6   in -- in the industry, if you're talking about the loss
7   of the -- either the insured or the -- the operators,
8   basically.
9        Q.    And who is the insured?
10       A.    The insured is Sea 21-21.
11       Q.    Who signed this application?
12       A.    Jorge Fernandez.
13       Q.    Not Sea 21-21?
14       A.    Well, I don't think Sea 21-21, which is a
15  paper corporation, can sign.
16       Q.    Okay.
17             MR. BAYER:  Just object to the form of
18       that.  That's a -- you're asking him a legal
19       question, and I don't think anybody can dispute
20       that a corporation has to act through an
21       individual and -- and cannot act on its own.
22  BY MS. GOLDMAN:
23       Q.    I think Mr. Bayer stated it perfectly.  A
24  corporation does not act on its own, and so when this
25  application asks, have you or any named operator been

Page 80

1   convicted -- excuse me, have you or any named operator
2   been involved in a loss in the last ten years, insured or
3   not, could this be referring to losses of the owner,
4   Mr. Fernandez?
5        A.    You're asking me?
6        Q.    Yes.
7        A.    Okay.
8             MR. MARINELLO:  Form.
9        A.    That's -- that's stretching it because this
10  application is strictly for the rigs being involved which
11  was the La Bestia.  That's what this applies, and I think
12  if he's a named operator, then we extend -- if we extend
13  the scope of the underwriting requirement being material,
14  then I want to know if you have had any losses navigating
15  a vessel like this one, you know, a -- a private vessel,
16  a yacht.  That's -- that's the scope that underwriters
17  would like to know.  Okay.
18  BY MS. GOLDMAN:
19       Q.    Does it say --
20       A.    Because they're insuring -- they're
21  insuring this vessel, they're not insuring the -- the Jet
22  Boat Miami or they're not insuring -- it's not material
23  to this policy contract.
24       Q.    Where does it say on this application that
25  the risk is limited in the way that you just said?  What

Page 81

1   are you basing that on?
2        A.    Well, by the policy.  By the policy
3   wording.  Policy wording doesn't include -- it strictly
4   covers the operation of a vessel -- vessel called
5   La Bestia, it does not include -- the scope of that
6   policy does not include other business that Mr. Fernandez
7   may have had.  It's not included in that so it's not
8   material.
9        Q.    Does question 11 say, "Have you or any
10  named operator been involved in a loss in the last ten
11  years insured or not, with a private yacht?"
12       A.    No, it doesn't.
13       Q.    No, it's much more broad than that, isn't
14  it?
15       A.    No.  I'll tell you what -- what the practice
16  is in this industry.  This application applies to this
17  risk.  Period.
18       Q.    If that's how you choose to read it then --
19       A.    Yeah.
20       Q.    -- then understood.
21       A.    Well, that's how -- that's how it's been --
22  I deal with multiple insurance companies that do yachts,
23  and that's how the process is.  It's strictly to the risk
24  that we are -- that they're going to be insuring.
25       Q.    So in your experience, underwriters are

Jose Figueroa
August 25, 2021

Page 82

1  typically unconcerned with losses that may have occurred
2  under a different corporate entity with the same
3  individual owner, is that what you're saying?
4       MR. BAYER:  Form.
5       A.    What I'm saying is this, Mr. Fernandez
6  probably had some windstorm losses in his house, okay?
7  Okay, with Hurricane Wilma, Hurricane Andrew, who knows,
8  and that's not material.  He did have losses.
9  Mr. Fernandez may have had medical expenses which are
10  losses to the insurance industry.  So you -- you cannot
11  expand that scope to include all types of losses because
12  it isn't.  This is limited, in my experience, and the
13  acceptance of insurance companies, what they want to talk
14  about is what they are insuring, what they're becoming
15  liable, who is going to be creating -- moving the asset
16  around.  That's what they are concerned about in this
17  case.
18       But all the losses, we would need to
19  include windstorm losses, flooding, all sorts of
20  different losses that Mr. Fernandez may have incurred in
21  other companies that he owns or his home personally.  And
22  I don't think that is the -- the objective of this
23  application.  It -- it never has been seen that way.
24  BY MS. GOLDMAN:
25       Q.    But you've made that decision to not

Page 83

1  include those other types of losses because, in your
2  judgment, those are not material?
3       A.    No, no.  I haven't made the decision.
4  Nobody in the industry comes back and states in their
5  policy or in an application that you got to list all the
6  losses a person has which are not related to the
7  policy being purchased.  That is unheard of.  That does
8  not occur.  It does not.
9       Q.    Who makes the decision as to what type of
10  loss is related to the risk?  Does an underwriter make
11  that decision or do you?
12       A.    No, I don't.  I don't.
13       Q.    The underwriter does, correct?
14       A.    Correct.
15       Q.    Thank you.
16       A.    But the industry -- the industry --
17       Q.    There's no question pending, Mr. Figueroa.
18       A.    Okay.  Thank you.
19       MR. MARINELLO:  But he can answer.  But he
20  can answer.
21       MR. BAYER:  Well, allow him to finish or
22  explain his answer.
23       MR. MARINELLO:  Yeah, he can answer.  Go
24  ahead.
25       A.    Yeah.  It -- it doesn't happen the way you

Page 84

1  said it.  But the industry, customary generally
2  acceptable practices is that risks are limited to the --
3  the losses, underwriting are limited to the policy being
4  issued by an insurance company, that is the standard.  If
5  some -- if some underwriter wants to do it differently,
6  they have to declare it as such.  And they would need to
7  have put there any loss including windstorm, a --
8  personal losses or blah, blah, blah, blah, blah.  It
9  would have to be declared.  It's not.  It's accepted as
10  being what the standard is in the industry.
11  BY MS. GOLDMAN:
12       Q.    Are you done?
13       A.    Yeah.
14       Q.    Thank you.
15       Back to question 11, it asks, "Have you or
16  any named operator been involved in a loss in the last
17  ten years, insured or not?"
18       What do you think insured or not means?
19       A.    That means some -- some -- some yacht
20  owners may not have had insurance on a policy -- on a
21  vessel and -- and they self-insure.  They self-insure the
22  vessel.  And that question is directed to that
23  possibility.  True, there is no loss record in the
24  insurance prior carriers.  But if you have this vessel
25  self-insured, did you have a loss.

Page 85

1       Q.    Does it say "self-insured?"
2       A.    Well, when -- when it's not insured,
3  basically is that you're not carrying insurance so the
4  owner is, basically, insuring it himself.
5       Q.    So you're reading this question to mean
6  whether or not the vessel was insured?
7       MR. MARINELLO:  Objection, form.
8       A.    Yeah, because that's what it's asking.
9  It's asking has he had a loss, okay?  In the context of a
10  yacht application, has he had a loss.  And they want to
11  know, even if you did not have insured -- insurance, if
12  it was not insured, have -- if it -- you need to tell me,
13  not what's -- not what's in the official loss records of
14  your prior carriers.  That's one type of loss.  But
15  there's other events where an insured may not have
16  insurance and sustained a loss, and they want to know if
17  that is the case, if they sustain any loss.  It says it
18  very clearly, you know, any loss.
19  BY MS. GOLDMAN:
20       Q.    I agree with you, it says very clearly it's
21  asking about losses.
22       A.    Yeah.  Related to marine operator, yes.
23       Q.    I disagree with you there.
24       A.    Okay.  Well, that's -- I'm telling you what
25  the common practice is in the industry and -- and that's

Jose Figueroa
August 25, 2021

Page 86

1  how -- that's how we look at it.

2  Q.  Do you understand that if Great Lakes'

3  denial of this claim is upheld by the Court, then

4  Sea 21-21 and Mr. Fernandez will have a claim against

5  Global?

6  MR. MARINELLO:  Objection, form.

7  A.  I don't -- I don't know that.

8  MR. BAYER:  I'll object to the form as

9  well.  And I'm -- I am going to instruct him not

10  to answer that, that's his -- that's, in my

11  opinion, badgering the witness and threatening the

12  witness.  So don't answer it, Jose.

13  THE WITNESS:  Okay.

14  BY MS. GOLDMAN:

15  Q.  I'm going to pull up the next exhibit.

16  Give me a moment.

17  (Screen shared.)

18  BY MS. GOLDMAN:

19  Q.  Have you seen this document before today?

20  Specifically, have you seen this second email that's

21  dated March 21st, 2019?

22  A.  Yes, I have.

23  MS. GOLDMAN:  I would like to mark that as

24  Plaintiff's Exhibit 2.

25  (Plaintiff's Exhibit No. 2 was marked for

Page 87

1  identification.)

2  BY MS. GOLDMAN:

3  Q.  This is an email from Beatriz Watson to

4  Alex Thomas.  Do you see that?

5  A.  Yes.

6  Q.  And you were cc'd on it, correct?

7  A.  I'm very familiar with it, yes.

8  Q.  Okay.  Mr. Fernandez has testified that he

9  has no idea where these numbers come from, and he has

10  said that Ms. Watson perhaps made them up.  Do you know

11  where these values came from?

12  MR. MARINELLO:  Objection, form.

13  A.  Yes.

14  MR. MARINELLO:  Objection, form and

15  predicate.

16  A.  Yes.  Yes, I do.

17  BY MS. GOLDMAN:

18  Q.  Who provided that information?

19  A.  Jorge Fernandez provided invoices and job

20  orders for all the repairs that were done in that dry

21  docking that resulted in his request to increase the

22  value of coverage at renewal.  And we -- what we -- what

23  was done was to survey.  A surveyor, licensed surveyor

24  sent a survey establishing the value of the vessel to be

25  over $760,000.  I don't recall exactly.  But it was in

Page 88

1  the $700,000, and we submitted that to Concept because

2  that is the value.

3  And Concept requested proof that that

4  additional from $400,000 to $700,000 was done.  You know,

5  while -- proof, you know, show me invoices.  Basically,

6  that was -- that was the comment.  Show me the invoices.

7  And Mr. Fernandez did send all the invoices and Beatriz

8  did a summary by category of the actual expenses paid out

9  to do the improvements of La Bestia.  And this is the

10  summary email that was required by Concept.

11  BY MS. GOLDMAN:

12  Q.  So did Ms. Watson actually calculate these

13  amounts?

14  A.  No, they were picked from invoices.

15  Q.  Okay.  But she's the one who reviewed the

16  invoices and put --

17  A.  Summarized it.

18  Q.  -- it together, this list?

19  A.  Yes.  And summarized it by categories,

20  correct.

21  Q.  And your office has seen all of these

22  invoices that you referenced?

23  A.  Yeah, they're on file.  And -- and -- and

24  they were submitted to Concept by the way.

25  Q.  I will represent to you that they were at

Page 89

1  no point submitted to Concept, so I'm not sure what it is

2  that you're referring to.

3  Do you know when they were submitted?

4  MR. MARINELLO:  Objection, form.

5  A.  They were submitted to Concept.  They were

6  submitted to Concept.  I don't know exactly when, but I

7  know they were submitted.

8  BY MS. GOLDMAN:

9  Q.  All right.  If you could hold on another

10  second, I'm going to have another exhibit.

11  A.  And the survey was submitted to Concept

12  too.

13  Before -- before this happened, what

14  your -- what you have on screen.  Before this happened,

15  the survey was submitted and it was the standard

16  documentation required to increase the value of a vessel,

17  the whole value of a vessel.  That's the standard in our

18  industry.  You get a certified surveyor to establish the

19  value, and that's what that surveyor did.  And we

20  submitted it to Concept, and Concept came back and said,

21  "No, we want proof."  And we requested from Mr. Fernandez

22  all the invoices, everything, and the interest,

23  consolidated by categories, that email, to show exactly

24  what -- what payment -- what he submitted.  There's hard

25  documents to those numbers.

Jose Figueroa
August 25, 2021

---

Page 90

1          (Screen shared.)
2  BY MS. GOLDMAN:
3      Q.    Do you see the email that I'm sharing?
4      A.    Yeah.
5      Q.    It's dated March 20, 2019.
6      A.    Yes.
7      Q.    Scrolling down to the first email, also
8  March 20th, 2019, Beatriz Watson to Alex Thomas.  Have
9  you seen this email before?
10     A.    Yes, I have.  I've seen it.  I've seen it.
11     Q.    And this email concerns that increase in
12 the insured value that you were talking about a moment
13 ago?
14     A.    Correct.  Yes.
15     Q.    I'm going to read to you the second
16 sentence of the first -- I will just read -- I'll read
17 you the first paragraph.
18          "The insured has informed me that he has
19 bank documentation of each repair provided in his bank
20 statements.  He has stated that these repairs have been
21 done over the course of two years and providing
22 individual receipts will prove a challenge for it is all
23 in storage boxes, with all documentation regarding their
24 business operations that they have separate from La
25 Bestia."  Do you see that?

---

Page 91

1      A.    Yes.
2      Q.    So it sounds here like Ms. Watson is saying
3  that providing the documentation to Concept will be too
4  difficult.
5      A.    At that time, yes, it was.  That was the
6  initial request.
7      Q.    Okay.  And then Ms. Thomas from Concept
8  responds to Beatriz the next day.
9          Have you seen this email, too?
10     A.    No, I have not.
11     Q.    Well, she says, "Please just provide a
12 spreadsheet with the individual costs."
13     A.    Okay.
14     Q.    Do you still think that Global provided
15 those invoices to Concept at this time?
16     A.    Well, let me put it this way.  She's asking
17 for a spreadsheet and that's why Beatriz consolidated all
18 the different repairs that had been done into that email
19 because that is what Concept requested, and that was
20 provided and Concept decided or Great Lakes decided that
21 they were not going to do the $775,000 valuation per a
22 certified surveyor and they decided that they were going
23 to cap it at $560,000.  I believe that's the number, the
24 final number that Concept agreed to -- to -- to insure.
25          And the insured had no other choice than to

---

Page 92

1  accept that -- that whole value established --
2  established unilaterally by Concept.
3      Q.    My question was much more narrow.
4      A.    Okay.
5      Q.    Just yes or no.  Do you still think --
6  having read this email now, are you still sure that
7  Global provided those invoices to Concept?
8      A.    My recollection is that they were provided
9  to Concept, that's my recollection.  And --
10     Q.    If you have an email --
11     A.    And that's when -- and that's when Alex
12 asked for a -- spreadsheet summary.
13     Q.    If you have an email showing that, we --
14     A.    I don't -- I don't -- I don't have it right
15 now, but that's my recollection.  You're asking me
16 something that happened, you know, three, four years ago.
17 My recollection is, we did receive the actual invoices.
18 The invoices were summarized by category and it was
19 provided and accepted by -- by what's her -- by Alex.
20     Q.    The summary, the spreadsheet was provided?
21     A.    I'm not sure if the invoices went with.
22     Q.    Thank you.
23     A.    I'm not sure.  I'm not sure.
24          MS. GOLDMAN:  I would like to mark this as
25 Plaintiff's Exhibit 3, if I haven't already.

---

Page 93

1          (Plaintiff's Exhibit No. 3 was marked for
2  identification.)
3      A.    Well, one thing that I want to go on record
4  saying is that this La Bestia survey is the first time in
5  my career that an insurance company has not accepted a
6  survey valuation of an independent certified surveyor.
7          I have never seen anything like a survey
8  being submitted, and the insurance company or Concept's
9  decided to not accept it and bring the -- the value down
10 to whatever they thought it should be.  I have never seen
11 that before.
12 BY MS. GOLDMAN:
13     Q.    You said that Concept wanted to see proof
14 of the monies that it had spent on the vessel, is that
15 correct?
16     A.    That's correct.
17     Q.    Well, what he spent or may have spent on
18 the vessel would not necessarily be exactly the same
19 amount as would be reflected in the survey, correct?
20     A.    Well, if you add -- I don't have that
21 email, but if you add the breakdown that Beatriz gave, I
22 think it would work.  It covers the -- the jump from
23 $400,000 to $775,000.
24 BY MS. GOLDMAN:
25     Q.    Yes.  We can go back to Plaintiff's --

---

Jose Figueroa
August 25, 2021

Page 94

1    A.    Yeah.
2    Q.    -- Exhibit 2.
3    A.    So it --
4    Q.    And I will represent to you -- I will
5    represent to you that this amount, the total of
6    everything on the list, comes out to something like
7    $320,000 something thousand dollars.
8    A.    Exactly.
9    Q.    However --
10         MR. MARINELLO:  Object to form.
11   BY MS. GOLDMAN:
12   Q.    However, you were saying earlier that
13   Mr. Fernandez is very good at -- or had been very good at
14   doing regular maintenance on the vessel, correct?
15   A.    That's correct.
16   Q.    And that's just necessary work that would
17   not necessarily increase the value of the vessel.  That
18   just maintains the value of the vessel, correct?
19   A.    That's correct.  And that's not what this
20   is about.  This is not the regular maintenance.  This was
21   a major overhaul of the vessel.
22   Q.    Do you know what an agreed value policy is?
23   A.    Yes, I do.
24   Q.    What is it?
25   A.    It's -- it's a limit of coverage that both

Page 95

1    the insured and the -- and the insurance company agree.
2    Q.    Okay.
3    A.    Okay.  That's what an agreed value policy
4    is.  They both agree.
5    Q.    And Concept only agreed to increase the
6    value by $160,000, correct?
7    A.    That's what they -- it was accepted
8    $160,000 or go somewhere else, basically.  That's what --
9    that's what that -- that was the situation.
10         So Fernandez did not have any other choice
11   because that vessel, the age of the vessel, there's not
12   that many markets at that time willing to accept that age
13   of an vessel.  He had no other choice than to accept.  He
14   did not agree with that value, but he did not have a
15   choice.
16   Q.    Are you aware that Concept Special Risks on
17   behalf of Great Lakes does not insure vessels for more
18   than an insured had invested in it, but not including
19   routine maintenance costs?
20        MR. MARINELLO:  Objection, form.
21   A.    Yeah, I do not know.
22        MS. GOLDMAN:  Thank you.
23        MR. BAYER:  Form as well on that.
24   BY MS. GOLDMAN:
25   Q.    Mr. Fernandez has testified that some of

Page 96

1    these items on this list were not done, and he said that
2    perhaps Ms. Watson made them up.  Who do you -- do you
3    think that he's lying or is Ms. Watson lying?
4         MR. MARINELLO:  Objection, form, predicate.
5         MR. BAYER:  Form.
6    BY MS. GOLDMAN:
7    Q.    And I'm referring to Plaintiff's Exhibit 2.
8         MR. MARINELLO:  Again, form, predicate.
9         MR. BAYER:  Join.
10   A.    You know, let me repeat what I said
11   earlier, Jacqueline.
12        The summary was a consolidation of items
13   reflected on hard copy invoices.  Okay?  They came from
14   hard copy invoices.
15        What -- what Mr. Fernandez -- you allege
16   he's saying, I don't know, but these invoices exist.
17   BY MS. GOLDMAN:
18   Q.    And they were provided to Global?
19   A.    They were provided by Jorge Fernandez when
20   Concept refused to accept the survey.
21        The increase in value based on the
22   certified survey, they made him prove it and he did
23   submit invoices, hard copy invoices.
24   Q.    To Global?
25   A.    Yes.

Page 97

1    Q.    Okay.  Thank you.
2    A.    Yeah.  And it was summarized.
3         Like I said, there may be an email where it
4    was actually sent to -- to Concept.  I don't recall if
5    there -- if they requested the actual invoices or they
6    took this email as a guideline.  But the invoices exist,
7    that I am completely sure of.
8         MS. GOLDMAN:  Moving on to Plaintiff's
9    Exhibit 4.
10        (Plaintiff's Exhibit No. 4 was marked for
11   identification.)
12   BY MS. GOLDMAN:
13   Q.    What I would like to mark as Plaintiff's
14   Exhibit 4.  Have you seen this email before today?
15   A.    I probably did, yes.  I don't recall it.  I
16   don't recall what it says.
17   Q.    I will scroll down so you can see it.
18   A.    But my name is on it, so I must have seen
19   it.
20   Q.    Scrolling down to page 2.  There's an email
21   dated March 19th, 2018 from you to James Potter.  Do you
22   see that?
23   A.    Yes.
24   Q.    And this email seems to be discussing a
25   renewal of the policy with Rockstone for Sea 21-21 doing

Jose Figueroa
August 25, 2021

Page 98

1   business as Jet Boat Miami, is that accurate?
2       A.   That's correct.
3       Q.   But this isn't for La Bestia, this is
4   for --
5       A.   Right.
6       Q.   -- the water sports business, correct?
7       A.   Correct.
8       Q.   Okay.  But it's still Sea 21-21?
9       A.   21, yes.
10      Q.   The second to last paragraph starts
11  with "Finally, please note..." I will just read it out
12  loud into the record.  This is your email so I will just
13  read this out loud.  "Finally, please note that the two
14  open claims are considered to be "frivolous" and should
15  be closed with only defense expenses.  As you saw
16  yourself, Jorge and his family and staff are conducting
17  the most efficient safety first water sports operations
18  within the Rockstone Marine portfolio.  This is one of
19  the elite operators for which our program is made to
20  attract.  Thank you for granting him well-deserved
21  consideration when pricing his renewal." Did I read that
22  correctly?
23      A.   Yeah.
24      Q.   Apart from stumbling a little bit.
25           The first sentence refers to two open

Page 99

1   claims, which you describe as frivolous.
2       A.   Correct.
3       Q.   What claims are you referring to?
4       A.   I recall there was a -- a lady, a
5   participant, they're called participant, that's climbing
6   up onto the pier.  She claimed she went up onto the pier,
7   and -- and as she is coming out of the water up onto the
8   pier, she says she hurt -- she hit her knee.  And
9   immediately the procedure is very clear.  Medical
10  attention is offered -- was offered to her and she
11  declined it.  She walked all the way through the pier
12  into the hotel and two hours later, she came and said
13  that she had hurt her knee massively.
14      Q.   Uh-huh.
15      A.   And she wanted to file a claim.
16      Q.   Do you remember her name?
17      A.   No, I don't.
18      Q.   Was it Andrianna Diaz?
19      A.   I don't recall.
20      Q.   Was it Mache Lanier?
21      A.   I don't recall.  But that was one of the
22  frivolous lawsuits that I was talking about.
23      Q.   One more, was it Maria Cardoza?
24      A.   I don't recall.
25      Q.   Okay.  That's one of them.  What was the

Page 100

1   other one?
2       A.   I think it had to do with a banana boat
3   participant that hit the person in front of him and then
4   said that there was -- that he suffered an injury.
5           And again, medical -- medical services were
6   offered to him, paramedics and so forth.  He refused and
7   walked away.  And I believe quite some time later, he
8   wrote a letter saying that he wanted money basically for
9   his injuries sustained, even though -- let me -- let me
10  just clarify this.
11          Why they're frivolous?  Because in those
12  operations, all participants must sign a waiver of
13  liability document where it is stated that they
14  understand that this activity, recreational activity can
15  result in bodily injury, okay, as a result of the
16  operations.
17          And they sign off, saying I waive my
18  rights.  I understand it.  And I understand that there is
19  possibilities of getting injured, and I now will pay for
20  my ride.  It's mandatory.
21          So because of that document, there is the
22  case where it is frivolous because, one, there was no
23  proven bodily injury.  And second, they had signed a
24  waiver.
25      Q.   I see that you refer to them as frivolous

Page 101

1   in your email.
2       A.   It's a commonly used term.  It's a very
3   commonly used term in our industry with Lloyd's, yes.
4       Q.   And this is -- you're referring to them as
5   frivolous in the context of requesting a renewal quote,
6   is that correct?
7       A.   That's correct.
8       Q.   Okay.  I am going to scroll up to the first
9   page, which looks like a response to your email.
10      A.   Yep.
11      Q.   The email from Tom Shepherd dated
12  March 20th, 2018, addressed to you and James Potter.
13  Also Gabriel Figueroa is cc'd.  Who is Gabriel Figueroa?
14      A.   He's my son.
15      Q.   Global Insurance is a wholly owned and
16  operated insurance agency and a family business?
17      A.   It's a family business, correct.
18      Q.   I know how that is.  I'm in a firm with my
19  father and my two brothers and -- and sometimes good,
20  sometimes bad working with family.  It's a blessing most
21  of the time.
22          In this email, Mr. Shepherd says, "The
23  claims may be frivolous and amount to nothing but we have
24  to take them into consideration." Did I read that
25  correctly?

Jose Figueroa
August 25, 2021

Page 102

1    A.    Yeah.
2    Q.    So it seems that underwriters do consider
3  these what you would call frivolous claims to have some
4  effect on their judgment.
5          MR. MARINELLO:  Objection, form.
6    A.    Do I answer --
7          MR. MARINELLO:  Okay.
8    A.    -- Neil?
9          MS. GOLDMAN:  I will rephrase the question.
10   A.    Okay.  I'm new at this, so please bear with
11 me.
12 BY MS. GOLDMAN:
13   Q.    Do those losses that you refer to in your
14 email of March 18 --
15   A.    Right.
16   Q.    -- 2018, do those losses sound at all
17 significant to Mr. Shepherd?
18         MR. MARINELLO:  Objection, form.
19         MR. BAYER:  Object to the form.  Object to
20 the form as well.
21         You're asking him to speculate on how
22 another person interpreted.
23         MS. GOLDMAN:  I'm asking him, what does he
24 think Thomas Shepherd meant when Shepherd said to
25 him that these claims may be frivolous but we have

Page 103

1  to take them into consideration.
2          MR. MARINELLO:  Objection, form.
3          MR. BAYER:  Object to form.
4          I think it speaks for itself.  He can't
5  speculate as to Mr. Shepherd's state of mind.
6          MS. GOLDMAN:  He can still answer.
7          MR. BAYER:  Jose, if you can answer, you
8  can.
9    A.    Yeah.  Yeah.  Again, I -- I understand what
10 he's saying that -- that they -- it should be brought to
11 his attention, but I don't know how material it is.
12 I don't think it's material, and -- and to be honest, it
13 wasn't material.
14 BY MS. GOLDMAN:
15   Q.    It wasn't material.  Really?  What do you
16 mean?
17   A.    It was not material to the -- because we
18 insured him.  We did insure the policy.
19         If it would have been material, the
20 underwriter of this program would have declined it, but
21 it wasn't.
22   Q.    He would have declined or they might have
23 increased the premium, isn't that true?
24         MR. BAYER:  Form.  You're calling for
25 speculation.

Page 104

1          MR. MARINELLO:  Again, form.
2          MS. GOLDMAN:  He's not going to have to
3  speculate for much longer when we look at my next
4  exhibit.
5    A.    Okay.  Well, then, let's look at it.
6          MR. MARINELLO:  Look at it.
7          MR. BAYER:  You want to show him another
8  exhibit, that's fine.  But don't try to set him up
9  by asking him to speculate.
10         MS. GOLDMAN:  Okay.  All right.  Thank you.
11 Counselor's objection's noted.
12         Thank you.  Please.
13         MR. BAYER:  You're welcome.
14         MS. GOLDMAN:  You can keep -- he's agreed.
15 All right?
16         MR. BAYER:  Okay.
17 BY MS. GOLDMAN:
18   Q.    Mr. Figueroa --
19   A.    Yes.
20   Q.    -- have you seen -- strike that.
21         MS. GOLDMAN:  I would like this to be
22 marked as Plaintiff's Exhibit 5.
23         (Plaintiff's Exhibit No. 5 was marked for
24 identification.)
25 BY MS. GOLDMAN:

Page 105

1    Q.    Have seen this email before, this email
2  chain?
3    A.    I'm seeing it now.
4          MR. MARINELLO:  Which one?  Which one?
5          MS. GOLDMAN:  I can scroll through it
6  slowly so you can --
7          MR. MARINELLO:  No, but there's multiple
8  emails.
9  BY MS. GOLDMAN:
10   Q.    Have you seen this email chain before?
11   A.    I don't recall if I've seen it.  The one
12 that my name is on it, sure, I've seen it.
13   Q.    Okay.  Let's go on the second page where
14 there is such an email.
15   A.    Okay.
16   Q.    Do you see the email dated March 3rd, 2018
17 that you sent?
18   A.    Yes, I do.  Yep.
19   Q.    Sir, I will just ask if you please allow me
20 to finish my question, it makes the record more clear
21 before you answer.
22   A.    Okay.  I will.
23   Q.    Have you seen this email on page 2 dated
24 March 23rd, 2018, from you to jorge@jetboatmiami.com?
25   A.    Yes, I have.

Jose Figueroa
August 25, 2021

Page 106

1    Q.    And is that Jorge Fernandez?

2    A.    Yes, it is.

3    Q.    And in the second paragraph, it says, "As I

4    expressed to you earlier today, I have obtained special

5    considerations from underwriters to revise their original

6    premium calculation, which was much higher due to your

7    open claims and the loss of your claims free discount."

8    Do you see that?

9    A.    Yes.

10   Q.    So Mr. Fernandez lost his claims for

11   discount, correct?  That's what you're saying?

12   A.    No.  I think he was given consideration.

13   Q.    So do you see here is a discount being

14   added here?

15   A.    A discount?  I don't -- I don't -- I don't

16   know if there is a discount, but what happens is that if

17   you renew a policy without any claims, you -- you

18   maintain a preferential rate.  The moment you have a

19   claim, then your price goes up or it may be nonrenewed.

20   Policy may be nonrenewed.  That's how it works.

21   Q.    And so what happened with Rockstone and

22   Lloyd's because of those two claims?  Did he lose his

23   claims free discount?

24   A.    No, no.  That's what I'm saying that we

25   were able to -- to get special consideration to revise

Page 107

1    their original premium calculation.  Okay.

2    Q.    Well, I see where it says --

3    A.    They reviewed the claim, they reviewed

4    those two incidents and did not penalize him.  Did not

5    penalize him at renewal.  That's basically what happened.

6    Q.    So is the premium unchanged from the prior

7    year's policy to this renewal?

8    A.    I don't recall if it was -- what the

9    premiums were because there's a number of other items in

10   there, jet skis, banana boats.  Prices may have gone up

11   on those.

12        I don't recall.

13   Q.    Were you aware that Mr. Fernandez or Sea

14   21-21 still owed the prior owner some amount of money for

15   the vessel at the time that he applied for coverage of

16   La Bestia with Great Lakes?

17   A.    See that that's -- let me -- let me put it

18   in context.  Because, originally, when La Bestia came in

19   to -- to Global, a -- a statement of sale was provided to

20   us.  And on that application, which was not Concept,

21   that's why I say it was -- to put it in -- in the AURA

22   application, the -- the owner of the -- the seller of the

23   vessel was listed as a loss payee on that application.

24        However, what happened during those

25   12 months, we don't know.  That's why it's required for

Page 108

1    the insurer to prepare another application.  And in that

2    second application, and subsequent to all the

3    applications of La Bestia, the loss payee of that

4    original seller was never -- was never requested to be

5    endorsed.  And, accordingly, we did not endorse.

6    Q.    Did Global ever have -- I'm sorry.

7    A.    No.  That I asked Jorge individually, hey,

8    did you pay off your loans?  Did you do this?  That's not

9    my -- that's not my scope.

10        We provide an application, they're supposed

11   to complete it and if they left it out, and -- and -- and

12   mind you, the -- the lienholder never requested the

13   endorsement.  Usually, this is how it goes.

14        The moment that a bank, for instance,

15   doesn't receive a certificate of insurance saying that

16   they have an interest on that policy, they will react

17   immediately and ask for the endorsement and certificate

18   of insurance.  That's the reality of this business.  The

19   holder of the lien makes sure that they're included as

20   part of that policy.

21        In this case, neither the purchaser -- the

22   seller, nor Jorge said anything about a debt being

23   outstanding, so I would not have a -- a means of knowing

24   it.

25   Q.    Thank you.  Did Global ever have the

Page 109

1    authority to bind a risk with Great Lakes Insurance?

2    A.    No.

3    Q.    That's because it wasn't Global's decision

4    to bind coverage, correct?

5    A.    That's correct.

6        Again, we are intermediaries.  The insured

7    has to authorize the purchase and the one that binds the

8    coverage is not us.  We will report it to Concept,

9    Concept binds it with the insurance companies.  It isn't

10   us.

11        MS. GOLDMAN:  That's all I have.

12   A.    Yeah.

13        MR. MARINELLO:  Mr. Figueroa, you have the

14   right to read this deposition transcript --

15        By the way, I don't have any other

16   questions.

17        You have the right to read this transcript

18   before the court reporter finalizes it.  If there

19   is anything that you consider that was taken down

20   wrong, you can actually prepare an errata sheet,

21   I'm sure your attorney would be able to help you

22   with that.

23        What that means is, it doesn't necessarily

24   change the transcript, it just says what you think

25   it should have said.

Jose Figueroa
August 25, 2021

Page 110

```
 1        THE WITNESS:  Yeah.
 2        MR. MARINELLO:  Your attorney will discuss
 3   that with you.
 4        MR. BAYER:  We'll read it.  The court
 5   reporter will prepare it.
 6        MR. MARINELLO:  The only problem we have is
 7   that we desperately need this transcript for
 8   purposes of a -- opposing the summary judgment,
 9   and I understand that it will not be finalized as
10   of yet, but Ms. Court Reporter, we're going to ask
11   that it be prepared within the next 24 hours on an
12   expedited basis, if you can make that happen.
13        I know it's -- you know, fortunately, it
14   didn't take all day, it's not eight hours, but we
15   will need this transcript accordingly.
16        Barbara, we have said that he will read.
17   So, once it's available, will you please indicate
18   to him that it is available for his reading.
19        THE WITNESS:  Gentlemen, Jackie,
20   Ms. Goldman?
21        MS. GOLDMAN:  Yes.
22        THE WITNESS:  While I was on break, I did
23   pull some documentation of the past that I think
24   they're very material.  And -- and I will not be
25   at ease without putting this on the record.  Okay?
```

Page 111

```
 1   In the policy --
 2        MS. GOLDMAN:  Are we back on the record,
 3   Ms. Court Reporter?
 4        THE WITNESS:  Yes, yes.  I would like to
 5   put this on the record because I think it's very,
 6   very, very material.
 7        You guys will figure out how it goes, what
 8   there is, something that needs to be clarified.
 9        In 2016, in 2014 -- to 2014, a policy was
10   issued with Great Lakes via Concept, which the
11   insured was Sea 20-20, LLC and Jet Boat Miami,
12   LLC.  That policy was renewed in 2016, Sea 20, LLC
13   and Jet Boat Miami, LLC.
14        Actually, it started in 2014.  2014, 2015
15   and 2016.  This was bound through Concept with
16   Great Lakes, and it was Sea 20-20, LLC and Jet
17   Boat Miami.  Therefore -- therefore, all these
18   claims -- and I must say it this way, all these
19   claims were -- were in the -- in the context of
20   Sea 20-20, LLC and Jet Boat Miami.
21        It -- I did mention that I remembered there
22   was a change in name and all that, and that is the
23   way -- when we did La Bestia originally, we had it
24   under Sea 20-20 and Jorge decided to separate it
25   into Sea 21-21.  And that is the reality.
```

Page 112

```
 1        I have -- I have the actual cover pages of
 2   the policies, the DEC pages.  So, for -- for
 3   honesty, you know, I got to say this.  I can't
 4   keep it.
 5        For honesty, all the losses that have
 6   occurred that were mentioned before were really
 7   with Sea 20-20, not even Sea 21-21.  And I did not
 8   know that, or else I would have said it before,
 9   until I pulled the actual declaration pages of the
10   policy.  And then I said, wait a moment, this is
11   Sea 20-20 that we've been always talking about,
12   and now it came to my mind clearly, that the
13   change that Jorge wanted was to take La Bestia out
14   of Sea 20, and he created a separate corporation,
15   Sea 21-21, to handle La Bestia for exposure
16   purposes.
17        That's -- that's the reality.  I just found
18   this out when I started pulling these documents.
19   And I want to go on record, I -- I just want to
20   have my conscious clear that I have served Great
21   Lakes, you know, with the truth as well as Jorge.
22   I have nothing to win or lose with this matter,
23   absolutely.
24        You know, our records are clear.  My track
25   record for -- as an agency, we have never had an
```

Page 113

```
 1   errors and omission in 25 years.  Never.  We've
 2   never had an errors and omission because we work
 3   very, very close -- we -- we are very good with
 4   documentation, and -- and when I saw this, I said
 5   I got to say this.
 6        What this means?  I don't know.  I really
 7   don't know.  But I wanted to go on record that it
 8   never was Sea 21-21 that those claims were
 9   attached to.  It was Sea 20-20.  And I have the
10   policies to substantiate that statement.
11        MR. MARINELLO:  Mr. Fernandez, I appreciate
12   that statement.
13             REDIRECT EXAMINATION
14   BY MR. MARINELLO:
15        Q.   And are you familiar with the fact that
16   Sea 21-21, LLC was actually formed on May 28th, 2015?
17        A.   Okay.
18        Q.   That's what the record says.
19        A.   Yeah.
20        Q.   And are you familiar with the fact that
21   Sea 21-21, LLC purchased La Bestia in February of 2016?
22        A.   Correct.  I wasn't aware of -- I'm telling
23   you what happened through our office.
24        Q.   I get it.
25        A.   It came -- it came as Sea 20-20.  We bound
```

Jose Figueroa
August 25, 2021

Page 114

1    it as Sea 20-20 and then we had to reverse it back out
2    and make it Sea 21-21 because Jorge wanted it as
3    Sea 20-20.  He corrected what he had put on the
4    application.  He put Sea 20-20 as being the owner, and
5    then when we issued the policy, he asked us to correct it
6    to make it Sea 21-21.  He wanted -- he wanted a
7    separation of this -- of his insurance policies and risk.
8         Q.   So it wasn't as if Mr. Fernandez had put La
9    Bestia first.
10             When he purchased it under the name of Sea
11   20-20, he wanted to make sure that La Bestia went into
12   its own insurance policy?
13        A.   That's correct.  And --
14        Q.   Okay.
15        A.   -- and he demanded a change to Sea 21-21.
16   He demanded a change.  You know, not demanded that he was
17   upset, it's just he wanted it in order.  He wanted it in
18   order.
19        Q.   But we know that La Bestia was bought
20   from the prior owner under the name -- into the name of
21   Sea 21-21?
22        A.   Correct.
23        Q.   Yeah.  So it was never really owned by Sea
24   20-20?
25        A.   Yeah.  Like I said, it -- it may have.  You

Page 115

1    know, I'm assuming it did come on the application, which
2    usually the applications were prepared by his wife.
3    Okay.
4             And she put Sea 21, we went ahead and did
5    it but when we came back, actually, with the binder, it
6    was -- we were requested to -- to change it.
7         Q.   Got it.
8         A.   Make it Sea 21.  And again, we -- at that
9    point, we did not know that Sea 21 existed.  We did not
10   know any of this.  He just said this has to be under
11   Sea 21 and we did it.
12             MR. MARINELLO:  Got it.  Thank you.
13        I have no other questions.
14             Jackie.
15             MS. GOLDMAN:  Nothing.
16             MR. MARINELLO:  All right.  Again,
17   Mr. Figueroa will read.
18             Barbara, I'm going to need this ASAP.  We
19   have a deadline.
20             (Discussion held off the record.)
21             (Thereupon, the proceedings concluded at
22   12:34 p.m.)
23
24
25

Page 116

CERTIFICATE OF OATH

THE STATE OF FLORIDA )

COUNTY OF BROWARD    )

        I, the undersigned authority, certify that

Jose Figueroa remotely appeared before me and was duly

sworn on the 25th day of August, 2021.

        Signed this 26th day of August, 2021.

        Barbara L. Kent, RMR, RPR, FPR, CSR-MI

        Notary Public - State of Florida

        My Commission No. GG 198346

        My Commission Expires:  March 20, 2022

Page 117

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA )

COUNTY OF DUVAL      )

        I, Barbara L. Kent, RMR, RPR, FPR, CSR-MI,

certify that I was authorized to and did stenographically

report the remote deposition of Jose Figueroa, pages 1

through 115, that a review of the transcript was

requested; and that the transcript is a true and complete

record of my stenographic notes.

        I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties, nor

am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.

        DATED this 26th day of August, 2021.

        Barbara L. Kent, RMR, RPR, FPR, CSR-MI

Jose Figueroa
August 25, 2021

Page 118

August 27th, 2021
Jose Figueroa
c/o Neil Bayer, Esquire
Campbell Johnston & Clark, LLP
Douglas Centre
2600 South Douglas Road, Suite 508
Coral Gables, Florida 33134
IN RE:  Great Lakes Insurance SE VS Sea 21-21, LLC
CASE NO.:  1:20-CV-22865-UU
Please take notice that on the 25th day of August, 2021,
you gave your deposition in the above cause.  At that
time you did not waive your signature.  The transcript is
now available for your review.
Please call (888) 881-3408 or email
production@phippsreporting.com between the hours of 9:00
a.m. through Friday 4:00 p.m., for access to a read-only
PDF transcript via computer.
Please execute the PDF-fillable Errata Sheet which will
be forwarded to you by Phipps Reporting.  The Errata
Sheet, can also be downloaded from
www.phippsreporting.com.  Once completed, please print,
sign, and return to us for distribution to all parties.
If you do not read and sign the deposition within 30
days, the original, which has already been forwarded to
the ordering attorney, may be filed with the Clerk of the
Court.
If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter and
return it to the address listed below.
Very truly yours,
Barbara L. Kent, RMR, RPR, FPR, CSR-MI
Phipps Reporting, Inc.
1551 Forum Place, Suite 200E
West Palm Beach, Florida 33401
I do hereby waive my signature.
_____
Jose Figueroa
Job. No.  204952

Page 119

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
IN RE:  Great Lakes Insurance SE vs Sea 21-21
CASE NO. 1:20-CV-22865-UU
WITNESS:  JOSE FIGUEROA        TAKEN:  08/25/2021
PAGE     LINE     CHANGE          REASON FOR CHANGE

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

          Under penalties of perjury, I declare that
I have read the foregoing document and that the facts
stated in it are true.
_____          _____
Date                 Jose Figueroa
Job No.:  204952

Jose Figueroa
August 25, 2021

1

---

### Exhibits

PLF Exhibit 001
Figueroa
  3:15 72:15,24
73:2,4

PLF Exhibit 002
Figueroa
  3:15 72:14
86:24,25 94:2
96:7

PLF Exhibit 003
Figueroa
  3:16 92:25
93:1

PLF Exhibit 004
Figueroa
  3:16 97:9,10,
14

PLF Exhibit 005
Figueroa
  3:17 34:20,21
36:2 104:22,23

DFT Exhibit 006
Figueroa
  3:21 33:2

DFT Exhibit 005
Figueroa
  3:21

DFT Exhibit 008
Figueroa
  3:23 49:25

DFT Exhibit 009
Figueroa
  3:22 47:20

DFT Exhibit 017
Figueroa
  3:22 42:18

DFT Exhibit 022
Figueroa
  3:20 20:5,6

---

  72:18

DFT Exhibit 025
Figueroa
  3:23 54:11

---

### $

$160,000
  95:6,8
$320,000
  94:7
$400,000
  41:10 88:4
93:23
$560,000
  91:23
$700,000
  41:12 88:1,4
$760,000
  87:25
$775,000
  91:21 93:23

---

### 1

1
  22:12 62:9
72:15,24 73:2,
4
10th
  50:8
11
  74:1,18 78:16,
19 81:9 84:15
11:04
  61:12
11:15
  61:6,10,11
11:16
  61:13
12

---

20:17 107:25
12:34
  115:22
14
  50:5
16
  14:15,18
17
  14:15,18 42:18
17th
  43:3
18
  102:14
19
  14:14,18
1987
  10:7
19th
  60:3 97:21
1:30
  8:21

---

### 2

2
  72:14 86:24,25
94:2 96:7
97:20 105:23
20
  51:12 72:17
90:5 111:12
112:14
20-20
  27:3 28:3 30:8
51:9,21,25
52:6 59:6,7,13
60:2,12,20
65:19 111:11,
16,20,24
112:7,11
113:9,25

---

114:1,3,4,11,
24
2006
  14:19
2013
  60:3
2014
  111:9,14
2015
  111:14 113:16
2016
  14:20 33:14,
15,21 36:14
38:22 41:17,18
43:3,10,19
44:18,21 62:10
64:13 111:9,
12,15 113:21
2017
  48:4,11 65:4,
12
2018
  9:15 20:17
33:21 35:3
37:12 42:14
43:18,21 50:8
51:22 59:18
66:15 73:12
97:21 101:12
102:16 105:16,
24
2018-2019
  54:16 68:1
70:7
2019
  54:17 86:21
90:5,8
2020
  54:17
2021
  33:7 38:19

Jose Figueroa
August 25, 2021

2

47:25 50:5

**20th**
90:8 101:12

**21**
49:3 51:6
60:12 98:9
115:4,8,9,11

**21-21**
26:5 30:8
43:6,11 46:22,
23,24 47:2
48:22 49:1,24
50:16,24 51:4
73:17 77:17
78:22 79:1,10,
13,14 86:4
97:25 98:8
107:14 111:25
112:7,15
113:8,16,21
114:2,6,15,21

**21st**
47:24 86:21

**22**
20:5,6 72:18

**23rd**
105:16,24

**24**
110:11

**24th**
33:7

**25**
54:11 57:22
113:1

**26**
48:11

**26th**
48:4

**28th**
113:16

**29th**
33:15

---
**3**
---

**3**
43:8 65:3
73:25 92:25
93:1

---
**4**
---

**4**
35:3 43:8
97:9,10,14

**4:00**
48:11

---
**5**
---

**5**
34:20,21 36:2
66:14 104:22,
23

**51**
61:22 67:6
70:9,10

**55**
70:6,8

---
**6**
---

**6**
33:2

**66**
5:10

---
**8**
---

**8**
49:25

---
**9**
---

**9**
47:20

**9:35**
4:2

---
**A**
---

**a.m.**
4:2 61:12,13

**aboard**
65:7

**absolutely**
6:24 43:23
44:1 65:11
66:11 112:23

**accept**
58:19 77:3
92:1 93:9
95:12,13 96:20

**acceptable**
84:2

**acceptance**
47:13 82:13

**accepted**
24:3 84:9
92:19 93:5
95:7

**access**
11:13 17:14
18:22 23:24

**accident**
7:11 48:9 58:2
67:14

**account**
47:13

**accurate**
36:5 98:1

**accurately**
58:9

**accuse**
12:12

**act**
79:20,21,24

**acted**
46:21,22

**active**
9:25 10:1

**activity**
100:14

**actual**
34:18 46:19
52:23 76:1
88:8 92:17
97:5 112:1,9

**add**
93:20,21

**added**
106:14

**additional**
17:20,21 21:24
23:2 88:4

**Additionally**
6:23 7:2,16

**address**
6:17

**addressed**
101:12

**addresses**
38:3

**adjuster**
28:17 29:1
31:23

**adjusting**
31:23

**admitted**
24:18

**advise**
47:18

affect
47:13

affirm
4:5

affirmed
4:12

age
95:11,12

agency
10:13 11:8,11,
15 101:16
112:25

agent
10:15 11:4,7,
12 12:16 14:1
46:23,24 47:1,
2 70:3 72:11

agents
10:20 11:9,10
17:24

agree
30:11 32:3
37:3,7 46:20,
22 56:21 58:10
67:9 68:23
85:20 95:1,4,
14

agreed
91:24 94:22
95:3,5 104:14

agreement
18:18 69:19

ahead
30:25 34:17
39:12 83:24
115:4

Alejandro
55:1,7

Alex
87:4 90:8
92:11,19

alive
5:11

allege
96:15

alleged
53:18

allegedly
66:10

amazed
5:13

Amendment
8:3

amount
21:17 93:19
94:5 101:23
107:14

amounts
88:13

analyze
31:23

analyzing
40:6

and/or
62:8

Andrew
82:7

Andrianna
65:13 99:18

answering
7:23 70:16
78:8

appearances
4:23

appears
26:6

applicants
47:17

application
16:7 17:9
18:5,9 19:10

20:10,13,15,20
21:11,19 23:6,
7,9,23 24:3,8,
16 26:23,24
32:20 33:14
38:25 39:16
45:4 46:21
47:5 48:22
49:1,3,5,8,12
50:19,20 52:2,
8,13,20 55:13
56:6,14,16,19
57:16,19,25
58:22 59:14
67:6 68:3,9
69:14 72:3,14
73:10 74:8
75:15,19 77:14
78:16 79:11,25
80:10,24 81:16
82:23 83:5
85:10 107:20,
22,23 108:1,2,
10 114:4 115:1

applications
15:4 16:12,24,
25 18:14,23
19:3,5,9,21
21:17,25
22:15,19
45:10,20 52:23
53:14 58:8
67:17 72:7
76:7 108:3
115:2

applied
74:11 79:2
107:15

applies
8:2 56:2 75:20
80:11 81:16

apply
49:19,20 78:25

appointed
23:25

appointment
17:13 25:11

appoints
28:17

appraised
41:11

appraiser
41:12

approach
18:14,15 19:19

approval
53:2

April
20:17

area
40:2

areas
77:1

arrested
56:23 57:3

ASAP
115:18

asks
25:20 54:22
77:20 79:25
84:15

asset
49:5 73:24
82:15

assign
31:23

assume
6:6 47:11

assuming
12:25 20:22
43:25 115:1

attach
11:10

attached
36:1,3,6,7
113:9

attaches
17:12

attaching
36:11 48:8

attempting
69:16

attention
99:10 103:11

attest
42:15

attorney
4:18 5:2 6:23
7:16,24 8:20
27:13 31:21
33:10 48:16
50:6 109:21
110:2

attorney's
31:21

attorney/client
8:1

attorneys
4:23

attract
98:20

audio
62:8

August
64:13

AURA
53:25 107:21

authority
109:1

authorize
109:7

auto
13:13,14,15

39:16 56:11
57:5,9

automobile
49:18 56:4

aware
55:4 67:10
95:16 107:13
113:22

Azul
43:5

---

**B**

back
10:12 29:1,12
38:22 43:16
54:2 59:5,21
61:5,10 83:4
84:15 89:20
93:25 111:2
114:1 115:5

backs
39:14

bad
101:20

badgering
86:11

banana
28:2 48:11
51:4,5 64:16
65:20 66:8
100:2 107:10

bank
90:19 108:14

Barbara
110:16 115:18

barreling
76:24

base
52:18

based

8:1 29:1,3
37:15 53:2
57:14 60:20
70:15 96:21

basically
22:17 26:1
40:23 70:12
78:11 79:8
85:3,4 88:5
95:8 100:8
107:5

basing
81:1

basis
29:3 58:19
75:9,11 110:12

Bayer
4:25 11:20
30:13,16,22
31:9 37:9
39:4,9 40:21
61:9 79:17,23
82:4 83:21
86:8 95:23
96:5,9 102:19
103:3,7,24
104:7,13,16
110:4

beached
37:7

beaching
43:14 62:14

bear
102:10

Beatriz
11:1 35:8 58:3
87:3 88:7 90:8
91:8,17 93:21

beeping
11:18

began
4:2

begin
8:13

begins
31:18

behalf
95:17

belief
36:4

believed
58:9

beneficial
73:18,21 75:6
77:16

beneficiary
78:8

benefit
13:17

benefitting
77:24

Benjamin
50:7

Bestia
20:10,11 23:10
24:7 36:12
37:5,13,16,17
38:4,8 39:3
42:5 44:2
48:23 49:4,7,
12,22 50:25
52:9,10,15
53:1,9 54:1,3
61:25 62:1,10
64:20,24 65:1,
7,8,17,24,25
66:18 67:15
68:1,3 69:12
80:11 81:5
88:9 90:25
93:4 98:3
107:16,18
108:3 111:23
112:13,15

113:21 114:9,
11,19

**Bestia's**
49:15

**biggest**
15:9

**bill**
42:22,25

**bind**
109:1,4

**binder**
115:5

**binds**
109:7,9

**bit**
5:17 98:24

**blah**
84:8

**blessing**
101:20

**blow**
7:23

**blowing**
39:24

**boat**
27:3,18 28:2
30:9 35:1
48:11 49:23
50:16,24 51:4,
5,7,11,25 52:4
59:12 60:18
64:16 65:2,20
66:8,9,12
80:22 98:1
100:2 111:11,
13,17,20

**boating**
54:22

**boats**
65:21 107:10

**bodily**
100:15,23

**body**
48:7

**bonded**
24:4

**Born**
6:10

**bottom**
32:14 53:4
54:19

**bought**
41:9,21 114:19

**bound**
24:4 111:15
113:25

**box**
43:8

**boxes**
90:23

**break**
6:25 7:1 8:15
60:24,25 61:1,
3,5 110:22

**breakdown**
93:21

**breaks**
6:24

**bring**
93:9

**broad**
81:13

**broke**
60:22

**broken**
32:18

**broker**
9:19 15:20,21,
23,25 17:14
18:8,12,21

25:8 28:7,12,
15 35:6 46:1
50:10 58:3

**brokerage**
10:18,21 11:5
17:10 27:1

**brokers**
9:5 12:17,18
23:25 45:7,16

**brother**
55:1 64:4,5
66:20

**brothers**
101:19

**brought**
103:10

**built**
21:18 24:17

**bumper**
39:15

**bumps**
39:15

**business**
5:8 7:3,18 9:1
10:13,23 11:2
14:2,3 17:10
18:19 19:18,20
23:19 25:6,11
57:22 59:2,8
71:16 81:6
90:24 98:1,6
101:16,17
108:18

**businesses**
27:2

**buyer**
43:6

**buzz**
11:20

**buzzing**
11:19

**_____**

C

**C-A**
63:11

**calculate**
88:12

**calculation**
106:6 107:1

**call**
7:4,13 102:3

**called**
11:9 14:23,25
15:3 37:1
52:15 57:7
81:4 99:5

**calling**
103:24

**calls**
7:9

**cap**
91:23

**capability**
56:18

**capacity**
10:8 68:14

**captain**
76:10

**car**
7:11 39:15
67:14

**Cardoza**
28:1 50:15
51:3 64:13
99:23

**career**
93:5

**carefully**
8:5

**Caribbean**
6:11,12

Jose Figueroa
August 25, 2021

6

carried
36:13

carrier
23:10,12

carriers
21:16 84:24
85:14

carrying
85:3

case
4:19 6:15 14:2
17:17 48:9
55:23 61:22
68:20 72:10
73:24 82:17
85:17 100:22
108:21

cases
8:3 11:10

Castillo
25:16 53:22
54:7 66:22

casualty
12:20,22 13:1

categories
88:19 89:23

category
18:24 88:8
92:18

caught
62:4

cayo
62:21,24 63:1,
8

cc'd
87:6 101:13

cell
12:11

certificate
76:5 108:15,17

Certification
35:25

certified
41:11 89:18
91:22 93:6
96:22

certify
36:3

chain
105:2,10

challenge
90:22

chance
20:19

change
51:23 55:17
59:21,23,24
60:11,17
109:24 111:22
112:13 114:15,
16 115:6

changing
60:12

chartered
22:17

Chief
10:8

children
7:8,9,12

choice
13:9 91:25
95:10,13,15

choose
81:18

Christopher
4:19

claim
27:25 28:4,15,
16,21,22 29:3,
6,7,25 31:5,7,
10,11,13,18,24

32:7,8 38:14
40:5 46:11,15
50:17 52:8
55:5,6 61:24
68:21,24 69:2,
5,18 70:3
77:25 78:3
86:3,4 99:15
106:19 107:3

claimant
28:18 29:10
31:19

claimed
28:1 51:4 99:6

claiming
48:20 69:12

claims
26:25 27:2,7,
9,21,24 28:19
29:17,20,22
30:7 45:12,15,
17,22 50:23
62:7 66:1
67:1,3,10,14
98:14 99:1,3
101:23 102:3,
25 106:7,10,
17,22,23
111:18,19
113:8

clarification
17:19

clarified
111:8

clarify
17:6 45:24
77:8 100:10

class
23:18

classes
71:10

clean
38:7

clear
99:9 105:20
112:20,24

client
30:17 58:5

client's
30:18

clients
58:4

climbing
99:5

close
29:14 113:3

closed
29:22 98:15

co-counsel
4:18

code
46:25

comment
30:17 69:1
88:6

commercial
13:20

Commissioner
71:17

common
17:9 45:8 70:1
79:5 85:25

commonly
22:2 35:19
101:2,3

companies
10:3 16:24
17:3 19:2,5,22
24:6,18 25:5,
10 27:4,7,15
28:25 29:20

Jose Figueroa
August 25, 2021

7

45:13,19,21
49:6 56:13
71:22 75:25
81:22 82:13,21
109:9

**company**
9:3,16,18,21,
24 10:17 12:20
13:23 14:7,8
15:2,16 16:4
18:22,25 19:10
28:16 30:1
31:22,23 36:25
47:10,15,19
48:24 50:9,10
51:7,10 52:5
55:11,17
56:20,22 57:11
60:18 67:23
72:7,9 77:24
84:4 93:5,8
95:1

**compared**
19:4,22

**complete**
22:22 108:11

**completed**
17:16 21:11
24:3 52:2

**completely**
28:15 43:24
97:7

**comprehensive**
19:11,12,17,20
21:13,16

**computer**
12:2

**con**
64:21

**Concept**
16:12,18 17:17
18:13 19:4,8,

16,17 22:21
23:8,21,25
24:2,3,20
30:4,6 31:2
44:25 45:3,10,
13,23 46:7,10,
12 47:3 49:9
50:18 53:2
57:17,20 60:13
65:21 67:7
68:10 72:11
75:21 78:10
88:1,3,10,24
89:1,5,6,11,20
91:3,7,15,19,
20,24 92:2,7,9
93:13 95:5,16
96:20 97:4
107:20 109:8,9
111:10,15

**Concept's**
18:5 52:23
76:7 93:8

**concerned**
67:20 82:16

**concerns**
90:11

**concluded**
115:21

**conditions**
29:2,4 31:25
49:21 67:21

**condominiums**
13:25

**conducted**
37:15

**conducting**
98:16

**conscious**
112:20

**consequential**
40:3,6 55:20

**consideration**
47:14 98:21
101:24 103:1
106:12,25

**considerations**
106:5

**considered**
12:16 56:13
71:25 72:2
98:14

**considers**
75:21

**consolidated**
89:23 91:17

**consolidation**
96:12

**construed**
74:21

**contact**
15:4,15

**contemplated**
56:5

**contents**
37:11

**context**
85:9 101:5
107:18 111:19

**continued**
18:1

**continuous**
32:18

**contract**
80:23

**contrary**
51:17

**controlling**
73:23

**conversation**
38:6,21 59:2

**convicted**
80:1

**copied**
28:7 33:10,11
35:8

**copy**
96:13,14,23

**corporate**
82:2

**corporation**
9:19 15:24
16:1 27:18,22
49:24 50:10
51:9 60:8,18
65:2 75:13
79:2,15,20,24
112:14

**corporations**
10:1 60:1

**correct**
5:22,23 6:3,4
8:24 16:5 21:6
23:3,11 27:10,
11,16 31:8
35:7,24 36:16
38:20 45:5
48:17 49:3
52:10 53:7
54:21 55:13,14
60:4,6 61:11
62:16 65:15
66:25 67:4
68:9 73:12
74:8,9,24
77:17,18 78:6,
17 83:13,14
87:6 88:20
90:14 93:15,
16,19 94:14,
15,18,19 95:6
98:2,6,7 99:2
101:6,7,17

106:11 109:4,5
113:22 114:5,
13,22

**corrected**
114:3

**correctly**
98:22 101:25

**correspondence**
59:22

**cosmetic**
44:16,17,19,22

**costs**
91:12 95:19

**counsel**
5:4 71:1

**Counselor's**
104:11

**count**
45:25

**County**
15:10

**couple**
43:15

**court**
6:1,17 86:3
109:18 110:4,
10 111:3

**cover**
53:15 55:19
76:1 112:1

**coverage**
87:22 94:25
107:15 109:4,8

**covered**
8:12 27:23
53:1 62:12

**covers**
81:4 93:22

**created**
112:14

**creating**
82:15

**crew**
22:18 76:11

**Crewman**
66:15

**criterias**
68:13

**CROSS-
EXAMINATION**
70:23

**Cuba**
6:12

**Cuban**
6:7,11 62:18

**customary**
84:1

**customer**
48:10

---

**D**

**Dade**
15:10

**damage**
33:22 41:5
44:1 53:10

**damages**
39:20 40:25
41:1 44:4,5,8
46:6,19

**date**
20:14,15,16
21:17,23 32:14
37:15 42:25
51:8

**dated**
33:6 86:21
90:5 97:21
101:11 105:16,
23

**dating**
38:22

**daughter**
11:1

**daughter's**
21:9 35:8

**day**
13:12 15:11
36:9 91:8
110:14

**deadline**
115:19

**deal**
6:15 81:22

**dealing**
27:14 55:6,10
66:5

**deals**
28:17 36:25
52:20

**dealt**
27:2 46:8
66:16

**debris**
63:4,6

**debt**
108:22

**DEC**
112:2

**December**
60:3

**decide**
55:18,21

**decided**
13:14 91:20,22
93:9 111:24

**decision**
82:25 83:3,9,
11 109:3

**declaration**

**26:2 38:11**
57:14 112:9

**declare**
84:6

**declared**
52:16 84:9

**declaring**
26:24

**declined**
69:6 99:11
103:20,22

**deductible**
46:18

**defendant's**
20:6 33:2
34:21 42:18
47:20 49:25
54:11

**defense**
29:9,21 98:15

**define**
47:7

**demanded**
114:15,16

**denial**
68:23 69:18
86:3

**denied**
46:11,13

**deny**
61:24

**denying**
68:20

**Department**
10:9 18:3 60:1
71:17

**depo**
5:14

**deposition**
5:9,12 20:5

Jose Figueroa
August 25, 2021

9

72:15,21
109:14

**depositions**
5:16

**describe**
31:5 99:1

**description**
44:17

**desperately**
110:7

**detailed**
19:20 23:1
26:9 54:19

**details**
20:24 28:21
74:17

**determination**
70:11

**determine**
29:2

**determining**
57:12

**developed**
19:19

**dialogue**
37:20

**Diaz**
65:13 99:18

**difference**
31:7

**differently**
84:5

**difficult**
5:17 91:4

**diligence**
69:4

**direct**
4:14 25:6,11
56:6

**directed**
75:13 84:22

**directly**
28:17

**director**
30:4

**disagree**
85:23

**disbursement**
29:9

**disclose**
47:3 67:8,18

**disclosed**
50:18 55:12

**discloses**
54:18

**discount**
106:7,11,13,
15,16,23

**discuss**
110:2

**discussing**
73:11 97:24

**discussion**
115:20

**dispute**
79:19

**disqualifies**
24:17

**distortion**
62:8

**distracting**
12:4

**distrust**
58:19

**Division**
60:1

**dock**
37:17 41:10,
14,18 42:10,13

62:14

**docked**
37:6 41:4

**docking**
36:13,15 41:6
42:16 43:23
87:21

**document**
19:24 33:4
35:17,25 36:6,
7,25 47:24,25
50:3,11 53:5
73:7 86:19
100:13,21

**documentation**
17:20 18:11
31:20 39:1
89:16 90:19,23
91:3 110:23
113:4

**documented**
38:24

**documents**
51:16 89:25
112:18

**dollars**
94:7

**domestically**
13:16

**double**
63:11,12

**Dowers**
50:7

**drifting**
63:6

**driver**
57:9

**driving**
56:23 57:3
64:2

**drove**
15:11

**drunk**
56:23 57:3

**dry**
36:13,14 37:6,
17 41:3,6,10,
14,18 42:10,
13,16 43:9,22
61:2,4 62:14
87:20

**due**
69:4 106:6

**duly**
4:12

---

**E**

---

**E-N**
63:11

**earlier**
73:11 78:4
94:12 96:11
106:4

**ease**
110:25

**economic**
13:17

**education**
18:1,4

**effect**
102:4

**effective**
60:2

**efficient**
98:17

**electronics**
12:1

**elite**
98:19

Jose Figueroa
August 25, 2021

10

email
  15:3,4 32:25
  33:6 34:4,6,9,
  12,18,25 36:7
  37:12 38:2,5,
  24 39:6 40:18
  41:16 43:17
  53:25 62:13
  86:20 87:3
  88:10 89:23
  90:3,7,9,11
  91:9,18 92:6,
  10,13 93:21
  97:3,6,14,20,
  24 98:12
  101:1,9,11,22
  102:14 105:1,
  10,14,16,23
emails
  58:15 59:23
  105:8
emphasizes
  76:7
employee
  66:9
employees
  22:18
en
  62:21,24 63:1,
  8
end
  13:12 29:17
endorse
  108:5
endorsed
  108:5
endorsement
  108:13,17
engines
  22:1
English

  6:14,18,21
  34:9 35:14
  36:5,9,23
  40:20 63:15,16
ensure
  52:8
enter
  4:23
entered
  18:18
entity
  27:24 75:14
  82:2
equivalent
  18:13
Erick
  66:15
errata
  109:20
errors
  113:1,2
establish
  89:18
established
  29:5,6 92:1,2
establishing
  87:24
estate
  11:3,5 13:20
evaluating
  76:2
event
  78:2
events
  85:15
EXAMINATION
  4:14 113:13
examined
  4:12

Examiner
  10:8
exception
  7:24
excuse
  5:10 80:1
exhibit
  20:5,6 33:2
  34:20,21 36:2
  42:18 47:20
  49:25 54:11
  72:14,15,17,
  18,24 73:2,4
  86:15,24,25
  89:10 92:25
  93:1 94:2 96:7
  97:9,10,14
  104:4,8,22,23
exist
  39:7 69:18
  96:16 97:6
existed
  60:3 115:9
existing
  32:1
expand
  82:11
expecting
  18:8
expedited
  110:12
expenses
  29:9 67:13
  82:9 88:8
  98:15
experience
  54:22 81:25
  82:12
experienced
  7:11

explain
  17:9 28:8,9
  29:18 77:21
  83:22
explaining
  14:10
exposure
  49:4 55:17
  112:15
expressed
  106:4
extend
  80:12
extended
  79:3
extensive
  19:21
extremely
  19:11,15

———————
      F
———————

facility
  28:12
fact
  64:9 65:6,16,
  18 66:6 68:2
  113:15,20
familiar
  55:4 62:1,21
  87:7 113:15,20
family
  7:2,8 58:17
  98:16 101:16,
  17,20
fare
  22:12
Farm
  24:23
father
  101:19

**February**
33:15 43:3
113:21

**feel**
7:5,13

**fell**
51:4

**Fernandez**
14:13 15:6,15
23:6,20,23,24
25:9,19 26:11,
14 27:1,12,17
30:8 32:16,19,
20 33:15,22
35:13,21 38:3,
22 39:2 40:7,
16 41:21 42:5
43:10 45:14
49:12 50:21,22
51:24 53:22
54:5,25 55:2,
6,7 56:23
57:2,3 58:6,12
60:4,20 62:8
63:25 66:4,10,
19 67:7,25
68:4 69:13
73:20 78:9
79:12 80:4
81:6 82:5,9,20
86:4 87:8,19
88:7 89:21
94:13 95:10,25
96:15,19
106:1,10
107:13 113:11
114:8

**Fernandez'**
57:16 61:24
66:20

**Figueroa**
4:11,16 5:8
8:23,25 12:15

38:2 44:25
50:4 52:18
58:3 60:21
61:16 70:18,25
73:7 78:23
83:17 101:13
104:18 109:13
115:17

**Figueroa's**
5:1

**figure**
111:7

**file**
27:21 30:2
88:23 99:15

**filed**
34:24 36:1
38:14 61:21

**files**
31:19 59:20

**filled**
15:5 58:7

**final**
91:24

**finalized**
110:9

**finalizes**
109:18

**Finally**
98:11,13

**find**
23:21 29:24
30:7

**fine**
104:8

**finish**
83:21 105:20

**finished**
41:10

**fire**

62:4 69:11

**firm**
101:18

**flooding**
82:19

**Florida**
4:18 9:2
10:12,14 11:1,
2 13:15,16,22
15:8,10 17:24
23:19 24:11,
13,18 45:25
46:25 60:1
62:5

**focus**
76:13

**focused**
75:15

**form**
7:21 30:21,22
31:9 37:9
39:4,8,9 40:21
79:17 80:8
82:4 85:7
86:6,8 87:12,
14 89:4 94:10
95:20,23 96:4,
5,8 102:5,18,
19,20 103:2,3,
24 104:1

**formal**
17:6

**format**
20:24

**formed**
9:15 51:9,10
60:9 113:16

**forms**
17:15,16,18
22:22 78:13

**Fort**

9:2

**forthcoming**
58:8

**fortunately**
110:13

**forward**
7:23 9:7 14:9
31:22

**forwarded**
17:16 47:24
57:17

**found**
69:4,21,25
112:17

**free**
7:5,13 106:7,
23

**frivolous**
98:14 99:1,22
100:11,22,25
101:5,23
102:3,25

**front**
100:3

**full**
8:23

**fully**
6:2,18

**function**
71:21

**functional**
44:15

---
G
---

**Gabriel**
101:13

**gave**
93:21

**GEICO**
24:22 25:4

general
  72:11

generally
  84:1

generate
  56:12

gentleman
  14:12

Gentlemen
  110:19

give
  4:6 5:11,14
  6:20 68:25
  86:16

giving
  57:11

Global
  9:5,6,7,8,14
  12:15,19 14:3
  28:14 45:7
  58:2 86:5
  91:14 92:7
  96:18,24
  101:15 107:19
  108:6,25

Global's
  109:3

Goldman
  5:3 7:18
  11:17,24 12:8,
  12 30:12 32:9
  33:7 34:14,24
  36:18 37:2,22
  40:18 43:17
  47:24 50:5
  70:20,22,24
  71:1 72:13,18,
  20,23 73:1,6
  79:22 80:18
  82:24 84:11
  85:19 86:14,
  18,23 87:2,17

88:11 89:8
90:2 92:24
93:12,24 94:11
95:22,24 96:6,
17 97:8,12
102:9,12,23
103:6,14
104:2,10,14,
17,21,25
105:5,9 109:11
110:20,21
111:2 115:15

good
  4:16 8:16,17
  44:16 61:7,9,
  19 76:3 94:13
  101:19 113:3

grammar
  63:17

granting
  98:20

gravitate
  11:14

Great
  5:4 16:12,19
  22:21 24:20
  30:3 45:23
  46:12 47:4
  48:20 49:9
  53:3 60:14,15
  61:21 62:7
  68:20 69:3,10,
  12,21 71:1
  72:10 86:2
  91:20 95:17
  107:16 109:1
  111:10,16
  112:20

greatly
  5:25

grounded
  62:20 64:1

grounding
  53:9 62:10,12,
  14

grounds
  70:6

Group
  17:18

guess
  18:7

guideline
  97:6

guidelines
  72:8

guilty
  5:21

Gustavo
  25:16 53:21

guys
  111:7

---

H

---

half
  15:11 60:22

hand
  4:3

handle
  112:15

handwriting
  20:25 21:2,5,9

happen
  83:25 110:12

happened
  23:15 38:8,12
  40:13,15
  41:17,18 43:9
  44:18,20 46:4
  53:23,24 54:9
  65:1,2 89:13,
  14 92:16
  106:21 107:5,

24 113:23

happening
  37:3

hard
  24:17 89:24
  96:13,14,23

health
  12:21

hear
  7:7,20 11:22

hearing
  11:18 12:10

heart
  7:10

held
  115:20

Henry
  4:17 11:17
  36:21 51:20
  72:15

hey
  108:7

higher
  37:14 46:19
  106:6

history
  56:18 77:4,11

hit
  10:11 37:7
  39:25 40:2
  62:25 63:4,6
  99:8 100:3

hitting
  36:17

hold
  21:20 89:9

holder
  108:19

home
  63:17 82:21

Jose Figueroa
August 25, 2021

13

homeowner's
  13:2,18 56:3,
  11
honest
  24:9 34:11
  35:15 57:21
  103:12
honesty
  112:3,5
hope
  8:21
hotel
  99:12
hour
  13:11 60:22
hours
  8:20,22 58:12
  99:12 110:11,
  14
house
  82:6
Hugo
  10:11
hull
  37:14 40:4
hundred
  9:10 67:9
hurricane
  10:11 76:22,23
  82:7
hurt
  99:8,13

—————————
          I
—————————

idea
  45:3 68:19
  87:9
identification
  73:5 87:1 93:2
  97:11 104:24

identified
  20:7 33:2
  34:21 42:19
  47:20 49:25
  54:12
ignore
  7:22
image
  4:20
immediately
  99:9 108:17
impeccable
  57:23
implicated
  50:22
important
  5:19
improvement
  37:13 41:4,16
  42:6,17
improvements
  88:9
incident
  27:14 28:3,10,
  24 31:11,14
  33:21 37:21
  38:16 39:19,23
  40:5 41:8
  43:14,19,21
  44:21 46:3
  48:5,13,15,21
  49:1 53:10,24
incidents
  107:4
include
  13:1 16:25
  49:17 56:3
  64:25 67:23
  81:3,5,6
  82:11,19 83:1
included

22:15,18 56:24
65:20 81:7
108:19
including
  36:13 84:7
  95:18
increase
  87:21 89:16
  90:11 94:17
  95:5 96:21
increased
  103:23
increasing
  47:19 55:20
incurred
  82:20
indemnification
  29:10,22
indemnity
  61:24
independent
  11:7,8,9,12
  12:16 51:1
  67:1 93:6
independently
  17:3
Indicating
  25:20
individual
  52:16 57:8
  75:12 77:7
  79:21 82:3
  90:22 91:12
individually
  108:7
industry
  10:6,7 11:4,6
  15:2 79:6
  81:16 82:10
  83:4,16 84:1,
  10 85:25 89:18

101:3
inform
  56:20
information
  14:6,9 16:25
  17:3,22 18:20
  19:4 21:24
  22:2 29:11,23
  30:1 34:2,7
  45:3 46:7
  47:4,8,12,18
  56:7 57:2
  58:10 66:3
  69:2,21 71:24
  72:5 75:16
  76:4,17 77:1
  87:18
informed
  90:18
initial
  91:6
initially
  16:3 72:6
injured
  64:14,18 65:4,
  13 66:15
  100:19
injuries
  100:9
injury
  100:4,15,23
instance
  27:25 75:5
  76:20 108:14
instruct
  86:9
instructed
  22:21 51:24
  52:1 60:13,14
instruction
  8:1

Jose Figueroa
August 25, 2021

14

instructions
5:14

instructs
7:24 8:4

insurance
5:4 9:5 10:3,
5,9,13,14,17,
21 11:6 13:2,
4,6,10,13,14,
15,21,24 14:7,
8,21 16:13,19,
24 17:3,5
18:3,22,24,25
19:2,5,10,22
20:10 24:6,18
25:5 28:14,16,
25 29:20
31:16,22 38:25
45:23,25
46:22,25 47:4,
10,15,19
48:20,22 49:2
55:17 56:9,11,
12,20,21 57:6,
11 58:3 60:18
67:15,22
71:17,22 75:25
76:1,15 77:23
81:22 82:10,13
84:4,20,24
85:3,11,16
93:5,8 95:1
101:15,16
108:15,18
109:1,9 114:7,
12

insure
55:23 91:24
95:17 103:18

insured
14:5,9 17:16,
21 23:10 25:5,
12,22 26:1,4

27:22,23 28:18
29:15 31:13,20
46:14 49:6,21
51:5 52:24
55:19 57:10,23
58:2 59:13
60:10,11 65:21
74:5 75:8
78:24 79:7,9,
10 80:2 81:11
84:17,18 85:2,
6,11,12,15
90:12,18 91:25
95:1,18 103:18
109:6 111:11

insured's
73:15

insurer
25:12 28:13
108:1

insurers
18:18

insuring
26:4 57:5
80:20,21,22
81:24 82:14
85:4

intelligent
58:24

intend
6:21

intended
56:20

intensive
13:11

intention
56:1

interest
60:9 73:22,23
89:22 108:16

interests

50:14

interference
12:4

interject
27:17

intermediaries
28:10 109:6

intermediary
14:4 17:13
60:10

interpret
53:13

interpreted
79:5 102:22

interrupt
11:18 12:5

interrupting
7:3

introduce
4:17

invested
95:18

invoices
37:24 87:19
88:5,6,7,14,
16,22 89:22
91:15 92:7,17,
18,21 96:13,
14,16,23 97:5,
6

invoke
8:3

involved
25:21 28:21
32:6,7,8 39:21
53:11 54:23
60:4 65:25
70:14 71:16
74:4 75:7
80:2,10 81:10
84:16

Islands
10:8,12,23,25
17:25 63:15

issue
56:25 69:8
77:25 78:13

issued
24:4 84:4
111:10 114:5

issues
43:23

items
70:14 96:1,12
107:9

— J —

Jackie
50:4 110:19
115:14

Jacqueline
5:3 33:7
38:17,18 70:25
96:11

Jadiel
50:15

James
97:21 101:12

jet
27:3,18 28:2
30:9 35:1
49:23 50:16,24
51:7,11,25
52:4 59:12
60:18 65:2,21
66:8,9,12
80:21 98:1
107:10 111:11,
13,16,20

job
28:11 87:19

Jose Figueroa
August 25, 2021

15

**Join**
96:9

**Jorge**
14:13,14 15:6,
15 21:1 25:19
26:10,11 27:17
34:3,7 35:1,20
37:16 38:6
49:11 50:21,22
51:24 53:22
55:6 58:12
59:12 60:20
69:5 73:20
79:12 87:19
96:19 98:16
106:1 108:7,22
111:24 112:13,
21 114:2

**jorge@
jetboatmiami.com**
105:24

**Jose**
4:11 8:25
36:11 50:4
58:3 78:23
86:12 103:7

**judge**
8:9 61:23
70:12

**judgment**
34:25 36:1
61:21 83:2
102:4 110:8

**July**
33:21 36:14
41:18 43:9,19
62:9

**jump**
93:22

**jumped**
20:5

**K**

**key**
76:14

**kind**
16:24 53:9

**kindly**
5:24

**knee**
99:8,13

**knew**
57:15

**knowing**
108:23

**knowingly**
57:24

**knowledge**
30:19 36:4
58:16 66:4

**L**

**L-L-O**
63:12

**L-O**
63:12,13

**La**
20:10,11 23:10
24:7 36:12
37:5,13,16,17
38:4,8 39:3
42:5 44:1
48:23 49:4,7,
12,15,22 50:24
52:9,10,15
53:1,9 54:1,3
61:25 62:1,10
64:20,24 65:1,
7,8,17,24,25
66:18 67:15
68:1,3 69:12

80:11 81:5
88:9 90:24
93:4 98:3
107:16,18
108:3 111:23
112:13,15
113:21 114:8,
11,19

**labeled**
20:4

**lady**
99:4

**Lakes**
5:4 16:13,19
22:21 24:20
30:3 45:23
46:12 47:4
48:20 49:10
53:3 60:14,15
62:7 68:20
69:3,10,12,21
71:1 72:10
91:20 95:17
107:16 109:1
111:10,16
112:21

**Lakes'**
61:21 86:2

**language**
63:14,18

**Lanier**
48:9 65:4
99:20

**Lanier's**
48:5

**laptop**
12:2

**Largacha**
66:15,16

**Lauderdale**
9:2

**law**
67:16,19,24

**lawsuit**
50:15

**lawsuits**
99:22

**lawyer**
48:8

**learned**
63:16

**left**
108:11

**legal**
79:18

**letter**
27:13 28:7
31:21 48:8,12,
16 50:5,7
100:8

**liability**
31:25 32:2
47:19 100:13

**liable**
78:2 82:15

**license**
11:3,4 18:1

**licensed**
10:14,17,25
11:1 14:1 18:4
71:6 87:23

**lien**
108:19

**lienholder**
108:12

**life**
7:4 12:20 56:4
58:14,16,25

**limit**
94:25

**limited**

Jose Figueroa
August 25, 2021

16

70:16 74:19
80:25 82:12
84:2,3

**lines**
32:18

**Linguistic**
37:1

**linked**
51:7,11

**list**
36:12 83:5
88:18 94:6
96:1

**listed**
53:11 54:3
55:2 67:5 70:6
78:9 107:23

**listen**
8:4

**live**
5:18

**LLC**
43:6 50:16,24
51:12 52:6
59:6 60:2,20
73:17 111:11,
12,13,16,20
113:16,21

**Lloyd's**
15:22 23:13,17
24:20 101:3
106:22

**loans**
108:8

**locking**
43:9

**log**
63:6

**logged**
4:21

**London**
17:14 18:13,21

**long**
9:14 10:5
14:12 16:11
71:4

**longer**
9:24 104:3

**loop**
70:1

**loose**
63:4,6

**lose**
106:22 112:22

**losing**
13:12

**loss**
13:17 25:21
26:2,12,14
28:23 29:8,9
31:8,16 32:6
33:17 34:13
38:14 40:5
49:13,17 54:23
55:5,6,10
56:1,2,3,4
61:25 62:1
64:25 68:14,
15,18 74:4
75:7 77:4,11,
23 79:3,6 80:2
81:10 83:10
84:7,16,23,25
85:9,10,13,14,
16,17,18 106:7
107:23 108:3

**losses**
50:22 52:12,17
53:12 56:11,12
62:9 66:5
69:14 80:3,14
82:1,6,8,10,

11,18,19,20
83:1,6 84:3,8
85:21 102:13,
16 112:5

**lost**
106:10

**lot**
19:14 21:13
59:23 71:3

**loud**
98:12,13

**low**
13:12 33:24
39:25

**lower**
40:1

**lying**
40:10,12 96:3

**Lynch**
4:19 33:11

---

M

---

**Mache**
48:4,9 65:4
99:20

**made**
31:24 37:4,5
51:21 69:13
70:12 82:25
83:3 87:10
96:2,22 98:19

**maintain**
42:11 106:18

**maintains**
94:18

**maintenance**
42:6 94:14,20
95:19

**major**
37:13,17,23

39:20,23 41:8,
16 42:13,17
47:14 94:21

**majority**
11:10

**make**
19:7 26:2
64:19 72:4
83:10 110:12
114:2,6,11
115:8

**makes**
5:17 24:17
65:5 74:13
75:24 83:9
105:20 108:19

**making**
71:2

**managing**
9:12 72:11

**mandatory**
22:7,10 100:20

**manual**
45:2

**manufacturer**
21:23

**March**
35:3 86:21
90:5,8 97:21
101:12 102:14
105:16,24

**Maria**
28:1 50:15
64:13 99:23

**marina**
75:18 76:20

**marine**
13:6 15:17
18:6 33:17
56:7 60:16
76:14 79:3

Jose Figueroa
August 25, 2021

17

85:22 98:18

**Marinello**
4:15,17,22
5:6,7 11:21
12:6,14 20:1,8
30:21,23 31:15
32:10 33:3
34:15,19,23
36:19 38:1
39:8,11 41:2
42:21 47:22
50:2 54:14
61:4,8,11,15
63:19 70:18
71:1 72:16,19,
22,25 73:3
80:8 83:19,23
85:7 86:6
87:12,14 89:4
94:10 95:20
96:4,8 102:5,
7,18 103:2
104:1,6 105:4,
7 109:13
110:2,6
113:11,14
115:12,16

**maritime**
67:16,19

**mark**
73:1 86:23
92:24 97:13

**marked**
72:16 73:4
74:7 86:25
93:1 97:10
104:22,23

**market**
24:16,17

**markets**
17:14 24:1,10,
12,19,21 95:12

**marking**
34:20

**massive**
67:24

**massively**
99:13

**material**
47:5,6,8 49:1,
16,19 50:18
52:8 55:12,15
56:8,17,25
59:3 67:6
69:13 71:25
72:1,12 76:4,
17 77:5,11
78:5 80:13,22
81:8 82:8 83:2
103:11,12,13,
15,17,19
110:24 111:6

**matter**
4:6 67:18
112:22

**matters**
61:23

**maximum**
56:17

**meaning**
6:21

**means**
18:17 35:14
52:23 55:15
57:12 68:17
69:7 70:16
84:18,19
108:23 109:23
113:6

**meant**
102:24

**measures**
76:24

**medical**
56:11 67:13
82:9 99:9
100:5

**meet**
15:6

**member**
9:12

**mention**
38:8 42:4
43:21 63:23
65:5 111:21

**mentioned**
33:21 37:22
38:10,16,17,18
40:24 43:18
50:23 53:25
58:1,11 72:6
112:6

**mentioning**
39:22

**met**
14:14

**Miami**
4:18 27:3,18
30:9 35:1 40:2
49:23 50:16,24
51:7,11,25
52:1,4 59:12
60:19 65:2
66:9,13 80:22
98:1 111:11,
13,17,20

**mind**
4:24 60:24
103:5 108:12
112:12

**Mine**
61:4

**minor**
33:22 38:13,15
44:3,5,8,9,14

**minute**
28:7 59:5

**misbehave**
6:13

**mischaracterizing**
39:4

**misrepresentation**
58:23

**misrepresentations**
69:13,24

**moment**
28:14 50:12
51:10 52:4
86:16 90:12
106:18 108:14
112:10

**Monday**
33:7

**money**
13:13 100:8
107:14

**monies**
93:14

**months**
43:10 107:25

**moored**
22:5 75:18

**morning**
4:16

**motion**
34:24 36:1
61:21

**motor**
57:7

**moved**
10:12

**moving**

Jose Figueroa
August 25, 2021

18

57:25 75:17
82:15 97:8

**multiple**
77:1 81:22
105:7

**mute**
7:6

---

**N**

**named**
20:11 50:21
53:6 54:20
59:13 60:11
74:4,11,15,19,
22,25 75:1,7
78:15,24 79:2,
25 80:1,12
81:10 84:16

**names**
27:6

**narrow**
92:3

**nationality**
6:6

**navigate**
75:15

**navigates**
22:9

**navigating**
54:10 56:18
62:19 76:13
80:14

**navigation**
76:21

**navigational**
22:8

**navigator**
56:7

**necessarily**
77:9 93:18

94:17 109:23

**needed**
59:3 72:5

**Neil**
4:25 102:8

**network**
10:22

**nightmare**
63:20

**nonconsequential**
39:18

**nonrenewed**
106:19,20

**nonreported**
55:5

**normal**
63:5 70:2

**note**
98:11,13

**noted**
104:11

**notice**
71:3

**notified**
47:15

**number**
22:12 55:1,2
62:9 64:12
65:3 66:14
70:8 91:23,24
107:9

**numbers**
22:1 87:9
89:25

---

**O**

**object**
30:13,21 79:17
86:8 94:10
102:19 103:3

**objecting**
7:19

**objection**
7:20,21 30:12,
22 32:9 34:14
36:18 85:7
86:6 87:12,14
89:4 95:20
96:4 102:5,18
103:2

**objection's**
104:11

**objections**
7:22 8:8

**objective**
82:22

**obligation**
14:10 31:13

**obtained**
14:11 106:4

**obtaining**
75:16

**occur**
17:10 59:15
83:8

**occurred**
27:14 41:7
43:14 82:1
112:6

**ocean**
63:5

**October**
65:12

**offer**
11:16

**offered**
99:10 100:6

**office**
17:8 28:20
88:21 113:23

**offices**
45:20

**official**
85:13

**omission**
113:1,2

**onboard**
65:6

**ongoing**
17:23 18:4

**online**
25:5,10,13

**open**
98:14,25 106:7

**operate**
66:11,12

**operated**
101:16

**operating**
52:5,24 68:18
70:2 76:4,17

**operation**
15:9,12 27:22
31:4 49:15,22
59:12 60:19
65:20 66:1,8
68:8 81:4

**operations**
28:9 51:1 52:1
65:23 66:13
90:24 98:17
100:12,16

**operator**
23:2 25:15,20
49:13 50:21
52:11,13,16,
20,21 53:6,11,
15 54:3,20
55:1,2 68:11,
13 74:4,11,15,
19,22,25 75:1,

7 76:2,11
77:7,8,10,13
78:15,20 79:25
80:1,12 81:10
84:16 85:22

**operators**
23:1,2 26:7,9
52:22,25 53:2,
10 54:18 57:11
74:12,17,20
75:10 76:6
77:19 78:12,17
79:3,7 98:19

**opinion**
48:25 55:11
86:11

**opportunity**
55:18

**opposing**
110:8

**Orange**
65:22 66:16,18

**order**
114:17,18

**orders**
87:20

**organization**
39:1 59:6

**organized**
59:7,10

**original**
20:9 23:5
32:17 72:14
106:5 107:1
108:4

**originally**
38:10 107:18
111:23

**outstanding**
108:23

**overhaul**
37:23 41:8
94:21

**owed**
107:14

**owned**
9:14 26:5 28:3
62:8 65:24
67:11 101:15
114:23

**owner**
9:20 64:10
73:18,21,23
74:25 75:6
77:6,9,16
78:2,20,21,22,
23,25 79:1
80:3 82:3 85:4
107:14,22
114:4,20

**owner's**
77:4

**owners**
84:20

**ownership**
49:22 78:1
79:1

**owns**
9:6,7 77:20
82:21

---

**P**

---

**p.m.**
48:11 115:22

**package**
24:3 76:6

**pages**
112:1,2,9

**paid**
22:18 38:14
76:11 88:8

**paint**
44:9,11,12

**paper**
76:5 79:15

**paragraph**
33:12,13,20
61:22 70:6
90:17 98:10
106:3

**paramedics**
100:6

**part**
21:22 57:6
76:10 108:20

**participant**
99:5 100:3

**participants**
100:12

**party**
31:19,24

**passenger**
64:13,16,19
65:4,13

**passengers**
22:13

**past**
26:3 52:12,17
110:23

**pay**
100:19 108:8

**payee**
107:23 108:3

**paying**
22:12

**payment**
89:24

**payments**
77:25

**pays**
31:17

**Pedro**
46:5

**penalize**
107:4,5

**pending**
83:17

**people**
8:3 27:6 36:10
45:19,21

**percent**
9:10 67:9

**perfectly**
79:23

**performing**
27:22

**period**
49:10 54:16,17
81:17

**person**
5:18,20 15:15
36:10 58:24
75:2 83:6
100:3 102:22

**personal**
5:1 26:2
68:13,18 75:9,
11 84:8

**personally**
15:13 49:13
58:1 64:2
68:11 69:23
82:21

**persons**
45:13 52:23

**pertain**
68:10

**pertaining**
33:17 46:9
49:7

**philosophies**
72:8

Jose Figueroa
August 25, 2021

20

phone
7:4,9 12:9,10,
11 59:1,2

Physically
15:7

picked
88:14

pier
99:6,8,11

pilot
63:25

piloted
66:4,19,20,22

piloting
53:17 54:6,7
62:19 63:25
66:7

place
9:1 14:1,3
22:4 25:6
35:23

placement
25:6

placing
13:13

plaintiff
5:4

plaintiff's
72:24 73:2,4
86:24,25 92:25
93:1,25 96:7
97:8,10,13
104:22,23

plan
76:22

pocket
12:2

point
9:7 15:25
31:12 60:15
89:1 115:9

polices
22:6

policies
10:3 45:22
46:9 51:11,20,
21,22,24 52:5
76:7 112:2
113:10 114:7

policy
14:16 15:5
17:5 23:14,15
24:5 27:23
29:2,3,4,19
30:6 31:11
32:1 39:16
41:25 42:1
46:18 49:8,14,
16,20 52:11
53:6,16,24,25
54:1,15,16,17,
20 57:9,10
58:23 59:21
60:12 65:10
67:15,21,23
68:1 69:17,18
70:7 72:2,3
74:12 76:15
80:23 81:2,3,6
83:5,7 84:3,20
94:22 95:3
97:25 103:18
106:17,20
107:7 108:16,
20 111:1,9,12
112:10 114:5,
12

portfolio
98:18

position
26:13 52:7,19
69:7

possibilities
100:19

possibility
84:23

possibly
7:3

potential
32:2,4

Potter
97:21 101:12

practice
42:7,12 45:8
81:15 85:25

practices
84:2

predicate
7:21 30:20,22
87:15 96:4,8

preferential
106:18

premium
103:23 106:6
107:1,6

premiums
13:11 107:9

prepare
108:1 109:20
110:5

prepared
110:11 115:2

prepares
18:23

present
7:16

pretty
7:21 8:10

preventive
42:6

previously
5:9

price
106:19

Prices
107:10

pricing
98:21

primarily
22:5

primary
63:14

prior
16:4 26:12
33:18 39:5
64:10 68:2
69:14 78:16
84:24 85:14
107:6,14
114:20

private
13:14 67:15
68:18 78:23
80:15 81:11

privately
65:24 67:11

prive
71:22

privilege
8:1

privy
69:1,3 71:22

problem
44:15 110:6

procedure
70:2 99:9

proceedings
4:2 61:12,13
115:21

process
13:10 38:9
57:6 81:23

processed
20:22 21:23
31:6

produce
10:23

products
11:11,16

program
15:8,21 98:19
103:20

Progressive
24:23 25:4

promote
10:2

proof
88:3,5 89:21
93:13

propeller
44:8,10,11

propellers
39:25 44:12

property
12:20,22 13:1

prove
90:22 96:22

proven
100:23

provide
6:24 14:6
17:14 18:4
71:18 91:11
108:10

provided
15:4 37:1,19,
24 45:2,6 49:9
87:18,19 90:19
91:14,20 92:7,
8,19,20 96:18,
19 107:19

providing
90:21 91:3

proving
68:17

Puerto
6:8,9,10 10:24
13:25 14:1
17:25 35:19
62:17

pull
34:17 59:22
72:13 86:15
110:23

pulled
28:2 66:8
112:9

pulling
34:20 112:18

purchase
109:7

purchased
21:18 43:11
83:7 113:21
114:10

purchaser
108:21

purports
20:9

purposes
14:22 17:4
23:22 46:21
59:7 110:8
112:16

put
12:1 37:16
40:18 42:10
52:22 53:5
57:19,24 59:3,
13,14 84:7
88:16 91:16
107:17,21
111:5 114:3,4,
8 115:4

putting
42:12 110:25

## Q

qualification
47:10

qualified
24:7

qualify
25:2 53:15

question
7:24,25 8:5,10
30:20 32:5,7,
24 33:17 36:21
52:19 70:17
74:1,5,10,13,
18,23 75:6,10,
13,22 78:8,16,
19 79:19 81:9
83:17 84:15,22
85:5 92:3
102:9 105:20

questions
7:19 8:13
17:19 18:10
19:14 21:14
22:11 53:8
70:20 71:4
78:14 109:16
115:13

quote
101:5

## R

Raise
4:3

raising
33:23

ramifications
70:14

ran
38:12

rate
106:18

react
108:16

read
35:10 74:3,23
78:19 81:18
90:15,16 92:6
98:11,13,21
101:24 109:14,
17 110:4,16
115:17

reading
85:5 110:18

real
11:3,5 13:20
40:5

reality
108:18 111:25
112:17

reason
8:8 9:23 11:14
14:24 46:17
71:15 78:9

recall
16:6,14 20:19,
21,23 24:10
28:19 34:6,10
38:5,21 39:5
40:14,16,17,22
41:20,24 42:2,
3 59:17,19
87:25 97:4,15,
16 99:4,19,21,
24 105:11
107:8,12

receipts
90:22

receive
7:4 28:11
92:17 108:15

Jose Figueroa
August 25, 2021

22

received
16:18,23 17:2
27:13 46:6
receiving
41:4 45:16
recertify
71:19
recessed
61:12
recognize
21:8
recollection
33:21 92:8,9,
15,17
reconvened
61:13
record
7:6 30:16
42:11 46:24
57:7 60:5,22
65:19 68:12
84:23 93:3
98:12 105:20
110:25 111:2,5
112:19,25
113:7,18
115:20
records
85:13 112:24
recreational
100:14
REDIRECT
113:13
ref
69:6
refer
9:7 29:15
100:25 102:13
reference
19:8

referenced
62:13 88:22
referred
15:1
referring
17:7 21:25
25:25 27:21
76:1 80:3 89:2
96:7 99:3
101:4
refers
98:25
reflected
93:19 96:13
refused
96:20 100:6
regular
94:14,20
related
33:22 43:22
49:6,11,15
51:11 59:22
65:9,10 66:2,
12 75:18 83:6,
10 85:22
relationship
58:13
remember
20:13 23:12
27:3,6,8,9
28:4 33:25
34:8,12 46:4,9
50:10,12 59:6,
8,16 99:16
remembered
50:13 111:21
remote
67:18 68:7
renew
29:19 68:1
106:17

renewal
30:1 39:16
52:2 54:15,16
55:12 59:11
60:11 68:2
69:14 87:22
97:25 98:21
101:5 107:5,7
renewed
51:23 111:12
renewing
38:9
renovation
37:18 42:17
repair
62:11 90:19
repairs
36:12 37:4
41:4 42:13
44:14,17,19,22
87:20 90:20
91:18
repeat
96:10
rephrase
102:9
report
31:14 48:9,13,
15 68:4 109:8
reported
28:11 29:11
31:12 38:13
39:17,19 40:4
44:24 48:21
55:9
reporter
6:1,17 109:18
110:5,10 111:3
reports
29:1
represent

19:1 50:14
51:3 69:9 70:5
71:18 88:25
94:4,5
representing
7:17
represents
28:12
reputation
57:22
request
17:20 23:2
29:24 57:6
60:19 87:21
91:6
requested
22:3 59:12
60:10 88:3
89:21 91:19
97:5 108:4,12
115:6
requesting
101:5
requests
18:19
require
18:12 72:5
required
39:21 58:9
67:17 72:1
88:10 89:16
107:25
requirement
68:15 80:13
requirements
18:25
requires
77:14
respect
38:4,22 52:19
67:17 69:14

Jose Figueroa
August 25, 2021

23

**responding**
58:9

**responds**
91:8

**response**
101:9

**responsibility**
47:3

**responsible**
78:11

**rest**
67:21

**result**
29:17 44:2
61:25 100:15

**resulted**
37:14 87:21

**results**
67:2

**retailer**
14:5

**retailers**
10:22

**revalidate**
18:1

**reverse**
114:1

**review**
29:1 33:14

**reviewed**
88:15 107:3

**reviewing**
15:12

**reviews**
17:18

**revise**
106:5,25

**rewrite**
23:16

**Rican**
6:9 62:17

**Rico**
6:8,10 10:24
13:25 14:1
17:25 35:19

**ride**
100:20

**rides**
51:5

**riding**
28:2

**rights**
8:3 100:18

**rigs**
80:10

**risk**
16:12,18 19:4,
8 22:21 23:8,
22 24:4,11,13
30:4,7 40:6
45:1,4,10,14
47:3,10 49:4,
7,10 50:19
55:20 57:17
67:7 68:14
76:3 80:25
81:17,23 83:10
109:1 114:7

**risks**
50:25 84:2
95:16

**Riva**
43:5

**Rockstone**
15:17 18:6
60:16 97:25
98:18 106:21

**role**
72:4,5

**room**

5:18,22

**routine**
95:19

**rule**
5:21 39:10

**run**
40:23

---

**S**

---

**safe**
75:18

**safety**
98:17

**sale**
42:23 43:1
107:19

**sandbar**
33:23 36:17
37:7,21 38:4,
12,23 39:3
40:2,25 41:8,
17 43:14,22
44:2 53:19
54:7,8

**sank**
62:4

**schedule**
68:11

**scheduled**
52:25 53:2
54:4 74:12
75:10

**scope**
56:15 58:16
80:13,16 81:5
82:11 108:9

**scraped**
44:8

**scratched**
44:12,13

**screen**
7:6 19:25 33:1
34:22 42:20,22
47:21,23 50:1
53:5 54:13
61:14 70:8
73:8 86:17
89:14 90:1

**scroll**
21:19 24:15
97:17 101:8
105:5

**Scrolling**
73:25 90:7
97:20

**Sea**
26:5 27:3 28:3
30:8 43:6,11
46:22,23,24
47:2 48:22
49:1,3,24
50:16,24 51:4,
6,9,12,21,25
52:6 59:6,7,13
60:2,12,20
65:19 73:17
77:17 78:22
79:1,10,13,14
86:4 97:25
98:8 107:13
111:11,12,16,
20,24,25
112:7,11,14,15
113:8,9,16,21,
25 114:1,2,3,
4,6,10,15,21,
23 115:4,8,9,
11

**sec**
30:16

**secretary**
33:11

Jose Figueroa
August 25, 2021

24

section
  22:14,25 25:15
  26:6 74:16
  78:17
seeking
  17:4
selected
  23:21
self-explanatory
  17:15
self-insure
  84:21
self-insured
  84:25 85:1
sell
  10:2 12:16,18,
  20,25 13:6,8,
  15,18,20,24
seller
  43:5 107:22
  108:4,22
selling
  10:3
seminar
  17:23
send
  88:7
sentence
  90:16 98:25
separate
  43:23 52:10
  90:24 111:24
  112:14
separated
  78:12
separation
  114:7
September
  48:4
serial

22:1
served
  112:20
service
  24:19
services
  100:5
session
  4:20
set
  8:19 104:8
shared
  19:25 33:1
  34:22 42:20
  47:21 50:1
  54:13 61:14
  86:17 90:1
shareholder
  9:10
sharing
  90:3
sheet
  109:20
sheets
  23:3
Shepherd
  101:11,22
  102:17,24
Shepherd's
  103:5
short
  71:3
show
  19:23 28:6
  51:17,18 88:5,
  6 89:23 104:7
showed
  51:16
showing
  42:22 50:3

54:15 92:13
shows
  60:2,6
sic
  70:6
sign
  32:20 79:15
  100:12,17
signature
  32:14,17,19
signed
  32:21 33:15
  79:11 100:23
significant
  102:17
simply
  6:25
sin
  39:23
sinking
  69:11
sir
  5:10 105:19
sit
  17:8 19:7
situation
  44:24 95:9
ski
  28:2 66:8,9
skis
  107:10
slight
  11:20
slowly
  105:6
small
  33:23 40:24
sold
  52:3

sole
  9:20
solemnly
  4:5
son
  101:14
sorts
  82:19
sound
  63:12 102:16
sounds
  36:14 43:10
  91:2
South
  15:9
Spanish
  6:3,13,16,19
  34:9 35:11,23
  36:5,8 40:20
  62:20 63:16
speak
  5:19,23 6:13
  63:16
speaker
  6:3
speaking
  5:20,24
speaks
  103:4
special
  16:12,18 19:4,
  8 22:21 23:8,
  22 30:4,7
  45:1,4,10,14
  47:3 50:19
  57:17 67:7
  95:16 106:4,25
Specialty
  9:19 15:23,25
  28:15 35:6
  45:7 50:10

58:3

**specific**
27:21

**specifically**
14:25 18:19
20:20 55:5,6
62:7 78:15
86:20

**speculate**
37:10 102:21
103:5 104:3,9

**speculating**
51:14

**speculation**
103:25

**spell**
6:20 63:9

**spelling**
63:18

**spent**
15:11 29:21
93:14,17

**spite**
57:16

**sports**
15:2,8,9,21
52:1 60:19
65:19 66:1,7
98:6,17

**spreadsheet**
91:12,17
92:12,20

**staff**
98:16

**standard**
42:9 84:4,10
89:15,17

**started**
10:12 111:14
112:18

**starts**
5:20 21:19
28:24 31:11
98:10

**state**
24:23 46:25
60:1 66:6
103:5

**stated**
8:23 57:20
64:7 79:23
90:20 100:13

**statement**
30:11 45:5
57:10 63:24
64:25 107:19
113:10,12

**statements**
90:20

**states**
26:22 83:4

**stating**
69:7

**stays**
49:14

**STENOGRAPHER**
4:3 11:22 63:9

**stolen**
68:3

**stop**
34:16

**storage**
90:23

**Straits**
62:5

**stretching**
80:9

**strictly**
12:19 14:5
59:1 80:10
81:3,23

**strike**
72:12 104:20

**stuck**
63:1,3

**studied**
63:15

**stumbling**
98:24

**Subject**
48:4

**subjective**
18:12,14,15,23

**submit**
28:11 96:23

**submits**
23:7

**submitted**
21:1 24:2,8
27:1,7,9 30:7
32:22 38:25
45:9,13,21
46:7 58:7
59:14 67:6
88:1,24 89:1,
3,5,6,7,11,15,
20,24 93:8

**submitting**
16:12 23:22
46:21 68:2

**subsequent**
51:8 108:2

**substantial**
41:4

**substantiate**
113:10

**suffered**
28:3 53:9
62:9,10 100:4

**sufficient**
39:8,9

**summarized**
88:17,19 92:18
97:2

**summary**
34:25 36:1
61:21 88:8,10
92:12,20 96:12
110:8

**supplemental**
76:11,12 78:13

**supplementals**
76:9,12

**supposed**
108:10

**survey**
37:15,19
87:23,24
89:11,15 93:4,
6,7,19 96:20,
22

**surveyor**
42:15 87:23
89:18,19 91:22
93:6

**sustain**
85:17

**sustained**
33:23 46:19
85:16 100:9

**swear**
4:5

**sworn**
4:12

**system**
30:10 31:2

**Systems**
37:1

T

**talk**

Jose Figueroa
August 25, 2021

26

82:13

**talked**
58:11 59:1

**talking**
13:13 41:11,15
44:20 53:14
56:1 74:22
79:6 90:12
99:22 112:11

**telling**
40:12 85:24
113:22

**ten**
25:21 26:3,12,
15 33:18
52:12,17 53:12
54:24 56:5
74:5 75:8 80:2
81:10 84:17

**ten-minute**
60:25 61:5

**tendency**
6:12

**term**
35:20 101:2,3

**terms**
29:2,4 31:25
49:20 67:20

**territories**
71:18 76:21

**territory**
17:25

**testified**
4:13 30:5
32:16 43:13
45:1 87:8
95:25

**testify**
65:7

**testimony**
4:6 30:18 39:5

**thing**
6:11 11:24
24:15 31:1
38:11 39:14
40:8 42:4,10
44:9 57:15
63:23 76:14
78:21 93:3

**things**
37:23,25 39:20

**thinking**
7:10

**Thomas**
87:4 90:8 91:7
102:24

**thought**
93:10

**thousand**
94:7

**threatening**
86:11

**throat**
7:10 61:2

**thrown**
66:10

**tide**
33:24

**time**
5:11,20 6:2,25
10:21 15:14
23:6 30:6
38:24 51:6
53:10,18 54:6,
8 68:7 70:19
91:5,15 93:4
95:12 100:7
101:21 107:15

**times**
5:21 7:18
39:25

**today**

4:19 6:15 8:21
19:7 52:3 71:3
86:19 97:14
106:4

**told**
15:1 34:3,4
40:17 44:5

**Tom**
101:11

**tons**
51:21

**top**
20:15,16 26:8
35:16,24 36:3
50:4 54:25

**total**
94:5

**totally**
7:22 11:7 18:7
28:16 50:25
51:1 58:8
65:23 67:1

**track**
30:10 112:24

**trained**
71:13,24

**training**
16:18,21,23
17:2,7,24
18:2,4 71:19

**transcript**
109:14,17,24
110:7,15

**transferring**
59:8

**transition**
28:23

**translated**
36:14,23,24
62:14

**translation**
35:25 36:4,5,9

**tri-county**
15:10

**true**
36:5 44:1
57:19 84:23
103:23

**truth**
4:7,8 112:21

**turning**
61:18,20

**Twister**
65:22 66:16,19

**type**
18:19,24 22:2
24:11,13 42:16
44:9 45:3
47:18 49:15
58:2,13 71:23
83:9 85:14

**types**
13:1 82:11
83:1

**typically**
82:1

---

**U**

**Uh-huh**
99:14

**ultimately**
28:22

**unchanged**
107:6

**unclear**
78:20

**unconcerned**
82:1

**undergo**
62:11

Jose Figueroa
August 25, 2021

27

understand
6:2 36:22
70:13 86:2
100:14,18
103:9 110:9

understands
58:21,23

understood
81:20

underwriter
23:21 71:6,8,
14 83:10,13
84:5 103:20

underwriters
15:8,12 17:4,
17 28:25 71:25
72:2 77:2,5,
10,12 78:5
80:16 81:25
102:2 106:5

underwriting
15:16 17:5
18:20,21 29:24
30:5,6 45:2
71:11 72:6,8
75:16 80:13
84:3

underwritten
45:22

unheard
83:7

unilaterally
92:2

unqualified
47:17

upheld
86:3

upset
114:17

upwards
24:15,16

Uribe
46:5

Usher
30:5 44:25

---

**V**

V-A-R-A-D-A
35:14

valuation
37:19 91:21
93:6

valued
41:9

values
42:16 87:11

Varada
35:13,19 36:14
62:13

varies
35:23 72:9

variety
11:11,15

vehicle
13:4,8,10
49:18 57:7

Venezuela
35:20

verifying
58:20

vessel
20:11 21:16
22:9,12,16
25:2 26:5
33:23 37:5,6,
14,18 38:12
40:25 41:3,5,
9,11,22 42:13,
17 43:11,20
44:13,15 46:6
52:13,15,24

53:17,18 54:6,
7,10 55:23,24
56:2,7 57:10
62:19,20 63:25
64:3 66:5
67:17 68:10,
13,18 73:24
74:25 75:15,
17,19 76:5,13,
18,23 77:20
78:22,24
80:15,21 81:4
84:21,22,24
85:6 87:24
89:16,17
93:14,18
94:14,17,18,21
95:11,13
107:15,23

vessels
66:7,11,12
95:17

view
39:14

violating
5:21

violation
57:25

violations
57:8,13

Virgin
10:8,12,23,25
17:25 63:15

visit
58:13

void
58:23 69:17

voiding
70:7

volume
30:9 31:2

---

**W**

wait
112:10

waive
100:17

waiver
48:8 100:12,24

walk
57:23 58:4

walked
99:11 100:7

wanted
38:7 93:13
99:15 100:8
112:13 113:7
114:2,6,11,17

Warning
53:6 54:19

warranty
57:10

water
15:2,8,9,21
52:1 60:19
65:19 66:1,7
98:6,17 99:7

waters
22:8

Watson
11:1 35:8 58:4
87:3,10 88:12
90:8 91:2
96:2,3

Watson's
21:8

well-deserved
98:20

whatsoever
16:21 39:2
41:1 55:11

wholesaler
13:25

wholly
101:15

wife
39:14 115:2

Wilma
82:7

win
112:22

wind
46:6

windstorm
76:22 82:6,19
84:7

withdrawn
46:13

withdrew
23:18 46:15

woman
27:25

word
6:19 35:13,18
62:21 63:9

wording
72:3 81:3

words
6:13,14,16
37:16 40:16,22
44:8 47:16
62:22,23

work
9:4,16,24
10:20 11:8
13:11 37:12
71:23 93:22
94:16 113:2

worked
12:8

working

16:11 101:20

works
11:5 31:2
106:20

write
14:3 45:24

writing
33:25 58:15
59:4

written
23:7 39:1 45:9
59:23

wrong
54:17 109:20

wrote
32:25 40:20
100:8

---

**Y**

yacht
21:24 22:15,19
45:24 46:1,5
49:5 52:23
56:8,10,16,19
65:24 67:11,15
68:18 76:1,15
78:23 80:16
81:11 84:19
85:10

yachts
81:22

year
16:14 21:18
24:17 29:19
41:24 42:2,3,5
70:7

year's
107:7

years
5:10 13:14
16:15,17 18:2,

9 19:19 25:21
26:3,12,15
33:18 40:15
41:7 43:15,19
52:12,17 53:12
54:24 56:5
57:22 65:22
71:20 74:5
75:8 80:2
81:11 84:17
90:21 92:16
113:1

young
7:8

---

**Z**

Zoom
5:17,22

| Page 1 of 5 | **Concept Special Risks Ltd** | www.special-risks.co.uk |
|---|---|---|

**Application Form**

| ASSURED'S NAME: | ASSURED'S DATE OF BIRTH: | ASSURED'S NATIONALITY: | ASSURED'S STATE OF RESIDENCE: |
|---|---|---|---|
| Sea 21-21 LLC | 5-10-1968 | | Florida |

**FULL MAILING ADDRESS (including ZIP/Post Code where available). IF COMPANY PROVIDE REGISTERED ADDRESS**
1951 NW 7 Avenue, Suite 160-317
Miami, FL 33136

**BENEFICIAL OWNER (this should be completed if vessel is insured in a company name or if the beneficial owner of the vessel is someone other than the Named Assured:** Jorge Fernandez

| EFFECTIVE DATE FROM: (mm/dd/yy) March 5, 2018 | TO: (mm/dd/yy) March 5, 2019 | 0.01hrs LST  00.01 LST |
|---|---|---|

| VESSEL NAME: La Bestia | HULL ID: OTH650058696 | LENGTH OVERALL: 65 |
|---|---|---|

| MANUFACTURER/MODEL: Ocean Tech Marine | YEAR BUILT: 1996 | MODEL YEAR: |
|---|---|---|

| PURCHASE PRICE: $400,000 | DATE OF PURCHASE: 02/18/2016 | PRESENT VALUE: $700,000 |
|---|---|---|

| MAXIMUM SPEED: 40 | VESSEL REGISTERED: | VESSEL FLAG: American |
|---|---|---|

**COVERAGES WILL NOT BE PROVIDED UNLESS REQUESTED HEREUNDER**

| COVERAGES | LIMIT (US Dollar) |
|---|---|
| HULL PHYSICAL DAMAGE | $400,000 |
| TENDER/DINGHY | N/A |
| MEDICAL PAYMENTS (maximum ($50,000) | $1,000 |
| PERSONAL PROPERTY | $2,500 |
| TRAILER | N/A |
| BREACH OF WARRANTY (APPLICABLE LOSS PAYEE MUST BE DETAILED ON PAGE 4) | |
| THIRD PARTY LIABILITY | $500,000 |
| LIABILITY TO PAID CREW | N/A |
| COMMERCIAL PASSENGER LIABILITY | $500,000 |
| UNINSURED BOATERS (minimum $100,000) | $100,000 |
| NON-EMERGENCY TOWING | $2,500 |
| OTHER (please specify) | |

**PLEASE TICK THE APPROPRIATE BOXES**

| PRIMARY POWER | SAIL | | TYPE OF VESSEL | | SAILBOAT | |
|---|---|---|---|---|---|---|
| | OUTBOARD | ✓ | | | MOTOR YACHT | |
| | INBOARD | ✓ | | | SPORTSFISHER | ✓ |
| HULL MATERIAL: | FIBREGLASS | | | | HOUSEBOAT | |
| | WOOD | | | | CATAMARAN | |
| | KEVLAR | ✓ | | | OTHER (give details) | |
| | CARBONFIBRE | | LAST SURVEYED (mm/dd/yy) | | ASHORE OR AFLOAT | |
| | FERROCEMENT | | | | | |
| | METAL | | | | | |

**VESSEL ENGINE/OUTBOARD DETAILS**

| | HP | MANUFACTURER | FUEL | YEAR | SERIAL NO# |
|---|---|---|---|---|---|
| #1 | 1100 | MAN | Diesel | 1996 | |
| #2 | 1100 | MAN | Diesel | 1996 | |

| | DATE PURCHASED | PURCHASE PRICE | PRESENT VALUE |
|---|---|---|---|
| #1 | | | |
| #2 | | | |

| #3 | 1100 | MAN | | Diesel | 1996 | |
|---|---|---|---|---|---|---|

**CSR/APP/2**

8/25/2021
Jose Figueroa
Job No. 204952
**PIf-1**

Page 2 of 5       **Concept Special Risks Ltd**       www.special-risks.co.uk

| TENDER/DINGHY INFORMATION | | | |
|---|---|---|---|
| MANUFACTURER | YEAR | HULL ID/SERIAL NUMBER | LENGTH |
| N/A | | | |

| TENDER/DINGHY ENGINE/OUTBOARD DETAILS | | |
|---|---|---|
| MANUFACTURER | HP | SERIAL NUMBER |
| | | |

| TRAILER INFORMATION | | | | | |
|---|---|---|---|---|---|
| MANUFACTURER | YEAR BUILT | DATE PURCHASED | PURCHASE PRICE | PRESENT VALUE | SERIAL NUMBER |
| N/A | | | | | |

PRIMARY MOORING LOCATION OF VESSEL (INCLUDING ZIP/POST CODE WHERE AVAILABLE) BETWEEN JULY 1ST – NOV 1ST
PLEASE SPECIFY WHETHER VESSEL WILL BE ASHORE/AFLOAT (MOORED)/OR ON A HOIST.  IF YOU ARE UNABLE TO PROVIDE A ZIP/POST CODE, PLEASE ADVISE LONGITUDE & LATITUDE.

Sea Isle Marina
1635 N. Bayshore Drive. Miami, FL 33132

PLEASE ADVISE IF THIS VESSEL IS FITTED WITH MANUFACTURER RECOMMENDED FIRE PREVENTION/EXTINGUISHING EQUIPMENT (if no provide explanation):

(YES)          NO     (see Survey, page 8 of 31)

PLEASE DETAIL ANY ANTI-THEFT PRECAUTIONS WHICH ARE IN PLACE

ALL WATERS TO BE NAVIGATED DURING THIS POLICY PERIOD (YOU MAY ATTACH AN ITINERARY)

Florida and Bahamas.

WILL THE VESSEL BE LAID UP (OUT OF USE) DURING THIS POLICY PERIOD – IF SO DETAIL EXACT DATES, LOCATION AND ADVISE WHETHER ASHORE OR AFLOAT.

| # | GENERAL INFORMATION | | | | |
|---|---|---|---|---|---|
| 1 | IS THIS VESSEL USED FOR FARE PAYING PASSENGERS? | YES | NO ✓ | IF YES, NUMBER OF PASSENGERS PER TRIP | |
| | | | | MAXIMUM: | AVERAGE: |
| | | | | NUMBER OF TRIPS PER YEAR | |
| | | | | MAXIMUM: | AVERAGE: |
| 2 | IS THIS VESSEL CHARTERED TO OTHERS WITH A CAPTAIN? | YES | NO ✓ | IF YES, COMPLETE CAPTAIN CHARTER SUPPLEMENTARY SHEET | |
| 3 | DOES THIS APPLICANT EMPLOY PAID CREW | YES ✓ | NO | IF YES, HOW MANY? | |
| 4 | IS THIS VESSEL CHARTERED TO OTHERS WITHOUT A CAPTAIN (BAREBOAT)? | YES | NO ✓ | IF YES, COMPLETE BAREBOAT CHARTER SUPPLEMENTARY SHEET | |
| 5 | IS THIS VESSEL USED FOR WATERSKIING OR DIVEBOAT CHARTER? | YES | NO ✓ | IF YES, PROVIDE DETAILS | |

**CSR/APP/2**

**Concept Special Risks Ltd**   www.special-risks.co.uk

| # | GENERAL INFORMATION CONTINUED | | | |
|---|---|---|---|---|
| 6 | IS THIS VESSEL USED FOR ANY OTHER COMMERCIAL OR BUSINESS PURPOSES? | YES | NO ✓ | IF YES, PROVIDE DETAILS |
| 7 | WILL THIS VESSEL BE OPEATED SINGLE HANDEDLY AT NIGHT? | YES | NO ✓ | IF YES, ADVISE WHEN, WHERE AND HOW OFTEN? |
| 8 | DOES ANYONE RESIDE ABOARD THE VESSEL | YES | NO ✓ | IF YES, FOR HOW LONG DURING THE POLICY PERIOD? |
| 9 | WILL THIS VESSEL PARTICIPATE IN ANY RACES/REGATTAS/RALLYS/SPEED TRIALS DURING THIS POLICY PERIOD? | YES | NO ✓ | IF YES, COMPLETE RACING SUPPLEMENTARY SHEET |
| 10 | WAS ANY INSURANCE DECLINED, CANCELLED OR NON-RENEWED IN THE LAST 5 YEARS? | YES | NO ✓ | IF YES, PROVIDE DETAILS |
| 11 | HAVE YOU OR ANY NAMED OPERATOR BEEN INVOLVED IN A LOSS IN THE LAST 10 YEARS (INSURED OR NOT) | YES | NO ✓ | IF YES, PROVIDE DETAILS |
| 12 | HAVE YOU OR ANY NAMED OPERATED BEEN CONVICTED OF A CRIMINAL OFFENCE OR PLEADED NO CONTEST TO A CRIMINAL ACTION? | YES | NO ✓ | IF YES, PROVIDE DETAILS |

**ALL OPERATORS MUST BE DETAILED – IF THERE ARE MORE THAN TWO OPERATORS PLEASE REQUEST ADDITIONAL OPERATOR SHEETS**

| No. | Full Name | Date of Birth (mm/dd/yy) | Violations/Suspensions (including Auto) in the last 5 years |
|---|---|---|---|
| 1 | Gustavo Castillo | 11-30-1976 | NONE |
| | | Years of Boat Ownership | Years of Boating Experience |
| | | 11 | 11 |
| | | Boating Qualifications (for example USCG 100Ton) | |
| | | USCG 100 TON | |
| | | Lengths and Manufacturers of Vessels previously owned or operated | |
| | | 31' Contender, 31' Eduardano, 58' Viking | |
| | | Have you been involved in a Loss in the last 10 years (insured or not)? If YES, please give details and amounts paid: | |
| | | NO | |
| | | Have you ever been convicted of a criminal offence or pleaded no contest? If YES, please give details | |
| | | NO | |
| 2 | Full Name | Date of Birth (mm/dd/yy) | Violations/Suspensions (including Auto) in the last 5 years |
| | Jorge Fernandez | 05/10/1968 | NONE |
| | | Years of Boat Ownership | Years of Boating Experience |
| | | 30 | 40 |
| | | Boating Qualifications (for example USCG 100Ton) | |
| | | Skeeper Unlimited Patron | |
| | | Lengths and Manufacturers of Vessels previously owned or operated | |
| | | Bertam 33', 31', 46', 54'; Hatteras 46', 53', 65'; Topaz 36', OCE eti |
| | | Have you been involved in a Loss in the last 10 years (insured or not)? If YES, please give details and amounts paid: | |
| | | NO | |
| | | Have you ever been convicted of a criminal offence or pleaded no contest? If YES, please give details | |
| | | NO | |

**WARNING:  THIS IS A NAMED OPERATOR ONLY POLICY**

**Concept Special Risks Ltd**                    www.special-risks.co.uk

LOSS PAYEE(S)  (PLEASE PROVIDE NAME AND FULL MAILING ADDRESS):

ADDITIONAL ASSURED'S REQUIRED – (PLEASE PROVIDE NAME, FULL MAILING ADDRESS AND  REASON FOR REQUEST)

**PLEASE READ BEFORE SIGNING APPLICATION**

1.  **This application will be incorporated in its entirety into any relevant policy of insurance where insurers have relied upon the information contained therein.**

2.  **Any misrepresentation in this application for insurance may render insurance coverage null and void from inception.  Please therefore check to make sure that all questions have been fully answered and that all facts material to your insurance have been disclosed, if necessary by a supplement to the application.**

3.  **Fraud Statement – please see page 5 of this application form & initial the paragraph relevant to you to indicate that you have read and understood this.**

| ASSURED SIGNATURE: | PRINT NAME  AND  STATE YOUR CONNECTION TO THIS POLICY IF YOU ARE NOT THE NAMED ASSURED/BENEFICIAL OWNER | SIGNATURE DATE: |
|---|---|---|
|  |  | 4/12/2018 |

PRODUCING BROKER

Jose E. Figueroa

BROKER USE ONLY:

PLEASE PROVIDE SURPLUS LINES TAX FILING INFORMATION OR ADVISE IF NOT APPLICABLE (LICENSE NUMBER WILL SUFFICE):

**Applicable in California**

For your protection, California law requires the following to appear on this form:

Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

California Insurance Frauds Prevention Act 1871.2

**Applicable in Florida and Idaho**

Any person who Knowingly and with the intent to injure, Defraud, or Deceive any Insurance Company Files a Statement of Claim Containing any False, Incomplete or Misleading Information is Guilty of a Felony*

*In Florida – Third Degree Felony

**Applicable in Indiana**

A person who knowingly and with intent to defraud an insurer files a statement of claim containing false, incomplete, or misleading information commits a felony.

**Applicable in Nevada**

Pursuant to NRS 686A.291, any person who knowingly and wilfully files a statement of claim that contains any false, incomplete, or misleading information concerning a material fact is guilty of a felony.

**Applicable in New Hampshire**

Any person who, with purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided by RSA 638:20.

**Applicable in New Jersey**

Any person who knowingly and with the intent to defraud any insurance company or other persons, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, subject to the criminal prosecution and civil penalties

**Applicable in New York**

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Applicable in Ohio**

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Applicable in Oklahoma**

WARNING: Any person who knowingly and with the intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony

**Applicable in Pennsylvania**

Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000.

**Samantha Thomas**

| | |
|---|---|
| **From:** | Alex Thomas |
| **Sent:** | 22 March 2019 11:49 |
| **To:** | Kathy Smith |
| **Subject:** | FW: SEA 21-21 LLC - MV 'LA BESTIA' EVIDENCE OF OVERHAUL 174282 |
| **Attachments:** | POI.docx |

Hi Kathy

Please could you review the attached POI breakdown. I have marked the ones I do not think we can include in red. Could you review also and see if you would include/preclude any more?

There are some which say replacement so perhaps we could reduce these costs by 20% for example to adjust for residual values?

Thanks, Alex

---

**From:** Beatriz Watson [mailto:beatriz.watson@globalinsbrkrs.com]
**Sent:** 21 March 2019 16:53
**To:** Alex Thomas
**Cc:** Jose Figueroa
**Subject:** Re: SEA 21-21 LLC - MV 'LA BESTIA' EVIDENCE OF OVERHAUL 174282

Hi Alex,

The breakdown of this overhaul is as follows:

**Vessel Bottom: $28,400**

- Alignment and balancing of the three axles $4,000
- Changes of the three bushings $1,900
- Revision and balance of the three propellers at level S-1 $6,000
- Application of seal primer to the entire hull $4,500
- Application of three layers of anti-fouling paint $3,000
- Update of the underwater lights $2,500
- Maintenance and repair of the three steering wheels $2,000
- Two new trim tabs $4,500

**Exterior: $103,900**

- Total painting of the vessel $65,000
- Addition of davit for the capacity of 1,000 lbs for the base of two tenders $6,500
- Base of two tenders $2,000
- Additional 90 gallon fuel tank for tenders $3,000
- Exterior lights $1,500
- Addition of two 12 feet tenders with their respective engines of 20 HP 4 times mercury $19,500
- New windlass $4,300

8/25/2021
Jose Figueroa
Job No. 204952
**PIf-2**

1

Sea 21-21_UF000061

## Vessel Bottom: $28,400

- Alignment and balancing of the three axles $4,000
- Changes of the three bushings $1,900
- Revision and balance of the three propellers at level S-1 $6,000
- Application of seal primer to the entire hull $4,500
- Application of three layers of anti-fouling paint $3,000
- Update of the underwater lights $2,500
- Maintenance and repair of the three steering wheels $2,000
- Two new trim tabs $4,500

## Exterior: $103,900

- Total painting of the vessel $65,000
- Addition of davit for the capacity of 1,000 lbs for the base of two tenders $6,500
- Base of two tenders $2,000
- Additional 90 gallon fuel tank for tenders $3,000
- Exterior lights $1,500
- Addition of two 12 feet tenders with their respective engines of 20 HP 4 times mercury $19,500
- New windlass $4,300
- Chain addition to the anchor $2,100

## Interior: $101,130

- Three new true haul for the engines $2,750
- Three new engine strainers $4,950
- Inspection and maintenance of fire equipment $300
- Replacement of two compressors of fridge and freezers $2,975
- Maintenance of the 1,000 hours of the three engines $26,350
- Overhaul of central engine injection pump $7,950
- Maintenance of six turbos $16,950
- Replacement of engine coolant pumps $8,790
- Replacement of the fuel transfer system $6,580
- Replacement of 12 bilge pumps $3,250
- Replacement of the fuel transfer system $2,790
- Replacement of the salt water pump of air conditioners $940
- Replacement of water heater $1,210
- Replacement of the fresh water pressure system $975

- Replacement of the bow thruster hydraulic motor and maintenance of all controls $7,500
- Replacement of the three seals of the axles $4,320
- Improvements of the blower system of the machine room $2,550

**Interior Aesthetic and Electrical: $90,755**

- Replacement of mattresses $5,900
- Interior reupholstery $19,775
- New floor made of synthetic teak $28,400
- Replacement of microwaves $640
- Replacements of two televisions $1,640
- Replacement of audio system $5,240
- Replacement of boat lighting/illumination with LED lighting $5,320
- Maintenance of air conditioning system $1,200
- Two new GPS systems $8,400
- Echo sounder $1,200
- New autopilot $6,300
- New VHF radios $1,400
- New VHF radio antennas $2,100
- Addition of air conditioning system in the fly bridge $3,240

## Samantha Thomas

| | |
|---|---|
| **From:** | Alex Thomas |
| **Sent:** | 20 March 2019 16:22 |
| **To:** | 'Beatriz Watson' |
| **Subject:** | RE: SEA 21-21 LLC - MV 'LA BESTIA' EVIDENCE OF OVERHAUL 174282 |
| **Attachments:** | SEA 21-21 LLC - MV 'LA BESTIA' EVIDENCE OF OVERHAUL |

Hi Beatriz

I don't think that is going to work. Have the assured provide a spreadsheet showing the individual costs for the items in your prior email (attached) so that we can determine which items we can include.

We can start from there.

Thanks, Alex

---

**From:** Beatriz Watson [mailto:beatriz.watson@globalinsbrkrs.com]
**Sent:** 20 March 2019 14:47
**To:** Alex Thomas
**Subject:** Re: SEA 21-21 LLC - MV 'LA BESTIA' EVIDENCE OF OVERHAUL 174282
**Importance:** High

Hi Alex,

The Insured has informed me that he has bank documentation of each repair provided in his bank statements. He stated that these repairs have been done over the course of two years and providing individual receipts will prove a challenge, for it is all in storage boxes with all documentation regarding their business operations that they have separate from La Bestia.

He also stated that if that the full $775,000 is not approved, that's fine-what he doesn't want is to be under insured being that he has invested hundreds of thousands on the overhaul of La Bestia.

Please advise if bank statements with notes on the applicable transactions will be sufficient.

Lastly, please advise if any other subjectivity is pending to complete the renewal.

Thank you,

Beatriz I. Watson
Specialty Broker Corporation
(954) 928-1647
(954) 627-2840
(754) 200-5452

---

**From:** Beatriz Watson
**Sent:** Friday, March 15, 2019 10:52 AM
**To:** Alex Thomas
**Subject:** Re: SEA 21-21 LLC - MV 'LA BESTIA' EVIDENCE OF OVERHAUL 174282
Hi Alex,

8/25/2021
Jose Figueroa
Job No.  204952
**PIf-3**

1

Sea 21-21_UF000054

**jacquie@goldmanandhellman.com**

| | |
|---|---|
| **From:** | Jose E. Figueroa <specialtybroker@earthlink.net> |
| **Sent:** | Friday, May 14, 2021 2:48 PM |
| **To:** | Jacquie Goldman |
| **Cc:** | Neil - CJC Law Firm |
| **Subject:** | Fw: RE: SEA 21-21 LLC dba JET BOAT MIAMI - 2018 RENEWAL QUOTE REQUEST |

-----Forwarded Message-----
From: Thomas Shepherd
Sent: Mar 20, 2018 4:56 AM
To: "Jose E. Figueroa" , James Potter
Cc: Gabriel Figueroa - Watersports Program Mgr
Subject: RE: SEA 21-21 LLC dba JET BOAT MIAMI - 2018 RENEWAL QUOTE REQUEST

Good Morning Jose & Gabriel,

Would you be able to send over a breakdown for this account? So we can let underwriters know the number of skis etc.

Also the claims may be frivolous and amount to nothing, but we have to take them into consideration.

Thanks & Regards

Thomas Shepherd
Underwriting Assistant

D: +44 (0) 20 3815 6240    T: +44 (0) 20 3815 6236
M: +44 (0) 7785 104 913    F: +44 (0) 20 7929 1393

5th Floor, 35 Great St. Helens, London, EC3A 6HB

Property Facultative Reinsurance, Property Treaty Reinsurance, Marine Hull / Liability and High Net Worth Motor.



ROKSTONE UNDERWRITING is a trading name of Direct Insurance Group PLC, which is

authorised and regulated by the Financial Conduct Authority, Firm Ref. No. 306080.

8/25/2021
Jose Figueroa
Job No. 204952
**Plf-4**

1

**From:** Jose E. Figueroa [mailto:specialtybroker@earthlink.net]
**Sent:** 19 March 2018 22:11
**To:** James Potter <james.potter@rokstoneuw.com>; Thomas Shepherd <thomas.shepherd@rokstoneuw.com>
**Cc:** Gabriel Figueroa - Watersports Program Mgr <gabriel.figueroa@specialtybrokercorp.com>
**Subject:** SEA 21-21 LLC dba JET BOAT MIAMI - 2018 RENEWAL QUOTE REQUEST

Hi James:

I am pleased to confirm Jorge has confirmed his desire to renew his Recreational Watersports Policy Number ROKMAR-201700002 with effective date of 21st March 2018-2019 as per the terms & conditions of the expiring Policy with the exception of:

1) Addition of LIABILITY ONLY coverage for Jet Boat Rides on the M/V Orange Twister XL (Year 1986; Length 35'; Aluminum Hull with ID# 4768560; Gasoline Engines; Maximum Passengers 40; Condition: Excellent). 2 Certified Captains will operate this vessel: Gustavo Castillo and Roberto Gonzalez. Both have many years of experience, without having had an incident while operating a vessel.

NOTE: The Insured has another Jet Boat M/V Orange Twister that is presently insured with Great Lakes-Concept which is the "work horse". The Orange Twister XL is used only on days with unusually high tourist participants. The Orange Twister will also be endorsed onto this Rokstone Marine policy when it's current policy expires in May 2018.

Our proposed breakdown of Premium-Fees-Fl Taxes for 2018-2019 Watersports Recreational Activities is as follows:

| | |
|---|---|
| USD21,000.00 | Watersports Scheduled Operations |
| USD 4,000.00 | Pontoon Rides (2) |
| USD 5,000.00 | Jet Boat Rides (Orange Twister XL) |
| USD 250.00 | S&A Pollution (USD250,000 Limit) |
| USD30,250.00 | Total Premium |
| USD 35,00 | Policy Fee |
| USD 1,514.25 | FSLSO Tax |
| USD 30.29 | FSLSO Services Fee |
| USD31,829.54 | Total Costs |

Finally, please note that the 2 open claims are considered to be "frivolous" and should be closed with only Defense Expense. As you saw yourself, Jorge and his family-staff are conducting the most efficient, safety-first watersports operations within the Rokstone Marine portfolio. This is a one of the "elite" operator for which our program was made to attracted. Thank you for granting him well deserved consideration when pricing his renewal.

I await for your formal Renewal Quotation in order to bind coverage by return.

Thank you.

Jose E. Figueroa
Specialty Broker Corporation
5719 N Andrews Way
Fort Lauderdale, FL 33309
Switchboard: (954) 928-1647
Direct Line:  (954) 288-7625

Facsimile:    (754) 200-5452

**jacquie@goldmanandhellman.com**

| | |
|---|---|
| **From:** | Jose E. Figueroa <specialtybroker@earthlink.net> |
| **Sent:** | Friday, May 14, 2021 2:48 PM |
| **To:** | Jacquie Goldman |
| **Cc:** | Neil - CJC Law Firm |
| **Subject:** | Fw: RE: SEA 21-21 LLC dba JET BOAT MIAMI - 2018 RENEWAL QUOTE REQUEST |

-----Forwarded Message-----
From: Thomas Shepherd
Sent: Mar 20, 2018 4:56 AM
To: "Jose E. Figueroa" , James Potter
Cc: Gabriel Figueroa - Watersports Program Mgr
Subject: RE: SEA 21-21 LLC dba JET BOAT MIAMI - 2018 RENEWAL QUOTE REQUEST

Good Morning Jose & Gabriel,

Would you be able to send over a breakdown for this account? So we can let underwriters know the number of skis etc.

Also the claims may be frivolous and amount to nothing, but we have to take them into consideration.

Thanks & Regards

Thomas Shepherd
Underwriting Assistant

D: +44 (0) 20 3815 6240    T: +44 (0) 20 3815 6236
M: +44 (0) 7785 104 913    F: +44 (0) 20 7929 1393

5th Floor, 35 Great St. Helens, London, EC3A 6HB

Property Facultative Reinsurance, Property Treaty Reinsurance, Marine Hull / Liability and High Net Worth Motor.



ROKSTONE UNDERWRITING is a trading name of Direct Insurance Group PLC, which is

authorised and regulated by the Financial Conduct
Authority, Firm Ref. No. 306080.

8/25/2021
Jose Figueroa
Job No.  204952
**PIf-4**

**From:** Jose E. Figueroa [mailto:specialtybroker@earthlink.net]
**Sent:** 19 March 2018 22:11
**To:** James Potter <james.potter@rokstoneuw.com>; Thomas Shepherd <thomas.shepherd@rokstoneuw.com>
**Cc:** Gabriel Figueroa - Watersports Program Mgr <gabriel.figueroa@specialtybrokercorp.com>
**Subject:** SEA 21-21 LLC dba JET BOAT MIAMI - 2018 RENEWAL QUOTE REQUEST

Hi James:

I am pleased to confirm Jorge has confirmed his desire to renew his Recreational Watersports Policy Number ROKMAR-201700002 with effective date of 21st March 2018-2019 as per the terms & conditions of the expiring Policy with the exception of:

1) Addition of LIABILITY ONLY coverage for Jet Boat Rides on the M/V Orange Twister XL (Year 1986; Length 35'; Aluminum Hull with ID# 4768560; Gasoline Engines; Maximum Passengers 40; Condition: Excellent). 2 Certified Captains will operate this vessel: Gustavo Castillo and Roberto Gonzalez. Both have many years of experience, without having had an incident while operating a vessel.

NOTE: The Insured has another Jet Boat M/V Orange Twister that is presently insured with Great Lakes-Concept which is the "work horse". The Orange Twister XL is used only on days with unusually high tourist participants. The Orange Twister will also be endorsed onto this Rokstone Marine policy when it's current policy expires in May 2018.

Our proposed breakdown of Premium-Fees-Fl Taxes for 2018-2019 Watersports Recreational Activities is as follows:

| | |
|---|---|
| USD21,000.00 | Watersports Scheduled Operations |
| USD  4,000.00 | Pontoon Rides (2) |
| USD  5,000.00 | Jet Boat Rides (Orange Twister XL) |
| USD     250.00 | S&A Pollution (USD250,000 Limit) |
| USD30,250.00 | Total Premium |
| USD       35,00 | Policy Fee |
| USD  1,514.25 | FSLSO Tax |
| USD       30.29 | FSLSO Services Fee |
| USD31,829.54 | Total Costs |

Finally, please note that the 2 open claims are considered to be "frivolous" and should be closed with only Defense Expense. As you saw yourself, Jorge and his family-staff are conducting the most efficient, safety-first watersports operations within the Rokstone Marine portfolio. This is a one of the "elite" operator for which our program was made to attracted. Thank you for granting him well deserved consideration when pricing his renewal.

I await for your formal Renewal Quotation in order to bind coverage by return.

Thank you.

Jose E. Figueroa
Specialty Broker Corporation
5719 N Andrews Way
Fort Lauderdale, FL  33309
Switchboard: (954) 928-1647
Direct Line:  (954) 288-7625

Facsimile:    (754) 200-5452

**jacquie@goldmanandhellman.com**

| | |
|---|---|
| **From:** | Beatriz Watson <beatriz.watson@specialtybrokercorp.com> |
| **Sent:** | Wednesday, May 26, 2021 12:21 AM |
| **To:** | Jacqueline Goldman |
| **Cc:** | Neil Bayer |
| **Subject:** | Fw: Additional Insured |

**ORANGE TWISTER (INBOX - SBC)**

Good evening Jacquie,

Pleased to send you the emails below.

Kindest regards,

*Beatriz I. Watson*
*Managing Director of Operations*



**SPECIALTY BROKER CORPORATION**

**5719 N. Andrews Way**
**Fort Lauderdale, FL 33309**
**(954) 928-1647**
**(954) 627-2840**
**(754) 200-5452**

**From:** mary@jetboatmiami.com <mary@jetboatmiami.com>
**Sent:** Tuesday, April 10, 2018 5:37 PM
**To:** Beatriz Watson <beatriz.watson@specialtybrokercorp.com>
**Cc:** jorge@jetboatmiami.com <jorge@jetboatmiami.com>
**Subject:** RE: Additional Insured

Hola Beatriz,

Por favor Beatriz mira abajo la cotizacion enviada por ustedes que fue la que se aporbó, la misma incluye el Jet Boat XL , nosotros tenemos dos Jet Boats, uno es el que se va a añadir en Mayo, pero ya el otro esta cubierto en esta nueva poliza y necesito que los additional insured ya vengan con ese Jet Boat incluido.

Kind Regards,
The Jet Boat Miami Team
1635 N. Bayshore Dr.
Miami, FL, 33132
Reservations: 305-433-1041
Tel: 954-397-6079
www.jetboatmiami.com



8/25/2021
Jose Figueroa
Job No. 204952
**PIf-5**

1

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

--------- Original Message ---------
Subject: SEA 21-21 LLC dba JET BOAT MIAMI - 2018 POLICY RENEWAL CONFIRMATION
From: "Jose E. Figueroa" <specialtybroker@earthlink.net>
Date: 3/23/18 9:32 pm
To: "Jorge - Jet Boat Miami" <Jorge@jetboatmiami.com>
Cc: "Maria Carmen - Jet Boat Miami" <info@jetboatmiami.com>, "Gabriel Figueroa - Watersports Program Mgr" <gabriel.figueroa@specialtybrokercorp.com>

Dear Jorge:

This is to confirm coverage has been bound with effective date of 21st of March 2018-2019 under our Recreation Watersports Program with Lloyd's of London.

As I expressed to you earlier today, I have obtained special considerations from Underwriters to revise their original Premium calculations which was much higher due to your Open Claims and the loss of your "claims -free discount".

After using "their sharpest pencil", the following rates were agreed with Underwriters:

| USD22,500.00 | 10 Jet Ski @ $2,250 |
|---|---|
| USD  5,000.00 | 1 Jet Boat |
| USD  1,500.00 | 1 Flyboard |
| USD  4,500.00 | 1 Banana Boat |
| USD  1,600.00 | 2 Pontoons @ $800 each |
| USD     250.00 | S&A Pollution |
| USD35,350.00 | Total Premium |
| USD      35.00 | Policy Fee |
| USD  1,769.25 | FSLSO Tax |
| USD      35.39 | FSLSO Service Fee |
| USD37,189.64 | Total Costs |

I will send you a formal Binder with Certificates of Insurance on Monday, together with the Premium Finance Agreement for your signature.

Thank you.

Jose E. Figueroa
Specialty Broker Corporation
5719 N Andrews Way
Fort Lauderdale, FL 33309
Switchboard: (954) 928-1647
Direct Line:   (954) 288-7625
Facsimile:     (754) 200-5452

<specialtybroker@earthlink.net><thomas.shepherd@rokstoneuw.com><gabriel.figueroa@specialtybrokercorp.com>

--------- Original Message ---------
Subject: RE: Additional Insured
From: "Beatriz Watson" <beatriz.watson@specialtybrokercorp.com>
Date: 4/10/18 1:09 pm
To: "mary@jetboatmiami.com" <mary@jetboatmiami.com>
Cc: "jorge@jetboatmiami.com" <jorge@jetboatmiami.com>, "specialtybroker@earthlink.net" <specialtybroker@earthlink.net>

Saludos Mary,

Los certificados se hicieron correctamente.  Lo que pasa es que El Jet Boat (MV Orange Twister) esta bajo otra poliza (Sea 20-20 LLC – ORANGE TWISTER #CSRYP/161642) que todavia esta corriente hasta el 5/20/2018.  Como se ha hablado con Jose, cuando esa poliza expira, entones pondremos ese Jet Boat en la poliza de Sea 21-21 LLC (Jet Ski) y la endosaremos.

Adjunto te envio los certificados para el MV Orange Twister que todavia aplican porque la poliza correspondiente todavia esta corriente.

En el 26 de marzo, Jose le envio a Jorge y te copio a ti, los 'declaration pages' de la poliza de Sea 21-21 LLC (Jet Ski).  Si lo necesitas de nuevo, con mucho gusto te lo puedo enviar de nuevo.  Por favor ver adjunto el Binder de 'La Bestia'.

***Por favor enviarme el SURVEY de La Bestia.  Lo tengo que someter antes del 12 de abril, ya que esa es la fecha que termina la extension.***

3

Gracias,

**Beatriz I. Watson**
**Florida Operations Manager**



**SPECIALTY BROKER CORPORATION**

**5719 N. Andrews Way**
**Fort Lauderdale, FL 33309**
**Switchboard:  (954) 928-1647**
**Direct Line:    (954) 627-2840**
**Facsimile:      (754) 200-5452**

**From:** mary@jetboatmiami.com [mailto:mary@jetboatmiami.com]
**Sent:** Tuesday, April 10, 2018 6:44 AM
**To:** Beatriz Watson
**Cc:** jorge@jetboatmiami.com
**Subject:** Additional Insured

Hola Beatriz,

Recibi todos los documentos de additional insured pero ahora que estaba por mandarlos porque me los están pidiendo, me estoy dando cuenta que en la descripción no están incluyendo el Jet Boat que está en esa póliza. Te agradezco que hagan los cambios y me envíen los corregidos. También por favor necesito que me mandes los binders de Sea 21-21 LLC y de la Bestia que aun no los hemos recibido.

Saludos,

Mary

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 81 of
114
Case 1:20-cv-22865-CMA   Document 69-5   Entered on FLSD Docket 08/20/2021   Page 1 of 4



# Certification of Translation

### COUNTY OF SUFFOLK
### COMMONWEALTH OF MASSACHUSETTS

August 11, 2021

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached document:

**2018-03-04.pdf Email**

Linguistic Systems, Inc. adheres to an ISO-certified quality management system that ensures best practices are always followed in the selection of linguists skilled in both the languages and subject matters necessary for every translation.

_____

Amr Abualy
Translation Project Manager
Linguistic Systems

**Linguistic Systems, Inc.**

260 Franklin Street, Suite 230, Boston MA 02110 • Phone 617-528-7400 • Fax 617-528-7490 • www.linguist.com
Certifications: ISO 9001 • ISO 17100 • ISO 18587 • ISO 27001

8/25/2021
Jose Figueroa
Job No. 204952
**Def-5**

**jacquie@goldmanandhellman.com**

| | |
|---|---|
| **From:** | Beatriz Watson <beatriz.watson@specialtybrokercorp.com> |
| **Sent:** | Friday, May 14, 2021 2:50 PM |
| **To:** | jacquie@goldmanandhellman.com |
| **Cc:** | Neil Burton |
| **Subject:** | Fw: La Bestia |
| **Attachments:** | IMG-20180303-WA0000.jpg; IMG-20180303-WA0001.jpg; IMG-20180303-WA0002.jpg; IMG-20180303-WA0003.jpg; IMG-20180303-WA0004.jpg; IMG-20180303-WA0005.jpg; IMG-20180303-WA0006.jpg; IMG-20180303-WA0007.jpg; IMG-20180303-WA0008.jpg; La Bestia Repairs.pdf; Mano de Obra.pdf |

Good afternoon,

Pleased to send you the email and attachments.

Kindest regards,

*Beatriz I. Watson*
*Managing Director of Operations*



**SPECIALTY BROKER CORPORATION**

**5719 N. Andrews Way**
**Fort Lauderdale, FL 33309**
**(954) 928-1647**
**(954) 627-2840**
**(754) 200-5452**

---

**From:** jorge@jetboatmiami.com <jorge@jetboatmiami.com>
**Sent:** Sunday, March 4, 2018 3:04 PM
**To:** Jose Figueroa <specialtybroker@earthlink.net>
**Cc:** Beatriz Watson <beatriz.watson@specialtybrokercorp.com>; mary@jetboatmiami.com <mary@jetboatmiami.com>
**Subject:** La Bestia

Hello Jose,

I am attaching the list with all the repairs done on La Bestia, including the dry docking that was carried out in July, 2016. If you check the list, you will find invoices from West Marine for July 15 to 21, 2016, which correspond to the paints used for the boat and, on July 26, you will find those from FJ Propeller Miami and Hurricane Cove, which are those for the repair of the propellers and the dry dock. I am also including another list with the amounts corresponding to labor for the repairs on the boat.

I am also attaching photographs of La Bestia when it was in dry dock.

Regards,

Jorge

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 83 of
Case 1:20-cv-22865-CMA   Document 69-5   Entered on FLSD Docket 06/20/2021   Page 3 of 4
114

**jacquie@goldmanandhellman.com**

| | |
|---|---|
| **From:** | Beatriz Watson <beatriz.watson@specialtybrokercorp.com> |
| **Sent:** | Friday, May 14, 2021 2:50 PM |
| **To:** | jacquie@goldmanandhellman.com |
| **Cc:** | Neil Burton |
| **Subject:** | Fw: La Bestia |
| **Attachments:** | IMG-20180303-WA0000.jpg; IMG-20180303-WA0001.jpg; IMG-20180303-WA0002.jpg; IMG-20180303-WA0003.jpg; IMG-20180303-WA0004.jpg; IMG-20180303-WA0005.jpg; IMG-20180303-WA0006.jpg; IMG-20180303-WA0007.jpg; IMG-20180303-WA0008.jpg; La Bestia Repairs.pdf; Mano de Obra.pdf |

Good afternoon,

Pleased to send you the email and attachments.

Kindest regards,

*Beatriz I. Watson*
*Managing Director of Operations*



**SPECIALTY BROKER CORPORATION**

**5719 N. Andrews Way**
**Fort Lauderdale, FL 33309**
**(954) 928-1647**
**(954) 627-2840**
**(754) 200-5452**

**From:** jorge@jetboatmiami.com <jorge@jetboatmiami.com>
**Sent:** Sunday, March 4, 2018 3:04 PM
**To:** Jose Figueroa <specialtybroker@earthlink.net>
**Cc:** Beatriz Watson <beatriz.watson@specialtybrokercorp.com>; mary@jetboatmiami.com <mary@jetboatmiami.com>
**Subject:** La Bestia

Hola Jose,

Te adjunto el listado de todas las reparaciones hechas en La Bestia, incluyendo la varada que se hizo en Julio de 2016. Si ves el listado, vas a ver facturas de West Marine de los dias 15 al 21 de Julio 2016 que son las pinturas que se usaron para el bote y el dia 26 de Julio vas a ver las de FJ Propeller Miami y Hurricane Cove que son las de reparacion de propelas y el varadero. Tambien te incluyo otro listado con los montos por concepto de mano de obra de los arreglos hechos en el bote.

Tambien te adjunto fotos de La Bestia cuando estaba en varadero.

Saludos,

1

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 84 of
Case 1:20-cv-22865-CMA   Document 69-5   Entered on FLSD Docket 08/20/2021   Page 4 of 4
114

Jorge

**jacquie@goldmanandhellman.com**

| | |
|---|---|
| **From:** | Jose Figueroa <jose.figueroa@globalinsbrkrs.com> |
| **Sent:** | Monday, May 24, 2021 6:25 PM |
| **To:** | Jacqueline Goldman |
| **Cc:** | Neil Burton; hmarinello@hemlegal.com; Christopher Lynch; Lourdes Martinez; Steven Goldman; Beatriz Watson |
| **Subject:** | RE: Fw: La Bestia - 2016 AURA POLICY |
| **Attachments:** | SEA 21-21 LLC - 2016  LA BESTIA PRIVATE YACHT BINDER (LONDON).pdf; SEA 21-21 LLC - 2016  LA BESTIA PRIVATE YACHT APPLICATION & PHOTOS.pdf; SEA 21-21 LLC - 2016 POLICY LOSS REPORT.pdf; SEA 21-21 LLC - 2016  HULL VALUE-BILL OF SALE WITH EMAIL.pdf; SEA 21-21 LLC - 2016 LA BESTIA FINANCE CONTRACT.pdf; SEA 21-21 LLC - 2016 LA BESTIA  SURVEY (2014).pdf; SEA 21-21 LLC - 2016 LA BESTIA INVOICE.pdf |

Good afternoon Jacqueline,

Further to my previous email pertaining to your inquiry to Beatriz on email following, I handled the 1st policy placed by us for "La Bestia" in 2016 for which the attached Policy DEC page is included for quick reference.

A review of the 2016 Application signed by Mr. Fernandez on 02/29/2016 indicates his answered was "No" to the question pertaining to "if having had a Marine Loss in prior 10 years".

To the best of my recollection, the July 2016 incident mentioned in 2018 by Mr. Fernandez "related to minor damages sustained when vessel went over a small sandbar raising-up at low tide". The minor repairs were completed and therefore, a "Marine Loss" was never filed with AURA.  Evidence of this fact is AURA's Loss Report included reflecting "No Known Nor Reported Loss" for the 2016 Yacht policy of La Bestia.

I have included all documentation related to the 2016 AURA policy that are in our files at this time.  Same may be useful should you deemed necessary to pursue this matter further.

Thank you.

**Jose E. Figueroa**
**President & CEO**



**GLOBAL INSURANCE BROKERS**

**5719 N. Andrews Way**

8/25/2021
Jose Figueroa
Job No. 204952
**Def-6**

Fort Lauderdale, FL 33309
**Main Line:**      **(954)928-1647**
**Direct Line:**    **(954)288-7625**
**Facsimile:**      **(754)200-5452**

---

**From:** Jacqueline Goldman <jacquie@goldmanandhellman.com>
**Sent:** Thursday, May 20, 2021 2:19 PM
**To:** Beatriz Watson <beatriz.watson@specialtybrokercorp.com>
**Cc:** Neil Burton <Neil.Burton@special-risks.co.uk>; Jose Figueroa <jose.figueroa@globalinsbrkrs.com>;
hmarinello@hemlegal.com; Christopher Lynch <clynch@hunterlynchlaw.com>; Lourdes Martinez
<lmartinez@hunterlynchlaw.com>; Steven Goldman <steven@goldmanandhellman.com>
**Subject:** Re: Fw: La Bestia

Good Afternoon Ms. Watson,

I am writing in regards to the email below, sent to me last Friday 5/14, original email dated March 4, 2018. Please note I have cc'd counsel for Sea 21-21.

The email from Mr. Fernandez on March 4, 2018 seems to reference an incident in which the La Bestia suffered a grounding in 2016, and certain repairs were made as a result ("Te adjunto el listado de todas las reparaciones hechas en La Bestia, incluyendo la varada que se hizo en Julio de 2016.")

Are there any more documents concerning the 2016 grounding referenced by Mr. Fernandez? I have gone through all the emails sent by Global, and this appears to be the only reference which has been provided to me, and it's two years after the incident it references. In fact, the response from Global appears to contain only five emails from all of 2016, none of which reference the July 2016 grounding.

Does Global have any other materials related to the 2016 grounding?

My question may be premature, if indeed further emails will be coming from Global. Please advise.

Thank you.


Best,

Jacquie Goldman, Esq.
Goldman & Hellman
8751 W. Broward Blvd., Ste 404
Fort Lauderdale, FL 33324
C: (617) 817-1887
F: (954) 832-0878

On 05/14/2021 2:50 PM Beatriz Watson <beatriz.watson@specialtybrokercorp.com> wrote:

2

Good afternoon,

Pleased to send you the email and attachments.

Kindest regards,

*Beatriz I. Watson*
*Managing Director of Operations*



**SPECIALTY BROKER CORPORATION**

**5719 N. Andrews Way**
**Fort Lauderdale, FL 33309**
**(954) 928-1647**
**(954) 627-2840**
**(754) 200-5452**

---

**From:** jorge@jetboatmiami.com <jorge@jetboatmiami.com>
**Sent:** Sunday, March 4, 2018 3:04 PM
**To:** Jose Figueroa <specialtybroker@earthlink.net>
**Cc:** Beatriz Watson <beatriz.watson@specialtybrokercorp.com>; mary@jetboatmiami.com <mary@jetboatmiami.com>
**Subject:** La Bestia

Hola Jose,

Te adjunto el listado de todas las reparaciones hechas en La Bestia, incluyendo la varada que se hizo en Julio de 2016. Si ves el listado, vas a ver facturas de West Marine de los dias 15 al 21 de Julio 2016 que son las pinturas que se usaron para el bote y el dia 26 de Julio vas a ver las de FJ Propeller Miami y Hurricane Cove que son las de reparacion de propelas y el varadero. Tambien te incluyo otro listado con los montos por concepto de mano de obra de los arreglos hechos en el bote.

Tambien te adjunto fotos de La Bestia cuando estaba en varadero.

Saludos,

Jorge

**jacquie@goldmanandhellman.com**

| | |
|---|---|
| **From:** | Jose E. Figueroa <specialtybroker@earthlink.net> |
| **Sent:** | Friday, May 14, 2021 2:46 PM |
| **To:** | Jacquie Goldman |
| **Cc:** | Neil - CJC Law Firm |
| **Subject:** | Fw: Fla. Stat. 627 Demand for Insured Sea 21-21 LLC and JetBoat Miami |
| **Attachments:** | CARDOZA - 627 Demand to Specialty Broker (L4526140xC232B).pdf |

-----Forwarded Message-----
From: Benjamin Dowers
Sent: May 10, 2018 1:48 PM
To: "Specialtybroker@earthlink.net"
Subject: Fla. Stat. 627 Demand for Insured Sea 21-21 LLC and JetBoat Miami


Hello,

Attached is a Fla. Stat. 627.4137 Demand to Specialty Broker Corporation, a copy of this has been sent Certified Mail.

Sincerely,

Ben Dowers


**McINTOSH SCHWARTZ, P.L.**

**Benjamin W. Dowers**
Partner
Board Certified in Construction Law   ☎ (954) 660-9888
McIntosh Schwartz, P.L.                ☎ Direct (954) 556-1487
888 S.E. 3rd Avenue, Suite 201         ☏ Fax: (954) 660-9882
Ft. Lauderdale, FL 33316               ✉ bwd@mcintoshschwartz.com
                                       www.mcintoshschwartzpl.com

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

THIS ELECTRONIC MAIL TRANSMISSION AND ANY ATTACHMENTS MAY CONTAIN PRIVILEGED, CONFIDENTIAL, OR PROPRIETARY INFORMATION INTENDED ONLY FOR THE PERSON(S) NAMED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE AUTHORIZED REPRESENTATIVE OF THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISTRIBUTION, COPYING, OR DISCLOSURE OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

8/25/2021
Jose Figueroa
Job No. 204952
**Def-8**

1

# McIntosh Schwartz, P.L.

### ATTORNEYS AT LAW

888 Southeast 3rd Avenue, Suite 201
Fort Lauderdale, Florida 33316-1159
Phone: (954) 660-9888

Benjamin W. Dowers

Direct Line: (954) 556-1487
Email: BWD@McIntoshSchwartz.com

May 10, 2018

***DELIVERED VIA CERTIFIED***
***US MAIL & EMAIL***
Specialty Broker Corporation
Attn: Mr. Jose E. Figueroa
5698 NE 7th Ave
Fort Lauderdale, FL 33334
Specialitybroker@earthlink.net

RE:     Demand for Insurance Information Pursuant to Fla. Stat. §627.4137
        Our Client:            Ms. Maria Cardoza and Mr. Jadiel Cardoza
        Your client/insured:   Sea 21-21, LLC
        Binder No.:            SPAMO16120399
        Customer No.:          C16-112335
        Carrier:               Prime Insurance Company
        Insured:               Sea 21-21 LLC (d/b/a Jet Boat Miami)

Dear Mr. Figueroa:

My name is Ben Dowers with McIntosh Schwartz, PL located in Fort Lauderdale, Florida. We represent the interests of Ms. Maria Cardoza and Mr. Jadiel Cardoza in a lawsuit against Sea 21-21, LLC and Jet Boat Miami. According to our records, your company was the acting insurance agent for Sea 21-21 and Jet Boat Miami to procure insurance for its operations in Miami. On August 6, 2016, Ms. Cardoza was injured while riding the banana boat which was pulled by a jet ski, and her lawsuit stems from her injuries.

Pursuant to Fla. Stat. §627.4137, demand is hereby made to Specialty Broker Corporation to disclose to our office a statement, under oath, of a corporate officer or the insurer's claims manager or superintendent, setting forth the following information with regard to each known policy of insurance, including excess or umbrella insurance for Sea 21-21, LLC and Jet Boat Miami for any policies that were in affect **between August 5, 2015 and August 7, 2017**:

(a)     The name of the insurer;
(b)     The name of each insured;
(c)     The limits of the liability coverage;
(d)     A statement of any policy or coverage defense which such insurer reasonably
        believes is available to such insurer at the time of filing this statement; and
(e)     A copy of the policy.

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 90 of
Case 1:20-cv-22865-CMA   Document 69-8   Entered on FLSD Docket 08/20/2021   Page 3 of 6
114

The requested information must be furnished within thirty (30) days of the date of this letter. If not, we will report the non-compliance to the Florida Department of Insurance Regulation. Thank you for your cooperation in this matter. Please contact our office with any questions or concerns.

Sincerely,

Benjamin W. Dowers

Attach: Copy of Binder



**PRIME INSURANCE COMPANY**

**SPECIALTY BROKER CORPORATION**

**Binder**

12/9/2016

**Specialty Broker Corporation**
5696 NE 7th Ave
Fort Lauderdale, FL 33334

Re: Sea 21-21 LLC

All Exclusions/Amendments apply as per the Quote provided.

This Binder is valid for 30 days on the condition that all duties and obligations of the Insured are met; including, but not limited to, the Insured's full and truthful disclosure of information during the application process, the Insured's compliance with the terms and conditions of coverage, and the Insured's payment of the stated premium and full compliance with these Payment Terms. Any potential coverage provided by this Binder will be deemed rescinded and void from the date of the Binder in the event of non-payment of the required premium or for any other failure of the Insured to perform or cooperate in the application, binding, or coverage process.

Carrier: Prime Insurance Company

| | | |
|---|---|---|
| Binder Number: SPAMO16120399 | Customer Number: C16-112335 | Invoice Number: INV341277 |
| Effective Date: 12/09/2016 | Expiration Date: 12/09/2017 | Retroactive Date: 12/09/2016 |

Description of Risk(s): Amusement & Recreational Operations

Description of Coverage: Commercial Liability Excluding Products and Completed Operations

| | | |
|---|---|---|
| Premium: | $5,234.00 | |
| Policy/Inspection Fee: | $350.00 | |
| State Taxes: | $279.20 | Minimum Earned: 40% |
| SLSC: | $8.38 | |
| Assessments | $0.00 | |
| Total: | $5,871.58 | |

**Conditions:** Review and comply with all the conditions below and complete and return all requirements on the coverage request form.

Auditable Exposures - All estimated premium bases are subject to a final audit to determine the earned premium for the coverage period at the time of expiration, renewal or cancellation.

Auditable Exposures - If the Insured does not comply with the voluntary audit, the company will automatically assess the policy a premium equal to 25% of the annual liability premium.

Personal Guarantee form must be signed by the principal owner and/or officer of the business and must be notarized

Commercial Liability – Only scheduled operations and locations are covered on the policy.

Higher Limits - Higher Liability Limits are available on this account either through the company or through the placement of excess liability through a reinsurance company.

Higher limits and/or optional quote limits may need further approval and pricing is subject to change.

Risk Management - Subject to an acceptable Premises/Operations and Safety Review by RMD - Risk Management Direct

Risk Management - Subject to completion of an RMD (Risk Management Direct) discussion by the Insured within thirty days of binding coverage. Toll Free 877-585-2851.

Risk Management - Subject to an acceptable Parental Permission Statement, Liability Release or Waiver Form that has been reviewed and approved by RMD - Risk Management Direct

Quote is for banana boat ride operations only. All other exposures are excluded.

If applicable, the Broker is responsible for all surplus lines taxes and fees.

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 92 of
114
Case 1:20-cv-22865-CMA   Document 69-8   Entered on FLSD Docket 08/20/2021   Page 5 of 6


PRIME
INSURANCE
COMPANY


SPECIALTY BROKER CORPORATION

| Commercial Liability: | | | |
|---|---|---|---|
| $500,000 | Per Person | | |
| $1,000,000 | Aggregate | | |
| $2,500 | SIR-BI | | |
| $2,500 | SIR-PD | | |
| Products: | ☐ Include | ☑ Exclude | |
| Completed Ops: | ☐ Include | ☑ Exclude | |
| Form Type: | ☑ Claims Made | ☐ Occurrence | |

**Limitations:** The Policy provides coverage for only those activities and operations otherwise covered under the Policy as listed below and for which a specific coverage charge has been paid.

| Classification and Description of activities and operations | Code No. | Basis of Coverage Charge |
|---|---|---|
| Boat Dealers | 10101 | Number of Units |
| Mobile Equipment - Scheduled | 15200 | Number of Units |
| Guided Watersport Activities | 44234 | Annual Gross Receipts |

| Loc No. | Address |
|---|---|
| 1 | 1635 N Bayshore Dr Miami, FL 33132 |

# CERTIFICATE OF INSURANCE

| | DATE (MM/DD/YY) |
|---|---|
| | 12/09/2016 |

**PRODUCER AND THE NAMED INSURED**
Prime Insurance Company

3722 S. Harrison St.
Sandy, UT 84070
(801) 304-5500

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE OF INSURANCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND, OR ALTER THE COVERAGE AFFORDED BY THE INSURANCE POLICIES BELOW.

## INSURERS AFFORDING COVERAGE

| | |
|---|---|
| INSURER A | Prime Insurance Company |
| INSURER B | |
| INSURER C | |
| INSURER D | |
| INSURER E | |

**INSURED**
Sea 21-21 LLC

DBA: Jet Boat Miami
1635 N Bayshore Dr
Miami, FL 33132

"LIMITS SHOWN ARE THOSE IN EFFECT AS OF POLICY INCEPTION"

## COVERAGES

The policies of insurance listed below have been issued to the insured named above for the policy indicated. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate may be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies. Aggregate limits shown may have been reduced by paid claims.

| TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS |
|---|---|---|---|---|
| ☑ **Commercial Liability** <br> ☑ Claims Made <br> ☑ Exclude Products <br> ☑ Exclude Completed Operations | SC1612399 | 12/9/2016 | 12/9/2017 | $500,000 Per Person <br><br> $1,000,000 Policy Aggregate |
| ☐ **Commercial Auto Liability** <br> Any Auto <br> All Owned Autos <br> Scheduled Autos <br> Hired Autos <br> Non-Owned Autos <br> Drive Away | | | | |
| ☐ **Commercial Garage Liability** <br> G.K.L.L. <br> O.T.R.P.D. <br> D.O.C. <br> Cargo <br> On Hook <br> Employee Dishonesty <br> Wrongful Repossession <br> Claims Made <br> Exclude Products <br> Exclude Completed Operations | | | | |
| ☐ **Excess Liability** <br> ☐ Claims Made | | | | |
| **OTHER** | | | | |

**DESCRIPTION OF OPERATION/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISION**
Coverage is limited to only insured activities or operations identified in the Policy. Guided Watersport Activities, Boat Dealers, Mobile Equipment - Scheduled

| ☑ CERTIFICATE HOLDER ☐ ADDITIONAL INSURED | ☐ LOSS PAYEE |
|---|---|
| PROOF OF INSURANCE | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 0 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. <br><br> AUTHORIZED REPRESENTATIVE *Melani Reed* |

UDA F-050-01OCT2005

**jacquie@goldmanandhellman.com**

| | |
|---|---|
| **From:** | Jose E. Figueroa <specialtybroker@earthlink.net> |
| **Sent:** | Friday, May 21, 2021 10:28 AM |
| **To:** | jacquie@goldmanandhellman.com |
| **Cc:** | Neil - CJC Law Firm; Jose E. Figueroa - GIB |
| **Subject:** | Fw: Mache Lanier's incident |
| **Attachments:** | incident report.pdf; JetBoat_-_DEMAND_LTR_from_Berman_re_Mache_Lanier_9-21-17 (1).pdf; signed waiver.pdf |

# JORGE

Jose E. Figueroa
Specialty Broker Corporation
Direct Line: (954) 928-1647
Office Line: (954) 772-4652
Facsimile: (954) 772-3832
-----Forwarded Message-----

From:
Sent: Sep 26, 2017 12:04 PM
To: Jose Figueroa
Cc:
Subject: Mache Lanier's incident

Hi José,

I am attaching the letter from the lawyer, the waiver, and the accident report for Mache Lanier case. The customer was on the banana boat on May 26th, 2017 at 4:00pm. Once she finished the ride, she left walking through the Grand. The customer came back about 30 minutes later saying that she had dislocated her knee on the ride. Our staff offered to call 911 and she said she didn't want to, we also told her that she would need to fill out the accident report, and she did not want to do that either. She called 911 on her own and the came to assist her inside the Grand Hotel, not our facilities. We never had any kind of information from 911 regarding the call because it was done in the hotel and not with us

One of our employees filled out the accident report as a formality so we would have in record what had happened, because the customer had come back after 30 minutes to complain. We want to be very clear on the fact that she did not want our help, she did not want us to call 911 and she denied anting to fill out an accident report. She also left the ride walking on her own and even left the premises before coming back to say she had dislocated her knee.

If you need any more information or have any questions, please let me know.

8/25/2021
Jose Figueroa
Job No. 204952
**Def-9**

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 95 of
114
Case 1:20-cv-22865-CMA   Document 69-9   Entered on FLSD Docket 08/20/2021   Page 2 of 11

Kind regards,,


Jorge Fernandez

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 96 of
114
Case 1:20-cv-22865-CMA   Document 69-9   Entered on FLSD Docket 08/20/2021   Page 3 of 11

# INCIDENT REPORT FORM

These instructions are to assist you in filling out the Incident Report Form in the event of an injury. Above all else, the form should be filled out as completely and accurately as possible. Completing this form shortly after the incident helps assure that all applicable information has been obtained. **However, please remember that caring for the injured person is of primary concern.**

If a waiver/release was signed by the injured person, or on his/her behalf, please attach a copy of the signed waiver/release to the Incident Report Form.

In the event that the injury involved the use of any equipment, you should inspect and document that equipment. Often, a picture of the equipment along with a description of its condition at the time of the injury will suffice. If you perceive that any problem exists with the equipment, it should be secured until otherwise instructed.

At this stage, it is important to gather all relevant information possible concerning the accident. No one from the business should discuss any opinion they might have as to the cause. It is important that you be factual. Opinions will be rendered at a later date once all relevant information has been reviewed and appropriately analyzed.

Additional considerations are as follows:

- When possible, have the injured person describe in their own words what happened. That description should be written in the section entitled "Injured Party's Description" and should be written in the first person, i.e. "I was...." If able to sign, the injured person should be asked to sign their description.

- Describe the extent of injury, treatment and method of transportation.

- Obtain the name, address and contact information (telephone numbers and email address) for each witness, including anyone associated with the business who observed either the incident, or anything giving rise to it. Ask each witness to prepare a written statement. If the witness is unwilling to prepare a written statement, please provide what they told you about the incident.

- Where applicable, take pictures of the accident site and forward them with the Incident Report Form.

- Cooperate fully with all law enforcement personnel called to the scene.

Once completed, please forward the Incident Report Form, waiver/release, witness statements, pictures and "Claim Notification" to the person identified in your insurance policy.

FORM 606 (0313)                    Page 1 of 3

Case 1:20-cy-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 97 of
Case 1:20-cv-22865-CMA   Document 69-9   Entered on FLSD Docket 08/20/2021   Page 4 of 11
114

## INCIDENT REPORT FORM

Date of report: 5/26/17     Time of report: 4:51 ☐ AM ☒ PM

Date of injury: 5/26/17     Time of injury: 4:00 ☐ AM ☒ PM

Name of Company: Jet Boat Miami

Address of Company: 1635 North Bayshore Drive

Activity Involved: Banana Ride     Location of Incident: Sea Isle Marina

| WEATHER: |
| --- |
| ☐ Cloudy    ☐ Rain    ☐ Snow    ☐ Windy    ☐ Ice |
| Temperature at time of incident: 86° |

Nature of suspected injury: Knee dislocation

Treatment rendered: _____

Name of person providing treatment: _____

TRANSPORTATION OF INJURED PERSON:

☐ Left on their own     ☒ Ambulance     ☐ Medical Evacuation Helicopter

When Possible, describe what occurred in injured person's own words:

Neglected all help, did not want to speak
with, to fill out her personal info.
us

INJURED PERSON'S INFORMATION:

Name: _____

Date of Birth: _____ (Month) _____ (Day) _____ (Year)

Address: _____ (Street) _____ (City) _____ (State) _____ (Zip Code)

Phone No: _____     Mobile No: _____

E-mail: _____ @ _____

Health Insurance: ☐ Yes     ☐ No

FORM 606 (0313)          Page 2 of 3

**WITNESS INFORMATION (use separate pages for statements):**

1. Name: _____

Date of Birth: _____ (Month) _____ (Day) _____ (Year)

Address: _____ (Street) _____ (City) _____ (State) _____ (Zip Code)

Phone No: _____         Mobile No: _____

E-mail: _____ @ _____

2. Name: _____

Date of Birth: _____ (Month) _____ (Day) _____ (Year)

Address: _____ (Street) _____ (City) _____ (State) _____ (Zip Code)

Phone No: _____         Mobile No: _____

E-mail: _____ @ _____

**PERSON COMPLETING FORM:**

Name: Llanet Aguero

Date of Birth: 11/30/1993 (Month) 11 (Day) 30 (Year) 1993

Address: 3639 SW 99th Ave (Street) Unit #1 (City) Miami (State) FL (Zip Code) 33165

Phone No: _____         Mobile No: (305) 979-8344

E-mail: llanitaguero @ gmail.com

**SUPPLEMENTAL INFORMATION:**

Witness Statements taken:              ☐ Yes    ☐ No

Photographs of accident scene taken:   ☐ Yes    ☒ No

Diagram of accident scene prepared:    ☐ Yes    ☒ No

Equipment involved in incident:        ☒ Yes    ☐ No

Identify equipment involved: Jet Ski

_____          _____
Signature of Injured Person                Signature of Person Completing Form

FORM 606 (0313)                    Page 3 of 3

Case 1:20-cv-22865-EGT Document 80-1 Entered on FLSD Docket 09/03/2021 Page 100 of
114
Case 1:20-cv-22865-CMA Document 69-9 Entered on FLSD Docket 08/20/2021 Page 7 of 11



**THE**
**BERMAN**
**LAW FIRM**

1111 Brickell Avenue
Suite 2350
Miami, Florida 33131
T 305-371-8223
F 305-371-8159

September 21, 2017

_**Via U.S. Mail Certified Return Receipt and First Class U.S. Mail**_

Jet Boat Miami, LLC,
a Florida limited liability company
3600 Red Road
Suite 306
Miramar, Florida 33025

Jet Boat Miami, LLC,
a Florida limited liability company
1951 N.W. 7th Avenue
Suite 160-317
Miami, Florida 33136

Jet Boat Miami, LLC,
a Florida limited liability company
c/o its Registered Agent, Janssen & Siracusa, P.A.
120 South Olive Avenue
Suite 504
West Palm Beach, FL 33401

Re:    **My Client: Mache Lanier**
       **Date of Incident: May 26, 2017**
       **Location of Incident: Jet Boat Miami's Banana Boat Ride in Biscayne Bay departed**
       **from 1635 N. Bayshore Drive, Miami, Florida 33132**

To Whom it May Concern:

I represent Mache Lanier in connection with the incident referenced above in which Ms. Lanier was involved in an accident that occurred while she was a passenger on the banana boat ride you own and operate. Ms. Lanier suffered personal injury as a result of the accident. You are hereby notified of her injury claim against you for this this accident.

Demand is hereby made for you to preserve any and all evidence, including all electronic information, that relates to the incident for my review and investigation. This includes, but is not limited to:

    (1) the vessel, inflatable banana boat, and tow rope(s) involved in my client's accident;

    (2) all maintenance and repair records relating in any way to the vessel, inflatable banana boat ride, and/or tow rope(s) involved in my client's accident;

    (3) any surveillance video footage or photographs of the incident, my client on the date of the incident, the scene of the incident on the date thereof, and/or the vessel, inflatable banana boat, and/or tow rope(s) involved in my client's accident at any time;

Jet Boat Miami, LLC
September 21, 2017
Page 2 of 2

(4) all cash register records and electronic information regarding my client's transactions with you at any time;

(5) all debit and/or credit card transaction records and electronic information regarding my client's transactions with you at any time;

(6) your internal correspondence and documents of any kind (other than attorney-client privileged documents or work product documents) relating my clients' incident;

(7) your entire personnel file and payroll records for your employee(s) working on the date of my client's incident, regardless of whether such employees(s) were involved in any way in my clients' incident;

(8) all correspondence and documents of any kind (other than attorney-client privileged documents or work product documents) relating in any way to any accidents of any kind involving any other of your customers at any time.

Moreover, demand is hereby made for you to promptly provide me with copies of all of the foregoing and to contact me to arrange for my inspection of the subject vessel, inflatable banana boat, and tow rope(s).

In addition, demand is hereby made, pursuant to Section 627.4137, Florida Statutes, that you provide me within thirty days the name(s) of all of your insurance carrier(s) and types and amounts of coverage for your insurance policy(ies) which may provide you with coverage in connection with liability for my client's incident, including any primary, excess, or any other applicable insurance. Demand is also made for you to forward this letter to all of your insurance carrier(s) as my client's request on such carriers for sworn statements required by Section 627.4137, Florida Statutes, including, for each insurance policy, the name of the carrier, the name of the insured, the limits of liability coverage, a statement of any coverage defenses which the insurer reasonably believes apply, and copy of the policy.

Your anticipated cooperation is appreciated.

Sincerely,

THE BERMAN LAW FIRM, P.A.

Jeffrey N. Berman, Esq.

*✱ Incidunt report*
*attached*

## BANANA RIDE WAIVER AND LIABILITY RELEASE AGREEMENT

In consideration of permitting me to participate in the Banana ride activities and related operations (hereinafter the "Banana ride"), JET BOAT MIAMI, LLC, SEA 20-20, LLC, SEA 21-21 LLC, ESJ JI Leasehold, LLC, ESJ JI Operations, LLC, Iconic Attractions Group, LLC, and their owners, members, officers, directors, agents, servants, and/or employees, and any and all independent contractors that may be at or about its operations (hereinafter collectively "JET BOAT AND ALL OTHERS"), on the Banana ride, I, for myself, my personal representatives, heirs, minor children and next of kin agree as follows:

1.        It is my intention by this instrument to give up my right to sue JET BOAT AND ALL OTHERS, whether specifically named or not, and it is also my intention to exempt and relieve JET BOAT AND ALL OTHERS and to hold them harmless from any liability for personal injury, property damage and/or wrongful death caused by any negligence and/or gross negligence, whether passive or active, and I agree to assume all risks in connection with the Jet Boat activities, whether foreseen or unforeseen.

2.        I will not hold JET BOAT AND ALL OTHERS responsible for transporting me to, from and/or on the Jet Boat ride.

3.        I am physically fit for the Jet Boat activities and I will not hold any of the above-named vessel, persons and/or entities responsible should I be injured as a result of heart problems, lung problems, or other illnesses or medical problems which might occur while traveling to, from and/or aboard the Banana ride.

4.        I understand that the Banana ride activities may cause physical strain or exertion not necessarily experienced in non-jet boat activities, and that I assume all risk for and will not hold JET BOAT AND ALL OTHERS responsible for any injuries, including injuries or death due to heart attack, panic, hyperventilation or other injuries caused by physical strain and exertion.

5.        I will immediately alert the Banana ride captain if I feel uncomfortable with the Banana ride abilities.

6.        I understand that I have a duty to exercise complete care for my own safety and the safety of my minor children if any, and agree to exercise this care.

7.        I also understand that sea conditions may change during to the Banana ride activities, and this is a function of the environment. I will not hold JET BOAT AND ALL OTHERS responsible for weather and/or sea conditions.

8.        I fully understand and am aware that the Banana ride has no medical facilities and that in the event of an illness and/or injury that appropriate medical care must be summoned by radio and/or until the Banana ride can safely return to the dock and that the treatment will be delayed until I can be transported to a proper medical care facility.

9.        JET BOAT AND ALL OTHERS have not made any representation to me, implied or otherwise, that they will render first aid. In the event that I show signs of distress or call for aid, I would like assistance and will not hold JET BOAT AND ALL OTHERS and/or any passengers responsible for their actions in attempting the performance of first aid. I fully understand and am fully aware that the Banana ride is extremely limited in its emergency medical response capabilities. As a result, in the event of an illness and/or injury, I understand that appropriate medical assistance may be significantly delayed and I and/or minor children in my care could sustain further serious injury, possibly resulting in death, from this delay. I acknowledge that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY PROCEDURES OF JET BOAT AND ALL

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 103 of
114
Case 1:20-cv-22865-CMA   Document 69-9   Entered on FLSD Docket 08/20/2021   Page 10 of 11

OTHERS and agree that this Waiver and Liability Release Agreement extends to all acts of negligence by JET BOAT AND ALL OTHERS, INCLUDING NEGLIGENT FIRST AID and is intended to be as broad and inclusive as is permitted by the laws of the State of Florida.

10.     I understand that being under the influence of prescription drugs, illegal drugs, many over-the-counter drugs, or excessive consumption of alcohol could cause my injury or death. Therefore I agree to refrain from drug or excessive alcohol use prior to and during the Banana ride trip.   If I am taking medication, I affirm that I have seen a physician and have approval to participate in the Banana ride activities while under the influence of the medication/drugs.

11.     I will be present at and attentive to the safety briefing given by JET BOAT AND ALL OTHERS, and if there is anything that I do not understand or am not in agreement with, I will notify the Banana ride captain immediately.

12.     I understand that all Banana ride riders under the age of 18 years old must wear a life jacket (PFD III "ski type") during the Banana ride.  I further understand that JET BOAT AND ALL OTHERS recommend that all riders over the age of 18 years old wear a life jacket (PFD III ski type) during the ride.   If I decide to wear a life jacket during the ride, I will request one from the Captain and/or crew at the dock before the Banana ride departs.  If I choose not to wear a life jacket during the Banana ride, or if I take it off at some point during the ride, then I agree that I am doing so at my own risk and peril.

13. I authorize Jet Boat Miami, LLC, SEA 20-20, LLC, SEA 21-21 LLC and its agents, to publicly use my name, likeness and/or image for marketing, advertising and/or other lawful commercial purposes.

14.     It is my intention that this Waiver and Liability Release Agreement will be admissible in any and all legal proceedings or lawsuits that may arise from the Banana ride activities.

15.     I understand that the terms of this Waiver and Liability Release Agreement are contractual and not a mere recital, and that I have signed this Waiver and Liability Release Agreement on my own free will. Further, I understand and agree that, in the event that one or more of the provisions of this Waiver and Liability Release Agreement is for any reason, held by a court of competent jurisdiction to be invalid and/or unenforceable in any respect, then such invalidity, illegality and/or unenforceability shall not affect any other provision hereof, and this Waiver and Liability Release Agreement shall be construed as if such invalid, illegal and/or unenforceable provisions had never been contained herein.

16.     I further state that I am of lawful age and legally competent to sign this Waiver and Liability Release Agreement or that I have acquired the written consent of my parent and/or guardian.

17.     I agree to pay all attorney's fees and court costs in the event of any credit card sales transaction disputes with JET BOAT AND ALL OTHERS. It is my intention to exempt and release JET BOAT AND ALL OTHERS from any liability whatsoever for personal injury, property damage and/or wrongful death caused to me and/or any minor children, by ordinary negligence and/or gross negligence.   I agree to pay all attorney's fees and costs arising from any dispute concerning the enforceability of this Waiver and Liability Release Agreement. I further agree that exclusive venue and jurisdiction for all disputes arising under this Waiver and Liability Release Agreement shall be in the Southern District of Florida.

18.     I have read this Waiver and Liability Release Agreement, fully understand its terms, understand that I have given up substantial rights by signing it, am aware of its legal consequences, and I have signed freely and voluntarily without any inducement, assurance and/or guarantee being

Banana ride Waiver & Liability Release Page 2 of 3

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 104 of
114
Case 1:20-cv-22865-CMA   Document 69-9   Entered on FLSD Docket 08/20/2021   Page 11 of 11

made to me and intend my signature to be a complete and unconditional release from all liability to the greatest extent allowed by law.  I have had the opportunity to personally discuss with the Banana ride captain the potential dangers incidental to the Banana ride activities.

19.      I have read and understand the foregoing in its entirety and agree to the terms and conditions set forth above for the sole consideration of being allowed to participate in the Banana ride activities.  I agree to the terms and conditions of each of the numbered sections contained herein on behalf or my heirs, any minor children, and my personal representatives and/or assigns.  I have not modified the content of this Waiver and Liability Release Agreement in any way.

### *** ALL BANANA RIDERS MUST PRINT NAME, SIGN AND DATE BELOW ***
*(By signing, you are agreeing to and accepting all of the terms and conditions set forth in the Waiver and Liability Release Agreement)*

| # | Name | Signature | Date |
|---|------|-----------|------|
| 1 | Moche Lanier | | 5/26/17 |
| 2 | Veronica Reaves | VReaves | 5/26/17 |
| 3 | Ashley Elliott | Ashley | 5/26/17 |
| 4 | Khalicia Campbell | Khalicia | 5-26-17 |
| 5 | Diamond Johnson | | 5-26-17 |
| 6 | Robert Johnson | | 5-26-17 |
| 7 | Mactee Smith | | 5-26-17 |
| 8 | Alquinton Smith | | 5-26-17 |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |

Banana ride Waiver & Liability Release Page 3 of 3

U.S. Coast Guard

**BILL OF SALE**

Expires: 06/30/2016

| 1. VESSEL NAME | 2. OFFICIAL NUMBER OR HULL ID NUMBER |
|---|---|
| LA BESTIA | 1049452 |

3. NAME(S) AND ADDRESS(ES) OF SELLERS

RIVA AZUL INC.
1100 BISCAYNE BLVD. #5001
MIAMI, FL 33132

3A. TOTAL INTEREST OWNED *(IF LESS THAN 100%)*: _____%

4. NAME(S) AND ADDRESS(ES) OF BUYER(S) AND INTEREST TRANSFERRED TO EACH

SEA 21-21 LLC
1951 NW 7TH AVENUE, 160-317
MIAMI, FL 33132

4A. TOTAL INTEREST TRANSFERRED (100% UNLESS OTHERWISE SPECIFIED): _____%

4B. MANNER OF OWNERSHIP. UNLESS OTHERWISE STATED HEREIN, THIS BILL OF SALE CREATES A TENANCY IN COMMON, WITH EACH TENANT OWNING AN EQUAL UNDIVIDED INTEREST. CHECK ONLY ONE OF THE FOLLOWING BLOCKS TO SHOW ANOTHER FORM OF OWNERSHIP.

☐ JOINT TENANCY WITH RIGHT OF SURVIVORSHIP    ☐ TENANCY BY THE ENTIRETIES    ☐ COMMUNITY PROPERTY

☐ OTHER *(DESCRIBE)*

5. CONSIDERATION RECEIVED *(ONE DOLLAR AND OTHER VALUABLE CONSIDERATION UNLESS OTHERWISE STATED)*

$400,000⁰⁰/₁₀₀  see attached amortization schedule of mor...

6. I (WE) DO HEREBY SELL TO THE BUYER(S) NAMED ABOVE, THE RIGHT, TITLE AND INTEREST IDENTIFIED IN BLOCK 4 OF THIS BILL OF SALE, IN THE PROPORTION SPECIFIED HEREIN.

VESSEL IS SOLD FREE AND CLEAR OF ALL LIENS, MORTGAGES, AND OTHER ENCUMBRANCES OF ANY KIND AND NATURE, EXCEPT AS STATED ON THE REVERSE HEREOF.  VESSEL IS SOLD TOGETHER WITH AN EQUAL INTEREST IN THE MASTS, BOWSPRIT, SAILS, BOATS, ANCHORS, CABLES, TACKLE, FURNITURE, AND ALL OTHER NECESSARIES THERETO APPERTAINING AND BELONGING, EXCEPT AS STATED ON THE REVERSE HEREOF.

| 7. SIGNATURES OF SELLER(S) OR PERSON(S) SIGNING ON BEHALF OF SELLER(S). | 8. DATE SIGNED |
|---|---|
| *[signature]* | Feb-17,2016 |

9. NAME(S) OF PERSON(S) SIGNING ABOVE, AND LEGAL CAPACITY IN WHICH SIGNED *(E.G., OWNER, AGENT, TRUSTEE, EXECUTOR)*

DEBORAH S. TYNES, DIRECTOR

10. ACKNOWLEDGMENT (TO BE COMPLETED BY NOTARY PUBLIC OR OTHER OFFICIAL AUTHORIZED BY A LAW OF A STATE OR THE UNITED STATES TO TAKE OATH.)

ON 2/17/16 *(DATE)* THE PERSON(S) NAMED IN SECTION 9    STATE: FL

ABOVE ACKNOWLEDGED EXECUTION OF THE FOREGOING INSTRUMENT    COUNTY: Miami-Dade
IN THEIR STATED CAPACITY(IES) FOR THE PURPOSE THEREIN CONTAINED.

NOTARY PUBLIC:

*[notary seal: DOROTHY NICOLE OFFUTT / MY COMMISSION #FF206624 / EXPIRES: MAR 05, 2019 / Bonded through 1st State Insurance]*

*[signature]* Dorothy Nicole Offutt

MY COMMISSION EXPIRES: 3/5/16 *(DATE)*

8/25/2021
Jose Figueroa
Job No. 204952
**Def-17**

LaBostria Amortization schedule

Feb 17, 2

| DATE | AMOUNT | | DATE | AMOUNT |
|------|--------|---|------|--------|
| 2/18/2016 | $ 4,500.00 | | 8/18/2018 | $ 8,027.57 |
| 3/18/2016 | $ 4,500.00 | | 9/18/2018 | $ 8,027.57 |
| 4/18/2016 | $ 4,500.00 | | 10/18/2018 | $ 8,027.57 |
| 5/18/2016 | $ 4,500.00 | | 11/18/2018 | $ 8,027.57 |
| 6/18/2016 | $ 4,500.00 | | 12/18/2018 | $ 8,027.57 |
| 7/18/2016 | $ 4,500.00 | | 1/18/2019 | $ 8,027.57 |
| 8/18/2016 | $ 4,500.00 | | 2/18/2019 | $ 8,027.57 |
| 9/18/2016 | $ 4,500.00 | | 3/18/2019 | $ 8,027.57 |
| 10/18/2016 | $ 4,500.00 | | 4/18/2019 | $ 8,027.57 |
| 11/18/2016 | $ 4,500.00 | | 5/18/2019 | $ 8,027.57 |
| 12/18/2016 | $ 4,500.00 | | 6/18/2019 | $ 8,027.57 |
| 1/18/2017 | $ 4,500.00 | | 7/18/2019 | $ 8,027.57 |
| 2/18/2017 | $ 8,027.57 | | 8/18/2019 | $ 8,027.57 |
| 3/18/2017 | $ 8,027.57 | | 9/18/2019 | $ 8,027.57 |
| 4/18/2017 | $ 8,027.57 | | 10/18/2019 | $ 8,027.57 |
| 5/18/2017 | $ 8,027.57 | | 11/18/2019 | $ 8,027.57 |
| 6/18/2017 | $ 8,027.57 | | 12/18/2019 | $ 8,027.57 |
| 7/18/2017 | $ 8,027.57 | | 1/18/2020 | $ 8,027.57 |
| 8/18/2017 | $ 8,027.57 | | 2/18/2020 | $ 8,027.57 |
| 9/18/2017 | $ 8,027.57 | | 3/18/2020 | $ 8,027.57 |
| 10/18/2017 | $ 8,027.57 | | 4/18/2020 | $ 8,027.57 |
| 11/18/2017 | $ 8,027.57 | | 5/18/2020 | $ 8,027.57 |
| 12/18/2017 | $ 8,027.57 | | 6/18/2020 | $ 8,027.57 |
| 1/18/2018 | $ 8,027.57 | | 7/18/2020 | $ 8,027.57 |
| 2/18/2018 | $ 8,027.57 | | 8/18/2020 | $ 8,027.57 |
| 3/18/2018 | $ 8,027.57 | | 9/18/2020 | $ 8,027.57 |
| 4/18/2018 | $ 8,027.57 | | 10/18/2020 | $ 8,027.57 |
| 5/18/2018 | $ 8,027.57 | | 11/18/2020 | $ 8,027.57 |
| 6/18/2018 | $ 8,027.57 | | 12/18/2020 | $ 8,027.57 |
| 7/18/2018 | $ 8,027.57 | | 1/18/2021 | $ 8,027.57 |


DOROTHY NICOLE OFFUTT
MY COMMISSION #FF206624
EXPIRES: MAR 05, 2019
Bonded through 1st State Insurance



Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 107 of 114
Case 1:20-cv-22865-CMA   Document 62-1   Entered on FLSD Docket 06/29/2021   Page 1 of 5

Page 1 of 5

**Concept Special Risks Ltd**          www.special-risks.co.uk

## Application Form

| ASSURED'S NAME: | ASSURED'S DATE OF BIRTH: | ASSURED'S NATIONALITY: | ASSURED'S STATE OF RESIDENCE: |
|---|---|---|---|
| Sea 21-21 LLC | 5-10-1968 | | Florida |

**FULL MAILING ADDRESS (including ZIP/Post Code where available). IF COMPANY PROVIDE REGISTERED ADDRESS**
1951 NW 7 Avenue, Suite 160-317
Miami, FL 33136

**BENEFICIAL OWNER (this should be completed if vessel is insured in a company name or if the beneficial owner of the vessel is someone other than the Named Assured):** Jorge Fernandez

| EFFECTIVE DATE FROM: (mm/dd/yy) March 5, 2018 | TO: (mm/dd/yy) March 5, 2019 | 0.01hrs LST 00.01 LST |
|---|---|---|

| VESSEL NAME: La Bestia | HULL ID: OTH650058696 | LENGTH OVERALL: 65 |
|---|---|---|
| MANUFACTURER/MODEL: Ocean Tech Marine | YEAR BUILT: 1996 | MODEL YEAR: |
| PURCHASE PRICE: $400,000 | DATE OF PURCHASE: 02/18/2016 | PRESENT VALUE: $700,000 |
| MAXIMUM SPEED: 40 | VESSEL REGISTERED: | VESSEL FLAG: American |

| **COVERAGES WILL NOT BE PROVIDED UNLESS REQUESTED HEREUNDER** | |
|---|---|
| **COVERAGES** | **LIMIT (US Dollar)** |
| HULL PHYSICAL DAMAGE | $400,000 |
| TENDER/DINGHY | N/A |
| MEDICAL PAYMENTS (maximum ($50,000)) | $1,000 |
| PERSONAL PROPERTY | $2,500 |
| TRAILER | N/A |
| BREACH OF WARRANTY (APPLICABLE LOSS PAYEE MUST BE DETAILED ON PAGE 4) | |
| THIRD PARTY LIABILITY | $500,000 |
| LIABILITY TO PAID CREW | N/A |
| COMMERCIAL PASSENGER LIABILITY | $500,000 |
| UNINSURED BOATERS (minimum $100,000) | $600,000 |
| NON-EMERGENCY TOWING | $2,500 |
| OTHER (please specify) | |

**PLEASE TICK THE APPROPRIATE BOXES**

| PRIMARY POWER | SAIL | | TYPE OF VESSEL | | SAILBOAT | |
|---|---|---|---|---|---|---|
| | OUTBOARD | ✓ | | | MOTOR YACHT | |
| | INBOARD | ✓ | | | SPORTSFISHER | ✓ |
| HULL MATERIAL: | FIBREGLASS | | | | HOUSEBOAT | |
| | WOOD | | | | CATAMARAN | |
| | KEVLAR | ✓ | | | OTHER (give details) | |
| | CARBONFIBRE | | LAST SURVEYED (mm/dd/yy) | | ASHORE OR AFLOAT | |
| | FERROCEMENT | | | | | |
| | METAL | | | | | |

| **VESSEL ENGINE/OUTBOARD DETAILS** | | | | | | |
|---|---|---|---|---|---|---|
| | HP | MANUFACTURER | FUEL | YEAR | SERIAL NO# | |
| #1 | 1100 | MAN | Diesel | 1996 | | |
| #2 | 1100 | MAN | Diesel | 1996 | | |

| a | DATE PURCHASED | PURCHASE PRICE | PRESENT VALUE |
|---|---|---|---|
| #1 | | | |
| #2 | | | |

#3 | 1100 | MAN | Diesel | 1996

**CSR/APP/2**

8/25/2021
Jose Figueroa
Job No. 204952
**Def-22**

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 108 of 114
Case 1:20-cv-22865-CMA   Document 62-1   Entered on FLSD Docket 06/29/2021   Page 2 of 5

Page 2 of 5        **Concept Special Risks Ltd**        www.special-risks.co.uk

| TENDER/DINGHY INFORMATION | | | |
|---|---|---|---|
| **MANUFACTURER** | **YEAR** | **HULL ID/SERIAL NUMBER** | **LENGTH** |
| N/A | | | |

| TENDER/DINGHY ENGINE/OUTBOARD DETAILS | | |
|---|---|---|
| **MANUFACTURER** | **HP** | **SERIAL NUMBER** |
| | | |

| TRAILER INFORMATION | | | | | |
|---|---|---|---|---|---|
| **MANUFACTURER** | **YEAR BUILT** | **DATE PURCHASED** | **PURCHASE PRICE** | **PRESENT VALUE** | **SERIAL NUMBER** |
| N/A | | | | | |

**PRIMARY MOORING LOCATION OF VESSEL (INCLUDING ZIP/POST CODE WHERE AVAILABLE) BETWEEN JULY 1ST – NOV 1ST
PLEASE SPECIFY WHETHER VESSEL WILL BE ASHORE/AFLOAT (MOORED)/OR ON A HOIST. IF YOU ARE UNABLE TO PROVIDE A ZIP/POST CODE, PLEASE ADVISE LONGITUDE & LATITUDE.**

Sea Isle Marina
1635 N. Bayshore Drive. Miami, FL 33132

**PLEASE ADVISE IF THIS VESSEL IS FITTED WITH MANUFACTURER RECOMMENDED FIRE PREVENTION/EXTINGUISHING EQUIPMENT (if no provide explanation) :**

(YES)        NO        (see Survey, page 8 of 31)

**PLEASE DETAIL ANY ANTI-THEFT PRECAUTIONS WHICH ARE IN PLACE**

**ALL WATERS TO BE NAVIGATED DURING THIS POLICY PERIOD (YOU MAY ATTACH AN ITINERARY)**

Florida and Bahamas

**WILL THE VESSEL BE LAID UP (OUT OF USE) DURING THIS POLICY PERIOD – IF SO DETAIL EXACT DATES, LOCATION AND ADVISE WHETHER ASHORE OR AFLOAT.**

| # | GENERAL INFORMATION | | | | |
|---|---|---|---|---|---|
| 1 | IS THIS VESSEL USED FOR FARE PAYING PASSENGERS? | YES | NO ✓ | IF YES, NUMBER OF PASSENGERS PER TRIP | |
| | | | | MAXIMUM: | AVERAGE: |
| | | | | NUMBER OF TRIPS PER YEAR | |
| | | | | MAXIMUM: | AVERAGE: |
| 2 | IS THIS VESSEL CHARTERED TO OTHERS WITH A CAPTAIN? | YES | NO ✓ | IF YES, COMPLETE CAPTAIN CHARTER SUPPLEMENTARY SHEET | |
| 3 | DOES THIS APPLICANT EMPLOY PAID CREW | YES ✓ | NO | IF YES, HOW MANY? | |
| 4 | IS THIS VESSEL CHARTERED TO OTHERS WITHOUT A CAPTAIN (BAREBOAT)? | YES | NO ✓ | IF YES, COMPLETE BAREBOAT CHARTER SUPPLEMENTARY SHEET | |
| 5 | IS THIS VESSEL USED FOR WATERSKIING OR DIVEBOAT CHARTER? | YES | NO ✓ | IF YES, PROVIDE DETAILS | |

CSR/APP/2

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 109 of
Case 1:20-cv-22865-CMA   Document 62-1   Entered on FLSD Docket 06/29/2021   Page 3 of 5
114

Page 3 of 5     **Concept Special Risks Ltd**     www.special-risks.co.uk

| # | GENERAL INFORMATION CONTINUED | | | | |
|---|---|---|---|---|---|
| 6 | IS THIS VESSEL USED FOR ANY OTHER COMMERCIAL OR BUSINESS PURPOSES? | YES | NO ✓ | IF YES, PROVIDE DETAILS | |
| 7 | WILL THIS VESSEL BE OPEATED SINGLE HANDEDLY AT NIGHT? | YES | NO ✓ | IF YES, ADVISE WHEN, WHERE AND HOW OFTEN? | |
| 8 | DOES ANYONE RESIDE ABOARD THE VESSEL | YES | NO ✓ | IF YES, FOR HOW LONG DURING THE POLICY PERIOD? | |
| 9 | WILL THIS VESSEL PARTICIPATE IN ANY RACES/REGATTAS/RALLYS/SPEED TRIALS DURING THIS POLICY PERIOD? | YES | NO ✓ | IF YES, COMPLETE RACING SUPPLEMENTARY SHEET | |
| 10 | WAS ANY INSURANCE DECLINED, CANCELLED OR NON-RENEWED IN THE LAST 5 YEARS? | YES | NO ✓ | IF YES, PROVIDE DETAILS | |
| 11 | HAVE YOU OR ANY NAMED OPERATOR BEEN INVOLVED IN A LOSS IN THE LAST 10 YEARS (INSURED OR NOT) | YES | NO ✓ | IF YES, PROVIDE DETAILS | |
| 12 | HAVE YOU OR ANY NAMED OPERATED BEEN CONVICTED OF A CRIMINAL OFFENCE OR PLEADED NO CONTEST TO A CRIMINAL ACTION? | YES | NO ✓ | IF YES, PROVIDE DETAILS | |

**ALL OPERATORS MUST BE DETAILED – IF THERE ARE MORE THAN TWO OPERATORS PLEASE REQUEST ADDITIONAL OPERATOR SHEETS**

| No. | Full Name | Date of Birth (mm/dd/yy) | Violations/Suspensions (including Auto) in the last 5 years |
|---|---|---|---|
| 1 | Gustavo Castillo | 11-30--1976 | NONE |
| | | Years of Boat Ownership | Years of Boating Experience |
| | | 11 | 11 |
| | | Boating Qualifications (for example USCG 100Ton) | |
| | | USCE 100 TON | |
| | | Lengths and Manufacturers of Vessels previously owned or operated | |
| | | 31' Contender, 31' Eduardano, 58' Viking | |
| | | Have you been involved in a Loss in the last 10 years (insured or not)? IF YES, please give details and amounts paid: | |
| | | NO | |
| | | Have you ever been convicted of a criminal offence or pleaded no contest? IF YES, please give details | |
| | | NO | |
| 2 | Full Name | Date of Birth (mm/dd/yy) | Violations/Suspensions (including Auto) in the last 5 years |
| | Jorge Fernandez | 05110/1968 | NONE |
| | | Years of Boat Ownership | Years of Boating Experience |
| | | 30 | 40 |
| | | Boating Qualifications (for example USCG 100Ton) | |
| | | Skeeper Unlimited Patron | |
| | | Lengths and Manufacturers of Vessels previously owned or operated | |
| | | Bertram 33', 31', 46', 54'; Hatteras 46', 53', 65'; Topaz '36' Ocean eti | |
| | | Have you been involved in a Loss in the last 10 years (insured or not)? IF YES, please give details and amounts paid: | |
| | | NO | |
| | | Have you ever been convicted of a criminal offence or pleaded no contest? IF YES, please give details | |
| | | NO | |

**WARNING: THIS IS A NAMED OPERATOR ONLY POLICY**

CSR/APP/2

Page 4 of 5                    **Concept Special Risks Ltd**              www.special-risks.co.uk

---

LOSS PAYEE(S)  (PLEASE PROVIDE NAME AND FULL MAILING ADDRESS):

ADDITIONAL ASSURED'S REQUIRED – (PLEASE PROVIDE NAME, FULL MAILING ADDRESS AND  REASON FOR REQUEST)

---

**PLEASE READ BEFORE SIGNING APPLICATION**

1. **This application will be incorporated in its entirety into any relevant policy of insurance where insurers have relied upon the information contained therein.**

2. **Any misrepresentation in this application for insurance may render insurance coverage null and void from inception.  Please therefore check to make sure that all questions have been fully answered and that all facts material to your insurance have been disclosed, if necessary by a supplement to the application.**

3. **Fraud Statement – please see page 5 of this application form & initial the paragraph relevant to you to indicate that you have read and understood this.**

---

| ASSURED SIGNATURE: | PRINT NAME  AND  STATE YOUR CONNECTION TO THIS POLICY IF YOU ARE NOT THE NAMED ASSURED/BENEFICIAL OWNER | SIGNATURE DATE: 4/12/2018 |
|---|---|---|
| PRODUCING BROKER | Jose E. Figueroa | |
| BROKER USE ONLY: PLEASE PROVIDE SURPLUS LINES TAX FILING INFORMATION OR ADVISE IF NOT APPLICABLE (LICENSE NUMBER WILL SUFFICE): | | |

CSR/APP/2

Page 5 of 5 **Concept Special Risks Ltd** www.special-risks.co.uk

### Applicable in California

For your protection, California law requires the following to appear on this form:

Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

California Insurance Frauds Prevention Act 1871.2

### Applicable in Florida and Idaho

Any person who Knowingly and with the intent to injure, Defraud, or Deceive any Insurance Company Files a Statement of Claim Containing any False, Incomplete or Misleading Information is Guilty of a Felony*

\*In Florida – Third Degree Felony

### Applicable in Indiana

A person who knowingly and with intent to defraud an insurer files a statement of claim containing false, incomplete, or misleading information commits a felony.

### Applicable in Nevada

Pursuant to NRS 686A.291, any person who knowingly and wilfully files a statement of claim that contains any false, incomplete, or misleading information concerning a material fact is guilty of a felony.

### Applicable in New Hampshire

Any person who, with purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided by RSA 638:20.

### Applicable in New Jersey

Any person who knowingly and with the intent to defraud any insurance company or other persons, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, subject to the criminal prosecution and civil penalties

### Applicable in New York

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

### Applicable in Ohio

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

### Applicable in Oklahoma

WARNING: Any person who knowingly and with the intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony

### Applicable in Pennsylvania

Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000.

Case 1:20-cv-22865-EGT  Document 80-1  Entered on FLSD Docket 09/03/2021  Page 112 of
Case 1:20-cv-22865-CMA  Document 62-4  Entered on FLSD Docket 06/29/2021  Page 1 of 3
114

Page 1 of 3          **Concept Special Risks Ltd**          www.special-risks.co.uk

**Renewal Questionnaire**

**Previous Policy Number:** CSRYP/174282

**Name of Assured:** Sea 21-21 LLC
**Assured's Mailing Address:** 1951 NW 7ᵗʰ Ave, Suite 160-317
Miami, FL 33136  USA
**Vessel Details:** 'La Bestia' 65' Ocean Tech Marine Sport-Fisherman
**Renewal Policy Period:** 03/05/2019 — 2020     0.01hrs LST  Flybridge

## 1) COVERAGES

| CURRENT COVERAGES | CURRENT LIMIT | REVISED COVERAGE |
|---|---|---|
| HULL PHYSICAL DAMAGE | $400,000 | TBD |
| HULL DEDUCTIBLE | $ 32,000 | |
| TENDER/DINGHY | | |
| MEDICAL PAYMENTS (MAXIMUM $50,000) | $ 1,000 | |
| PERSONAL PROPERTY | $ 2,500 | |
| TRAILER | | |
| BREACH OF WARRANTY | | |
| THIRD PARTY LIABILITY | $500,000 | |
| PAID CREW LIABILITY | $500,000 | |
| COMMERCIAL PASSENGER LIABILITY | | |
| UNINSURED BOATERS (MINIMUM $100,000) | $400,000 | |
| NON-EMERGENCY TOWING | | |
| OTHER (PLEASE SPECIFY) | | |

2) Will your vessel be your full-time residence during the next policy period. Please circle as
appropriate:          YES     or     (NO)

3) Your last survey was <date from database> your next survey is due <date to be calculated> and should
be performed <out or in> water. Please note that if an in water survey is requested you may be
required to provide a divers inspection of the hull.     The next survey will be out of water
between
April and May.

4) Do you require different navigation from that quoted on <quote number>? If so please detail below or
attach an itinerary     No change to navigation. Same
as last policy term.

CSR/RENQ/1

8/25/2021
Jose Figueroa
Job No. 204952
**Def-25**

Page 2 of 3     **Concept Special Risks Ltd**     www.special-risks.co.uk

Please confirm that all persons (including paid Captains and/or paid Crew) operating the vessel during
<dates of renewal policy> are listed below & that the details shown are correct.
Please complete all missing information for each listed operator. Please delete any person(s)
no longer required. If you wish to add any operators please ask your broker for a
supplementary operators sheet.

**ALL OPERATORS MUST BE DETAILED – IF THERE ARE MORE THAN TWO OPERATORS PLEASE REQUEST ADDITIONAL OPERATOR SHEETS**

| No. | Full Name | Date of Birth (mm/dd/yy) | Violations/Suspensions (including Auto) in the last 5 years |
|---|---|---|---|
| 1 | Jorge Fernandez | 05-10-1968 | No |
| | | **Years of Boat Ownership (please update)** 35 | **Years of Boating Experience (Please update)** 35 |
| | | colspan Boating Qualifications (for example USCG 100Ton) International License | |
| | | Lengths and Manufacturers of Vessels previously owned or operated Hatteras 53, Bertram 54, Bertram 46, Hatteras 65, Ocean Tech 65', Bradord 92', Buddy Davys 68', etc. | |
| | | Have you been involved in a Loss in the last 10 years (Insured or not)? If YES, please give details and amounts paid: No | |
| | | Have you ever been convicted of a criminal offence or pleaded no contest? If YES, please give details No | |
| 2 | Alejandro Fernandez | **Full Name** | **Date of Birth (mm/dd/yy)** 06-15-1973 | **Violations/Suspensions (including Auto) in last 5 years** No |
| | | **Years of Boat Ownership (please update)** 30 | **Years of Boating Experience (Please update)** 30. |
| | | Boating Qualifications (for example USCG 100Ton) International License | |
| | | Lengths and Manufacturers of Vessels previously owned or operated Hatteras 53, Bertram 54, Ocean Tech 65, Hatteras 65, etc. | |
| | | Have you been involved in a Loss in the last 10 years (insured or not)? If YES, please give details and amounts paid: No | |
| | | Have you ever been convicted of a criminal offence or pleaded no contest? If YES, please give details No | |

**WARNING: THIS IS A NAMED OPERATOR ONLY POLICY**

CSR/RENQ/1

Case 1:20-cv-22865-EGT   Document 80-1   Entered on FLSD Docket 09/03/2021   Page 114 of
Case 1:20-cv-22865-CMA   Document 62-4   Entered on FLSD Docket 06/29/2021   Page 3 of 3
114

Page 3 of 3       **Concept Special Risks Ltd**       www.special-risks.co.uk

5) Please advise your primary mooring location during the period 1st July to 1st November (full
address including ZIP/Post code where available) also advise whether your vessel will be Afloat
or Ashore. If you are unable to give a ZIP/Post code, please provide Longitude & Latitude.
**Please do not enter 'as last year':**

_Sea Isle Marina   1635 N. Bayshore Dr, Miami, FL_
_33132   - Afloat_

6) Have there been any other changes since your last signed application form? If so, please detail;

_No_

7) Please provide full name and full mailing address for any loss payee(s):

_Sea 21-21 LLC   1951 NW 7th Ave, Suite 160-317_
_Miami FL 33136._

In order that we may make the required amendments to your renewal policy, we
must have your signature giving us permission to do so.

**WARNING:**

**Any misrepresentation in this renewal questionnaire may render insurance
coverage null and void from inception. Please therefore check to make sure
that all questions have been fully answered and that all facts material to your
insurance have been disclosed, if necessary by a supplement to the
application.**

**Assured signature:** _____   **Date:** _03 - 22 - 2019_ .

**Print Assured's Name:** _Jorge Fernandez - Sea 21-21 LLC._

**BROKER USE ONLY:**

Please provide surplus lines tax filing information or advise if not applicable (license
number will suffice):

**CSR/RENQ/1**