## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-22865-Civ-TORRES

GREAT LAKES INSURANCE SE,

      *Plaintiff,*

vs.

SEA 21-21 LLC,

      *Defendant.*

_____/

## AMENDED
## <u>FINDINGS OF FACT & CONCLUSIONS OF LAW</u>

      This matter is before the Court following a bench trial conducted by the Court on the consent of the parties and the referral of the case for disposition. Following the trial, the parties submitted well-prepared proposed findings and supplemental briefing in support of their positions. The Court has reviewed the transcript of the trial, the supporting exhibits, all supplemental materials and filings, and the entire record in the case. Following that extensive review, as well as a period of time that allowed the parties an opportunity to review their positions and reach a compromise (which regrettably was not forthcoming), the matters before the Court remain pending and require adjudication. Hence we enter the following findings and conclusions of law.

      It is often said that the boater's motto is "break out another thousand." In this case, SEA 21-21 shelled out over $400,000 in expenses for the privilege of buying and

using a vessel before its total loss.  The owner purchased insurance in the event of such a loss.  It is thus not hard to sympathize with the insured's position in this case, whose principal's testimony we largely credit and who no doubt feels wronged by an insurance company's denial of his claim.   But the legal issue we must address is whether the insurance company rightfully refused to honor the policy under the law of admiralty.  We find that it did under the governing law that we are bound to apply, which as in this case may be deemed unduly harsh.  Even so, we are duty bound to enter judgment for the Plaintiff, Great Lakes, that filed this declaratory action to have the Court declare its policy void *ab initio*.  Judgment for Plaintiff to that effect will be entered by separate Order.

## I.     FINDINGS OF FACT

### A.     *The Vessel*

1.      In January 2016, Plaintiff Sea 21-21 LLC, whose principal and beneficial owner was Jorge Fernandez, purchased a twenty-year old pleasure motor yacht, *La Bestia,* which was a 65' diesel-powered vessel capable of long distance excursions.  The vessel had a master stateroom, full size galley, and flybridge.  In 2016 the vessel was in relatively above average to good condition. [D.E. 119-19].

2.      The vessel was purchased from a company called Riva Azul, Inc., whose shareholder was Deborah Tynes.

3.      The parties originally negotiated a purchase of $450,000 on a vessel that was surveyed in 2014 to be worth about at least $1,200,000. [D.E. 119-19 at 21].

4.      Sea trials conducted during the inspection period revealed problems with the center engine that would require substantial repairs.  The parties then negotiated a modification in the transaction that accounted for those costs.  The $450,000 purchase price would be contingent on the cost of those repairs.  The parties agreed upon a Marine Note, Security Agreement Power of Attorney that $50,000 of the purchase price was deferred pending final repairs to the center engine.  The seller agreed that there would be a $50,000 set aside, from which any monies spent on the center engine repairs would be credited.  Any monies not applied to the center engine would then be due to the seller within 120 days from execution of the Agreement.  [D.E.  119-16 at 10].  The Agreement contemplated that the principal balance of the purchase price after the set aside, $400,000, would be paid by SEA 21-21 through a monthly payment schedule that would mature by January 2021.

5.      Repair work was undertaken on the center engine as contemplated by the agreement, for which Fernandez actually incurred $43,881.42 to repair the center engine in addition to $2,295 in extra costs.  As the Master Agreement required, Fernandez ultimately forwarded to the seller a check for $3,823.58, which represented the credit due under the set aside provision.  That left the remaining amount due under the agreement, $400,000, which was then financed over time as contemplated by the Agreement. [D.E. 120-8, 119-24].

6.      The seller executed a notarized Bill of Sale, signed February 17, 2016, that memorialized a sale of the vessel for $400,000, which was signed and initialed by the seller Deborah Tynes. The Bill of Sale attached the agreed-upon amortization schedule for that loan amount through January 2021. [D.E. 119-19].

7.     No persuasive evidence of collusion between the seller and buyer was demonstrated at trial and the parties' performance demonstrated that SEA 21-21 invested at minimum $450,000 for the initial purchase of the vessel.  Contrary to Plaintiff's claim at trial, the cost overhaul of the central engine amounted to $43,881.42 plus additional costs of $2,295 for miscellaneous items.  SEA 21-21 also incurred the balance deposit payment of $3,823.58 paid to the seller.  The Court found Fernandez's testimony as to these payments and expenses to be fully credible, which constitutes sufficient consideration and investment of the vessel to at minimum $400,000.

8.     Apart from that, Great Lakes testified at trial that the insurer will only insure a vessel for the amount the insured paid for the vessel, which is the best way to establish value beyond any estimate of fair market value.

9.     Even if the $46,000 costs charged against the purchase price to the seller never actually were incurred, SEA 21-21 incontrovertibly paid the balance of that amount for the purchase of the vessel over an amortization period.  The payment of even those sums to the seller under the Agreement amounts to at least $400,000 for the principal, interest, and initial monies down in the amount of $3,823.58.

10.     Therefore, the buyer's actual cost for the purchase of the vessel has been documented through convincing evidence to amount to at least $400,000, which was the amount of coverage initially purchased by SEA 21-21 and approved by Great Lakes as discussed below.

11.     But even if documentary proof of payment for the repairs represented as having been made was a predicate to establish the original insurable amount for the vessel, Great Lakes' expert confirmed that $13,798.58 in repairs to the central engine and cooling system were verified in his review of the vessel's records.  That sum, added to the amount of the purchase price actually incurred by SEA 21-21 further support the finding that the insured had in fact incurred at least $400,000 in hard costs for the purchase of the vessel.

12.     That sum further supports the accuracy of the initial policy application's claim (as further detailed below) that the purchase price of the vessel was indeed at least $400,000.

### B.     *The Insurance Policies*

13.     Two years after initially purchasing the vessel, SEA 21-21 purchased a new insurance policy to insure for any loss of the vessel.  On April 12, 2018, through its insurance broker, Global Insurance Brokers, Inc. ("Global"), SEA 21-21 submitted to the Plaintiff, Great Lakes Insurance SE ("Plaintiff" or "Great Lakes"), an application for a Marine Insurance Policy seeking Hull & Machinery coverage for *La Bestia*.  [D.E. 119-1].

14.     The original application asked, as normal, for the details of the vessel and its original purchase price.  SEA 21-21's broker represented the purchase price to be "$400,000" incurred on February 18, 2016, for the vessel worth $700,000.

15.    On March 19, 2018, Great Lakes issued Marine Insurance Policy No. CSRYP/166843 (the "2018 Policy"), which afforded Hull & Machinery insurance coverage for the vessel, for the coverage amount of $400,000, during the one-year period commencing on March 15, 2018.

16.    There were no losses claimed during this coverage period and no dispute that the policy premium was paid.

17.    On March 22, 2019, SEA 21-21, once again through its broker Global, submitted to Great Lakes a Renewal Questionnaire for coverage of the Insured Vessel. [D.E. 119-4].   On the same day, Great Lakes issued to SEA 21, Marine Insurance Policy No. CSRYP/174282 (the "2019 Policy"), affording Hull & Machinery insurance coverage for the vessel for the same coverage amount, $400,000, for a period of one year commencing March 5, 2019. [D.E. 119-5].

18.    In advance of this renewal application, SEA 21-21 through Global initiated discussions with Great Lakes' underwriter to increase the amount of hull coverage for the vessel based upon improvements that Fernandez claimed he incurred in the interim period.   Specifically, in an email from Beatriz Watson at Global, to Great Lakes' underwriter, Concept Special Risk Ltd ("Concept"), she asked that Concept "Please revise this binder, increasing the Hull Valve for MV 'La Bestia' from $400,000 to $775,000 per insured's request per the attached Survey." [D.E. 119-2].

19.    In response, on March 8, 2019, Concept, through Alex Thomas, requested that Global "[pl]ease provide any information available to evidence the increase in Hull Sum Insured above the purchase price of the scheduled vessel; a list of upgrades and associated values will suffice (a survey valuation will assist in agreeing a (sic) value but we must have proof of investment also)." [D.E. 119-2].

20.    On March 13, 2019, Ms. Watson then replied by email: "I'm pleased to provide the following breakdown of the complete overhaul of 'La Bestia.' This overhaul correlates with the surveyor's assessment of vessel hull value of $775,000 stated in the survey that has been submitted. (For reference, please see attached Survey.)." [D.E. 119-26].

21.    In response, on March 15, 2019, Thomas pushed back:  "Noted with thanks. In terms of the assured's request to increase the sum insured to the survey valuation please could you review the below: . . . Please note that the costs for the upgrades listed in your last email total $324,185 and some of these items are deemed to be the maintenance costs associated with ownership and upkeep of the vessel (such as painting of the hull, maintenance of engines etc.) - these cannot be included in the hull sum insured.  The tenders also cannot be included in the hull limit.  Jose made reference to 10 pages of documentary evidence to support the amount spent.  In order that we can come to an agreed value, I think in this instance we will need to see the receipts for the upgrades.  Apologies, this is going round and round we cannot almost double a sum insured without making sure we are happy with the valuations and investments made." [D.E. 120-14].

22.     The 2018 survey, referenced in the emails, provides that the fair market value of the vessel was $775,000. [D.E. 119-21 at 37].

23.     In response to Concept's March 15, 2019 email, Global through Watson acknowledged: "It is understandable to request more documentation to support these amounts.  The insured did provide me with the cost of each repair. I'll request the receipts/invoices of these repairs and upgrades and get them to you as soon as possible." [D.E. 120-14].

24.     On March 20, 2019, SEA 21-21's broker represented to the underwriter: "The insured has informed me that he has bank documentation of each repair provided in his bank statements. He stated that these repairs have been done over the course of two years and providing individual receipts will prove a challenge for it is all in storage boxes with all documentation regarding their business operations that they have separate from La Bestia.  He also stated that if the full $775,000 is not approved, that's fine-what he doesn't want is to be under insured being that he has invested hundreds of thousands on the overhaul of La Bestia.  Please advise if bank statements with notes on the applicable transactions will be sufficient. Lastly, please advise if any other subjectivity (sic) is pending to complete the renewal." [D.E. 119-6].

25.     The underwriter, again through Thomas, rejected that alternative:  "I don't think that is going to work. Have the assured provide a spreadsheet showing the individual costs for the items in your prior email (attached) so that we can determine which items one can include. We can start from there." [D.E. 119-6].

26.     On March 21, 2019, Watson submitted a summary breakdown of the overhaul's associated costs for the individual items. [D.E. 120-3].  The summary did not attach any supporting documentation or receipts for the amounts included.  It claimed that many improvements were made to the vessel's bottom, exterior, interior, and electrical systems, totaling $324,850.00.

27.     That breakdown was reviewed in detail by the underwriter, which review evidences that the true and documentable costs of the repair was material to increase coverage under the policy.  For instance, in a March 22, 2019 internal email from Concept's Thomas to Kathy Smith, Thomas asked: "Please could you review the attached PIO breakdown. I have marked the ones I do not think we can include in red. Could you review also and see if you would include/preclude any more? There are some which say replacement so perhaps we could reduce the costs by 20% for example to adjust for residual values." [D.E. 120-3].

28.     The underwriter's review evidences gross reductions of $176,510 from the amount submitted.  Consequently, Concept approved an endorsement increasing the agreed value of the hull coverage to $560,000. [D.E. 119-5 at 33].  Such increase was made in reliance on the verifiable improvements to the vessel that increased the insured's investment in the vessel by $160,000 beyond the initial purchase price.

29.     Post-litigation expert analysis of all records produced by SEA 21-21 shows that actual proof of payment and work for the improvements that warranted the increase in hull coverage reveal only $38,354.48 in verified costs of improvements to the vessel.  No tangible documentation is in the record for anywhere between $85,000 to $138,000 in improvements that were relied upon to bind the March 2019 policy and its endorsement increasing the amount of hull coverage for the vessel to $560,000.

30.     SEA 21-21 was on notice at the time that the endorsement was initially included to the March 2019 policy that Great Lakes was relying on SEA 21-21's representation that the improvements were made on the vessel and that documentation existed to support the increase in the hull coverage amount.  SEA 21-21's broker indeed expressly represented to the underwriter on March 15, 2019, that all individual receipts could be obtained as they were in storage boxes that included documentation for all the entity's business expenses apart from those involving the vessel.  In lieu of submission of those receipts at the time of the issuance of the policy, the underwriter agreed to accept a spreadsheet of expenses that was represented to be an accurate breakdown of all the verifiable improvements made to the vessel to warrant an increase in the hull coverage amount.

31.     SEA 21-21 was hence also on notice that the documentation supporting such improvements was material to Great Lakes' decision to approve an increase in the amount of hull coverage and issuing the 2019 endorsement to the policy.  Great Lakes in fact relied upon that material representation in its ultimate decision to approve an increase in the hull coverage amount and to issue the March 2019 policy.

**C.**     ___The Vessel's Loss and the Resulting Claim/Denial on the Policy___

32.     On February 26, 2020, the Insured Vessel caught fire and sank while enroute to Bimini from Pompano Beach Florida.  There is no dispute that the loss of the vessel triggered payment of the claim based on the vessel's total loss, minus the deductible included in the policy.

33.     Nevertheless, after Great Lakes investigated the loss, its agent communicated the denial of the claim on July 17, 2020: "The position asserted herein is based upon the fact that the policy contains a provision which states that the coverage afforded thereunder ' . . . is null and void in the event of non-disclosure or misrepresentation of a fact or circumstances material to our acceptance or continuance of this insurance.' The investigation referenced herein determined that there were numerous misrepresentations and/or a failure to disclose material facts on the original application, signed and submitted on April 12th, 2018, and in the Renewal Questionnaire, signed and submitted on March 19, 2019. Specifically, the following material misrepresentations and/or non-disclosures have come to light: 1) the purchase price of the "La Bestia" was not $400,000 as had been represented; 2) Deborah Tynes, as mortgage holder on the "La Bestia" should have been disclosed as the loss payee and an additional insured, but she was not; 3) Ms. Tynes' prior loss history should have been disclosed, but it was not; 4) the prior partial sinking of the "La Bestia" should have been disclosed, but it was not, and 5) the May 2018 crew liability claim under Policy CSRYP/161642 should have been disclosed on the Renewal Questionnaire, but it was not. Such

misrepresentations of and/or a failure to disclose material facts voids coverage under the policy." [D.E. 119-22].

34.     Contemporaneously with the denial of coverage, on July 13, 2020, Great Lakes filed a Complaint for Declaratory Judgment.   The operative Complaint seeks a finding from the Court find that the 2019 Policy did not cover any losses due from the February 26, 2020 incident.   The sole count of the Second Amended Complaint alleges that SEA 21-21 misrepresented several material facts in its Original Application, Renewal Questionnaire, and in subsequent communications, including "the actual purchase price of the vessel, the alleged improvements to the vessel, the existence of the proper loss payee, Ms. Tynes, her prior loss history, the vessel's prior loss history, and Mr. Fernandez's prior loss history." [D.E. 54, ¶ 50].

35.     SEA 21-21 filed a counterclaim for breach of contract and declaratory relief of its own, which seeks a declaration that coverage existed for the vessel's loss and judgment for the payment due under the policy.  [D.E. 63].

36.     At trial, Great Lakes expressly stipulated on the record that its declaratory judgment action would be limited to two alleged misrepresentations of fact:  (1) that SEA 21-21 had actually paid $400,000 for the purchase of the vessel prior to the inception of the policy, and (2) that SEA 21-21 had actually paid $160,000 worth of improvements to the vessel and had documentation of those improvements to justify an increase in the hull coverage amount in March 2019.  All other defenses to coverage pleaded in the operative complaint were withdrawn. [D.E. 124 at 8-9].

37.   Utilizing those questions presented at trial by stipulation, the Court finds that SEA 21-21 actually paid at least $400,000 for the purchase of the vessel prior to the inception of the policy.

38.   The Court also finds, however, that SEA 21-21 did not incur at least $160,000 in improvements to the vessel, nor did it document anywhere close to that neighborhood of tangible improvements to justify the increase in hull coverage to $560,000.  Such documentation of the improvements was a material representation that Great Lakes relied upon to issue the March 2019 endorsement.   Even if unintentional or mistaken, SEA 21-21 misrepresented its ability to provide verifiable documentation of the extent of improvements.

## II.  CONCLUSIONS OF LAW

### A.   *The Doctrine of Uberrimae Fidei under Federal Admiralty Law*

We note at the outset that the following discussion of the law that governs the case and how it applies to the Court's findings of fact may itself incorporate specific findings for purposes of Rule 52(a) and should be treated as such.

We begin by restating the governing rule that Great Lakes' declaratory judgment action is invoking in this case to deny payment under the policy. It has long been settled that "[m]arine insurance contracts qualify as maritime contracts, which fall within the admiralty jurisdiction of the federal courts and are governed by maritime law." *GEICO Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1139 (11th Cir. 2019) (alteration added; citations omitted). And in matters of admiralty, the supremacy of established federal rules of law over state law is clear. *See, e.g., Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 314 (1955) ("[I]n the absence of

controlling Acts of Congress this Court has fashioned a large part of the existing rules that govern admiralty. And States can no more override such judicial rules validly fashioned than they can override Acts of Congress.") (cleaned up and citation omitted)).

If a judicially fashioned rule of federal maritime law applies to the dispute, a district court must apply it despite contrary state law. *See id.* In the absence of a judicially fashioned admiralty rule, the district court must then turn to state law in addressing questions of marine insurance. *See Shackleford*, 945 F.3d at 1139 (quoting *AIG Centennial Ins. Co. v. O'Neill*, 782 F.3d 1296, 1302 (11th Cir. 2015)).

The maritime doctrine of *uberrimae fidei* is the controlling law in the Eleventh Circuit and therefore applies to this dispute. *See, e.g., Markel Am. Ins. Co. v. Nordarse,* 297 F. App'x 852, 853 (11th Cir. 2008) (the marine insurance doctrine of *uberrimae fidei* is the controlling law of this circuit) (citing *HIH Marine Servs. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000)); *Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir. 1984) ("The general rule of [*uberrimae fidei*], requiring full disclosure, is well settled in this circuit, and as a clear rule of maritime law it is the controlling federal rule even in the face of contrary state authority." (citation omitted)).

This doctrine "requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk." *HIH Marine,* 211 F.3d at 1362. That requirement incorporates the duty to exercise the "highest degree of good faith" in entering a marine insurance contract because "the underwriter often has no practicable means of checking on either the accuracy or the sufficiency of the

facts" that the insured furnishes to the insurer before the insurer accepts the risk and sets the policy's conditions and premiums. *Id.* (quoting Gilmore & Black, *The Law of Admiralty* 62 (2d ed. 1975)).

The insured's duty to disclose extends to those material facts into which the insurer may or may not have directly inquired. *See id.* at 1362–63 (citing *Jackson v. Leads Diamond Corp.*, 767 F. Supp. 268, 271 (S.D. Fla. 1991)) (other citation omitted). Thus, an insured's material misrepresentation on an application for marine insurance would violate the *uberrimae fidei* doctrine and warrant the voidance of the entire disputed maritime insurance policy. *See id.* at 1363. Thus, "the *insured* bears the burden of full and voluntary disclosure of facts material to the decision to insure." *Id.* at 1363 (emphasis in original).

Whether a misrepresented fact is material is a second factor central to the application of *uberrimae fidei*. In the context of marine insurance disputes, the issue of materiality is a mixed question of law and fact that the court can answer as a matter of law only "if reasonable minds could not differ on the question." *Great Lakes Reinsurance (UK) PLC v. Roca*, No. 07-23322-Civ, 2009 WL 200252, at *4 (S.D. Fla. Jan. 27, 2009) (citing *Woods v. Indep. Fire Ins. Co.*, 749 F.2d 1493, 1496 (11th Cir. 1985)). To determine a fact's materiality, the Court must decide whether the fact could "possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk." *AIG Centennial*, 782 F.3d at 1303 (citation and quotation marks omitted); *see, e.g., Great Lakes Reinsurance (UK) PLC v. Gonzalez*, No. 10-21138-Civ, 2011 WL 13115484, at *1 (S.D. Fla. Sept. 12, 2011) ("[T]he

standard is whether a reasonable *insurer*, not insured, would find the misrepresentation material.") (emphasis in original; citation omitted).

As to what constitutes a misrepresentation to void the policy under this doctrine, a misrepresentation under this doctrine can obviously arise from an affirmative statement of fact that is false, untrue, or misleading. *See* 2 *Admiralty & Mar. Law* § 19:14 (6th ed. 2024) ("The fundamental idea is that a misrepresentation relates to a past or an existing (and presumably verifiable) factual state which is untrue. A misrepresentation can be express or implied, written or oral."). Such a false statement need not rise to the level of an outright fraud to trigger the doctrine's application. As Judge Brown explained in an oft-cited precedent in our circuit, in the case of a misrepresentation under a maritime contract, "[w]hether such suppression of the truth arises from fraud (that is, from a wilful intention to deceive for the party's own benefit), or merely from mistake, negligence, or accident, the consequences will be the same.'" *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 981 n.20 (5th Cir. 1969) (quoting 2 Arnould, *Marine Insurance & Average* § 575, at 531 (13th ed. 1950)).

But an affirmative misrepresentation is also not required because the failure to disclose any material fact, whether requested or not, will void the policy "even if it is a result of 'mistake, accident or forgetfulness." *HIH Marine,* 211 F.3d at 1363 (quoting *Steelmet,* 747 F.2d at 695); *see also Kilpatrick Marine Piling v. Fireman's Fund Ins, Co.,* 795 F.2d 940, 943 (11th Cir. 1986) ("[C]oncealment of such facts voids the policy, whether the concealment be due to fraud, negligence, accident, or mistake.") (citation omitted). Again, as Judge Brown put it:

'Concealment,' in the law of marine insurance, is the failure to disclose any material fact or circumstance in relation to the subject matter of the contract which may increase the liability to loss, or affect the risk or obligation assumed, and which is, in fact or law, within or ought to be within, the knowledge of one party, and of which the other party has no actual or presumptive knowledge. In the case of marine insurance the insured must disclose all facts material to the risk, and in default of such duty the contract may be avoided by the insurer. In other words, an applicant for marine insurance must state all material facts which are known to him and unknown to the insurer.

*Gulfstream,* 409 F.2d at 980 (quoting 29 Am. Jur. *Insurance* § 690 at 956).

In our case, the grounds on which Great Lakes defends its decision to deny coverage rest on affirmative misrepresentations allegedly committed by SEA 21-21. First, that the purchase price of the vessel was $400,000, and, second, that the amount of improvements made to the vessel amounted to $160,000 that could be substantiated with receipts.  SEA 21-21 argues in response that there is no misrepresentation of fact in the case of the former, and that as to the latter ground it need only show that the value of the improvements amounted to $160,000 whether or not written proof, like receipts or invoices, was available.  In other words, as to this second ground, SEA 21-21 is purportedly bound only to the representation that the value of the improvements was $160,000 as opposed to the broader claim that it had any obligation to produce every receipt imaginable to verify that claim.

We will turn first to the question of the misrepresentation as to the purchase price.

**B.**     ***Purchase Price of Vessel Was Not Misrepresented***

Great Lakes has the burden to prove by the greater weight of the evidence that the purchase price of the vessel was not $400,000.  That means that Great Lakes must first show that SEA 21-21's initial application represented a false, untrue or misleading amount of its investment in the vessel.  Then it must show that this conflict between the stated purchase price and SEA 21-21's real investment in the vessel was material to Great Lakes or any other objective insurer.[1] *See, e.g., Kilpatrick,* 795 F.2d at 942-43; *Puritan Ins. Co. v. Eagle Steamship Co., S.A.,* 779 F.2d 866, 871 (2d Cir. 1985).

Great Lakes has not met its burden, however, to show that SEA 21-21 was not truthful as to the $400,000 purchase price of the vessel.  Great Lakes' theory is that Fernandez admitted at trial that SEA 21-21 "credited" $50,000 from a $400,000 purchase price for moneys allegedly spent on repairs to the center engine.  And, when comparing the repairs that it claims to have made to the vessel, with the amount of documentable invoices and receipts reflecting the work on the central engine in early

---

[1]     We can assume in this case that the second element was proven, because the purchase price of a vessel is almost always material to the underwriting decision, and because in this case we find as a matter of fact that the purchase price was dispositive in Great Lakes' decision to issue a $400,000 hull coverage policy to SEA 21-21.  *See, e.g., Markel Am. Ins. Co. v. Nordarse*, 297 F. App'x 852, 853 (11th Cir. 2008) (affirming judgment for on insurer's defense that insured misrepresented purchase price of vessel; "[insurer] did not have an actual bill of sale at the time it made its decision[;] it relied on Nordarse's written representation on the application, that the purchase price and current value of the vessel was $180,000.").

2016, the record only shows about $15,000 was spent.  (This was based on the testimony of Great Lakes' marine surveyor expert who analyzed all the documentation produced in the case).  So, Great Lakes concludes, the actual purchase price was only $365,000 (the negotiated purchase price, minus the $50,000 credit, plus the $15,000 actually spent).  That amount is materially less than the $400,000 that SEA 21-21 represented in the original policy application.  And because that difference is material to an objective insurer, and was indeed material to Great Lakes, Great Lakes has proven that it is entitled to void the policy and deny coverage for the loss of *La Bestia*.

The facts do not support Great Lakes' theory, however, because the Court has found that the negotiated price was not $400,000 as Great Lakes claims, but was instead $450,000 as attested to by Fernandez at trial.  His unequivocal testimony (which Great Lakes' proposed findings point to) was that the actual purchase price was $450,000.  The $50,000 credit that the seller and he negotiated came from that gross price.  And, after he spent $43,881.42 in labor and material expenses for the post-sea trial repairs to the vessel, he paid the net of $400,000 (through a monthly payment plan) plus an initial deposit check in the amount of $3,823.58.

The Court found Fernandez fully credible as to this testimony.  Great Lakes presented no contrary testimony, either from the seller or anyone else, that rebutted Fernandez's version of how the original transaction was structured and how he arrived at a net purchase price of $400,000.  This credibility finding undermines the claim that the purchase price was ever misrepresented on the policy application.  It was neither untrue nor misleading.  The purchase price was $400,000, which is the

amount that Fernandez paid to the seller over time and which represents the investment that SEA 21-21 incurred in the vessel.

Apart from that unrebutted testimony, documentary evidence in the record also fully supports Fernandez's version of the transaction. As the Court findings of fact make clear, the parties agreed upon a Marine Note, Security Agreement Power of Attorney that $50,000 of the $450,000 purchase price was deferred pending final repairs to the center engine. The seller agreed that there would be a $50,000 set aside, from which any monies spent on the center engine repairs would be credited. Any monies not applied to the center engine would then be due to the seller within 120 days from execution of the Agreement. [D.E. 119-16 at 10]. The Agreement contemplated that the balance of the purchase price after the set aside, $400,000, would be paid by SEA 21-21 through a monthly payment schedule that would mature by January 2021.

So, this exhibit in evidence fully supports Fernandez's version of the events. And, again, Great Lakes did not present any testimony, from someone with personal knowledge of the transaction, to present an alternative interpretation of that document or Fernandez's testimony. Moreover, other documentary evidence supporting Fernandez includes his memorandum of the work performed on the vessel to the seller, as well as his check drawn in favor of the seller for $3,823.58. That check is further evidence of the $450,000 purchase price minus the repair credit.

Finally, the record also includes a notarized Bill of Sale, signed by the seller on February 17, 2016, that memorialized a sale of the vessel for $400,000, which was signed and initialed by the seller Deborah Tynes. The Bill of Sale attached the

agreed-upon amortization schedule for that loan amount through January 2021. [D.E. 119-19]. This Bill of Sale fully corroborates Fernandez's testimony, because had the price been as Great Lakes theorizes, the $450,000 would have been reflected minus the agreed-upon repair credit. The Bill of Sale, which is precisely the type of "receipt" that Great Lakes insists on, does not support its theory.

Accordingly, Great Lakes has failed to meet its burden on this score. We add as well that its legal theory as to this issue is also flawed. In this case, the subject Policy contains no per se requirement for receipts or invoices evidencing the amount of the purchase price. So the failure to provide all receipts and invoices supporting the $50,000 repair credit would not alone establish a misrepresentation of the policy in the first place. In this respect, the testimony of the witnesses with knowledge, if credible, would be sufficient. That is also the case because the insurer's Underwriting Manual (which is often a key document in the materiality determination) does not contain the word "invoice" and instead requires "receipts of genuine investment" supporting the purchase price. This shows that what matters here is the net investment that a vessel purchaser has made in the vessel to sustain the amount of hull coverage purchased. In this respect a verified ledger of costs incurred on the vessel, again if credited by the fact finder, could be sufficient to sustain the represented purchase price. The type of receipt-by-receipt process contemplated by Great Lakes and its expert would thus not be a prerequisite to the finding that no misrepresentation took place *with respect to the purchase price.*

A good illustration for this conclusion can be found in cases where Courts have sided with insurers asserting misrepresentations over the purchase price of a marine

vessel. Take for instance, an Eleventh Circuit that addressed this very claim, *Markel American v. Nordarse,* 297 F. App'x at 853. There, the record showed that a vessel owner sought coverage based on a $180,000 purchase price, while the bill of sale he received from the seller only referenced a payment of $107,000. No bill of sale existed for a purchase of $180,000. The district court thus granted summary judgment in the insurer's favor under the doctrine of *uberrimae fidei* because that misrepresentation, which was material to the insurer's decision to take the risk, voided the policy. The district court was thus correct to reject the insured's theory that, because the vessel's fair market value was at least $180,000, no misrepresentation took place.

Here, by contrast, the best evidence of the transaction, the bill of sale signed by the seller, evidences the insured's version of what he paid for the vessel. The bill of sale does not reference a $450,000 purchase price as Great Lakes imagines. It instead only references a $400,000 price. That is what the net result was of the agreed-upon purchase price minus the repair credits that the seller agreed to. So the amount of the buyer's net investment in the vessel was matched by the amount of hull coverage purchased under the policy.

Moreover, the amortization schedule included with that bill of sale reflects monthly payments, running through January 2021, that would require the buyer to pay *more* than $400,000. That is understandably the case given that the seller agreed to help finance SEA 21-21's purchase of the vessel, and the cost of that financing was built into the monthly payment schedule. That alone supports the Court's finding that the amount of the investment that SEA 21-21 incurred for the vessel was at least $400,000. The fact that it actually incurred more than that for the initial repairs to

the engine, whether $15,000 as claimed by the expert or $47,000 as attested to by Fernandez, only underscores the Court's finding that at least $400,000 was incurred for the purchase of the vessel.

At bottom, Great Lakes' position requires that the Court find that the actual purchase price was $400,000 minus a repair credit that did not materially exist. The Court finds instead that the greater weight of the evidence shows that the gross purchase price was $450,000 and the minimum amount of SEA 21-21's investment in the vessel was at least $400,000.

Great Lakes' position would make more sense if, for instance, SEA 21-21 sought $450,000 in insurance coverage based on this transaction, but could only prove that the net monetary value exchanged between seller and buyer was $415,000. Then, even if one believed Fernandez's testimony that $46,000 worth of work was performed on the vessel, the documentary record only supported a $415,000 transaction so the amount of the policy could not exceed that sum. *Cf. AGF Marine Aviation & Transp. v. Cassin*, 544 F.3d 255, 264 (3d Cir. 2008) (affirming summary judgment that voided maritime policy based on misrepresentation in purchase price; record showed that monetary value exchanged was $400,000, while buyer represented purchase price to be $600,000 based on undocumented "equity stake" in vessel that pre-dated transaction).

Here, however, the opposite is the case. The insured did not seek $450,000 in coverage based upon that purchase price; he sought only the net amount of his actual monetary exchange with the seller (that actually *exceeded* $400,000). SEA 21-21 has supported its record with credible testimony from Fernandez, as well as a series of

documents evidencing the veracity of his claim.  The insurer, however, relies only on the conclusion that the purchase price should be treated as being $450,000 despite the contrary record evidence.  The Court disagrees on this record and finds that Great Lakes has failed to meet its burden of showing that any misrepresentation of fact took place with respect to the purchase price of the vessel.  The policy cannot be voided on this basis.

### C.   *The Amount of Vessel Improvements Was Not Supported*

We turn then to the next argument that Great Lakes has relied upon to support its action to void the policy:  that SEA 21-21 misrepresented the amount of verifiable improvements made to the vessel to warrant the 2019 increase in coverage to $560,000.  Unfortunately for SEA 21-21, the Court's analysis of this issue cannot just mirror the earlier discussion with respect to the purchase price claim.  That is because the nature of the representation is very different, as we explain further below.

The doctrine of *uberrimae fidei*, as we discussed earlier, is firmly in place whether or not an insurer makes any inquiry at all.  *See, e.g., HIH Marine,* 211 F.3d at 1362–63; *see also Certain Underwriters at Lloyds v. Inlet Fisheries, Inc.,* 518 F.3d 645, 648 (9th Cir. 2008) ("Under uberrimae fidei, [insured] would have been obligated to disclose all material information, regardless of a request by Lloyds.").  That is the case because the duty to disclose exists precisely to inform the insurer of relevant, material information "sufficient to call the attention of the underwriter in such a way that, *if the latter desires further information, he can ask for it.*" *Puritan,* 779 F.2d at 871 (emphasis added) (citing 2 M. Mustill & J. Gilman, *Arnould's Law of Marine Ins. & Average* § 646, at 493 (16th ed. 1981)).

So, then, what happens when the underwriter acts on that information and directly asks for more? Does the insured's duty in responding with accurate information grow under the doctrine of "upmost good faith," or alternatively does it diminish because the insured satisfied its basic disclosure obligation? The answer is, of course, plainly the former. Once an insured has actual knowledge of the importance of information to the underwriter, that insured has an even more acute obligation to ensure that the responses that follow are unmistakably accurate and complete. The initial burden borne by the party with the most knowledge of the vessel to make "full" disclosure, the owner seeking to buy insurance, is undoubtedly enhanced. *See HIH Marine,* 211 F.3d at 1363. There simply is no other way to look at it. After all, "[i]t is the duty of the assured to place the underwriter in the same situation as himself; to give to him the same means and opportunity of judging of the value of the risks; and when any circumstance is withheld, however slight and immaterial it may have seemed to himself, that, if disclosed, would probably have influenced the terms of the insurance, the concealment vitiates the policy." *Sun Mut. Ins. Co. v. Ocean Ins. Co.,* 107 U.S. 485, 510-11 (1883) (quotation omitted).

Not only is the duty of disclosure enhanced, but also the importance, i.e. "materiality" of the information at issue. The insured has been placed on express notice by the insurer that a particular fact is essential to the underwriter's decision whether or not to bind coverage. In that circumstance, the insured not only has reason to believe that the matter "could possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk[,]" *Kilpatrick,* 795 F.2d at 942-43, he now knows *for a fact* that the insurer will indeed be relying on

the veracity of the disclosure if it chooses to issue a policy (or in this case renew a policy for a higher coverage amount).

### 1.      SEA 21-21's Two Misrepresentations

Given this legal backdrop, we turn to the record here.   SEA 21-21, via its broker, submitted a request on March 7, 2019 to increase the insured value of the vessel to $775,000, based on its most recent survey valuation and based on the value of improvements made to the vessel since it was first purchased.   The underwriter, Concept, responded the next day, alerting the broker that Great Lakes required "proof of investment" before Concept could agree to increase the insured value to any amount above the purchase price.   In the written discussions that followed between Concept and the SEA 21-21 broker, Concept explicitly gave notice to the broker that it required documentary proof in the form of receipts before it could agree to any increase in the insured value of the vessel:

> Please note that the costs for the upgrades listed in your last email total $324,185 and some of these items are deemed to be maintenance costs associated with the ownership and upkeep of a vessel (such as painting of the hull, maintenance of engines etc.) – these cannot be included in the hull sum insured. [….] *In order that we can come to an agreed value I think in this instance we will need to see the receipts for the upgrades. Apologies . . . we cannot almost double a sum insured without making sure we are happy with the valuations and investments made.*

[D.E. 120-14 (emphasis added)].

The broker responded the same day, stating "I'll request the receipts/invoices of these repairs and upgrades and get them to you as soon as possible." [*Id.*].   Yet, five days later, on March 20, 2019, the broker advised that providing the receipts would not be as easy as she had previously thought:

> He [Fernandez] stated that these repairs have been done over the course of two years and providing individual receipts will prove a challenge, *for it is all in storage boxes with all documentation regarding their business operations that they have separate from La Bestia.*

[D.E. 120-6] (emphasis added)].

In so doing, SEA 21-21 made not one, but *two* representations of fact to the underwriter after having been made fully aware of the importance of the information to Great Lakes.   First, SEA 21-21 represented that well over $300,000 in improvements were made to the vessel itself, and second that documents and receipts existed that would support the costs of the work performed.   Those documents could not be immediately produced to the underwriter, however, because they were scattered among various storage boxes located in SEA 21-21's offices.   This latter representation further impliedly expressed that the documents could not be quickly turned over, as they were not isolated in the vessel from which they could easily be retrieved.

In light of these two representations, Concept offered a compromise for the time being, in which it would accept a spreadsheet reflecting the individual costs for each item of work.   Working off this spreadsheet it could then begin to determine which items to include in the increased value as opposed to those that were merely routine maintenance that did not add to the core value of the vessel.

This spreadsheet, with costs associated for each type of work, was provided to Concept via email the next day, on March 21, 2019. [D.E. 120-3]. The information contained in the spreadsheet was extremely specific, with a breakdown of nearly fifty different types of work and the alleged cost for each, totaling $324,185.00.   From

Concept's own internal review of that spreadsheet, the underwriter concluded that the majority of the work identified amounted only to routine maintenance. Concept agreed, however, to issue an endorsement increasing the insured value of the vessel from $400,000 to $560,000. In so doing, the underwriter accepted SEA 21-21's representation that improvements to the vessel were indeed made to the tune of at least $160,000. And, most importantly, the underwriter relied on the promise that, if necessary, those improvements could be verified with receipts or other documents evidencing the value of the work and how they increased the value of the vessel.

After the vessel was lost in a fire while at sea, the claim was made on the increased policy. Great Lakes denied the claim on various grounds, one of which was based on this representation as to the value and documentation behind the increased coverage amount. In discovery, however, SEA 21-21 produced only two categories of documents: a twenty-five (25) page Transaction Detail by Account, from March 2016 through January 2020 [D.E. 120-11]; and 197 pages of receipts and invoices that purportedly verified and documented the improvements performed on the vessel.

At trial, Great Lakes' expert testified that he reviewed and analyzed these documents to determine if at least $160,000 in improvements could be documented from SEA 21-21's production. The expert opined that there were few documents, receipts or invoices to support the alleged improvements included in the transaction log. And the costs included there did not correspond with the actual costs found in the documentation. Where represented costs could be matched with supporting documents, he further concluded that the represented costs were significantly higher for most line items in the log. The expert thus concluded that, for the $176,150.00

allegedly spent on improvements to the vessel, there was documentary support for only about $40,000. The biggest discrepancies in his review included central engine overhaul costs, hydraulic motor replacement, interior upholstery, installation of new synthetic flooring, GPS and autopilot systems, and other items.

In response to this evidence, no rebuttal expert testimony was presented. Instead, Fernandez testified generally on various line items where he claimed work was performed and there was documentation to support much of it. He claimed that a great deal of the discrepancies were attributable to the labor costs that he incurred, much of which came from his own employees as opposed to third parties. With respect to big ticket items, such as the "new floor made of synthetic teak" for $28,400.00, he claimed to identify specific invoices totaling $5,500 but he could not identify how much labor cost was charged to reach the sum included in the log. Apart from that, however, Fernandez did not testify to the vast majority of the alleged improvements in the spreadsheet that was relied upon by the underwriter. The net result of this is that the expert surveyor's testimony, that documentation did not support the increased coverage, was not persuasively rebutted.

The available record, therefore, required the Court to stretch mightily to find that sufficient documentation supporting the $160,000 increase in value existed. And that was what the Court is tasked to do here because the two-fold representation required tangible improvements to the vessel for verifiable amounts. The insurer requested that specific information and SEA 21-21 responded affirmatively in both respects. To find in favor of SEA 21-21 the Court would have to find on this record

that SEA 21-21's representations were indeed not false or misleading and were, instead, accurate at the time they were made.

And in contrast with the prior section that dealt with the original purchase price, where objective facts are easier to discern based on the documented sale of a vessel, the task here is far more complex. "The value of the vessel, as it may or may not have been increased by the owner's efforts over the years, is a far more debatable proposition. It requires an evaluation of whether work done on the vessel was merely for normal upkeep or truly enhanced its worth, and by how much." *New Hampshire Ins. Co. v. C'Est Moi, Inc.*, 519 F.3d 937, 939-40 (9th Cir. 2008) (affirming summary judgment applying *uberrimae fidei* to dispute over initial purchase price despite owner's claim that he invested substantial monies restoring the vessel; "By failing to disclose the purchase price and substituting another figure, without clearly disclosing that it had done so, [insured] made a material misrepresentation to NHIC, in violation of its duty of *uberrimae fidei*.").

That proved to be impossible. The Court generally finds Fernandez credible because he undoubtedly expended monies to improve his vessel after 2016. But more is required. Fernandez's testimony on the specific task at hand was far more sketchy, especially when compared to his compelling testimony about the purchase price. Fernandez, at best, explained why he could not make a better showing, such as the claim that the documents were actually lost when the vessel sunk. But he could not reliably attest that, in fact, the amount of improvements amounted to $160,000.

Great Lakes, on the other hand, fully satisfied its initial burden of proof by introducing prima facie evidence that the value of the improvements did not amount

to $160,000, and further that documents or receipts were not made available to substantiate that sum. In response, SEA 21-21 relies on its largely self-serving testimony but offered no rebuttal expert testimony to challenge the bulk of the compelling testimony provided by Great Lakes' expert. Plus, the excuses that Fernandez offered were not very persuasive. After all, he represented in 2019 that receipts and invoices were in his possession, *not* on the vessel but instead in storage boxes. If that was the case, after coverage was bound he and his staff had ample time to gather all those invoices to make sure it could verify the representations made to Great Lakes. To then claim, after the loss, that he did the best he could because most of the documents sank with the vessel belies the representation made to the underwriter in the first place. And if they were on the vessel as Fernandez claims now, why could they not be immediately produced for the underwriter's review in March 2019? The underwriter repeatedly requested them, yet none were provided. All in all, the two versions of the story simply cannot be squared.

So based on the record presented the Court has little choice but to find that Great Lakes satisfied its burden of showing that both representations relied upon by the underwriter in 2019 were not accurate. The amount of any improvements to the vessel, as opposed to general maintenance or repairs (or even worse costs incurred for other vessels and not *La Bestia*), did not come close to $160,000. And, further, whatever improvements were made on the vessel were not fully verified and supported by some form of documentary evidence, in the form of receipts, invoices, or otherwise. On this score, the Court agrees with Great Lakes that the task at hand is not simply to believe or not believe Fernandez's claims. Even if we fully credited him

on this issue, which we cannot do, his burden was to produce documents evidencing his claim that he claimed existed in 2019.  He failed in that respect.

A few additional points must also be made.  First, Fernandez also claimed to have only just realized the night before trial that an entire box of invoices and receipts from 2017 had been provided to his broker in 2019 at the time he sought an increase in coverage.   But these potentially significant documents were supposedly never returned to Fernandez.  He puzzlingly claimed that he never asked his broker, Jose Figueroa, to return the boxes because, until the previous night as he was "unaware that they were missing." [D.E. 125 at 57]. Yet, SEA 21-21 never called Figueroa to trial to testify and confirm the whereabouts of this box of relevant invoices.  Given all these inconsistencies, the Court cannot credit Fernandez's sketchy explanation as to why these documents are unavailable.

That is particularly the case given the record evidence presented at trial that, throughout the litigation, Fernandez never mentioned this before and testified, instead, that all relevant documentation that was available to Fernandez had been produced. [D.E. 125 at 66-67]. Great Lakes repeatedly demanded production of all available invoices and documentation.   Yet only these limited documents were produced without any mention that Figueroa over at Global might have a missing box of 2017 invoices.  Suffice it to say, that surprise testimony is quite unpersuasive.  In sum, the Court finds that Fernandez's trial testimony contradicts sworn testimony he provided in discovery, a finding that further undermines Fernandez's credibility on this score and makes it even less possible for SEA 21-21 to prevail over Great Lakes' defense.

After all, Fernandez's broker works for him, so whatever information or materials are in the broker's possession then so too are they in Fernandez's possession. Similarly, whatever representations were made by the broker to the underwriter in 2019 are legally tantamount to representations made by Fernandez himself. "Under New York law, an insurance broker . . . generally [is] considered the agent of the insured, not the agent of the insurer." *XL Specialty Ins. Co. v. Prestige Fragrances, Inc.,* 420 F. Supp. 3d 172, 192-93 (S.D.N.Y. 2019) (citing *Centrehigh Ltd. v. Chubb & Son Inc.,* 2012 WL 13042572, at *12 (S.D.N.Y. Feb. 3, 2012)). When a broker is acting only on behalf of the insured, "notice to the . . . broker is not notice to the liability carrier[.]" *Bennion v. Allstate Ins. Co.,* 727 N.Y.S.2d 222, 224 (N.Y. App. Div. 2001) (quoting *Sec. Mut. Ins. Co. v. Acker–Fitzsimons Corp.,* 293 N.E.2d 76, 79 n.3 (N.Y. App. Div. 1972)). A broker serves as the insurer's agent only where there is some evidence of action on the insurer's part, or facts from which a general authority to represent the insurer may be inferred. *XL Specialty,* 420 F. Supp. 3d at 193 (citing *Fidelity & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.,* 540 F.3d 133, 140-41 (2d Cir. 2008)).[2]

---

[2]    We cite New York law for this point given that the Great Lakes policy here incorporates New York law, which law governs any dispute absent an applicable rule of federal admiralty law. But the same is true under Florida law. *See, e.g., Great Lakes Reinsurance PLC v. Barrios*, 08-20281-CIV-UNGARO, 2008 WL 6032919, at *6 (S.D. Fla. Dec. 10, 2008) (insurance broker acts as insured's agent and not the insurer's agent absent indicia of agency presented to overcome that presumption) (citing *Essex Ins. Co. v. Zota,* 985 So. 2d 1036, 1044-45 (Fla. 2008)).

Second, SEA 21-21 argues that it had no duty to produce receipts of the improvements, either under the policy or the underwriting manual, and so it only needed to produce some credible evidence of the investments in the vessel that Fernandez provided at trial.  This argument is more convincing when it comes to the dispute over the purchase price.  But for these purposes, SEA 21-21's theory falters because the requirement to maintain documentary evidence of the improvements was expressly demanded of SEA 21-21 at the time the endorsement increased coverage. This is thus a far stronger case for holding the insured to that promise because it was placed on express notice that the insurer was relying on that representation and would insist on it as a predicate to bind coverage.  So, unlike a generic case where we only can turn to the language of the policy or the underwriting manual to establish the materiality of a given representation, here we have clear and convincing evidence in the record that the insurer demanded written proof of the improvements.  SEA 21-21's broker advised that such proof was available.  The insurer then relied on that representation being accurate and complete.  This record fully undermines any argument that SEA 21-21 had no legal obligation to maintain receipts of the work or that the failure to do so cannot trigger the doctrine of *uberrimae fidei.*

Third, we cannot save SEA 21-21 from the effect of its multiple misrepresentations as to the value and verifiability of the alleged improvements because they only related to an endorsement and renewal of the original policy.  A material misrepresentation of fact by an insured relating to the issuance of an endorsement will void the entire policy of marine insurance if the endorsement merely increases the amount of coverage for the same property, as in the present case,

and hence the endorsement is not severable from the policy.  For example, in *New York Marine & Gen. Ins. Co. v. Tradeline(L.L.C.),* No. 98 CIV. 7840 (HB), 2000 WL 739567, at *1 (S.D.N.Y. June7, 2000), *aff'd in part, rev'd in part on other grounds and remanded,* 266 F.3d 112 (2d Cir. 2001), a marine insurer filed a declaratory judgment action seeking a declaration that the policy of marine insurance was void due to material misrepresentations of fact made by the insured relating to the issuance of an endorsement extending coverage to damage caused by rainwater.  The district court ruled that the insured had violated the duty of utmost good faith by failing to convey material information concerning weather conditions that motivated them to seek the extension for expanded coverage. *Id.* at *9.  In response to the insured's argument that it could still be covered under the original policy, the district court rejected that approach because the underlying policy and endorsement could not be severable where the endorsement merely increased the amount of coverage for the same property and the same risk. It could only be severable if the endorsement extended coverage to a different type of risk. *Id.*  Consequently the district court held that the rainwater extension was severable because it was for a different type of coverage, and that as a result the insured was still covered under the main policy. *Id.*

Here, however, the opposite is true.  The endorsement did not expand the scope of coverage by covering a different risk.  It merely increased the insured value of the vessel for the same risks.  Hence, the endorsement, and the misrepresentations that prompted the increased coverage amount in the endorsement, cannot be severed from the original policy for purposes of the *uberrimae fidei* doctrine.  We have no choice in this respect but to find that misrepresentations tethered to the endorsement void the

policy *ab initio* as per the general rule.  *See also HIH Marine,* 211 F.3d at 1364 ("we agree with the district court that Mobay made material misrepresentations to HIH in obtaining the Netan–El endorsement that voided the policy *ab initio*.").

### 2.      The Misrepresentations Were Material

We finally turn to the second element of Great Lakes' claim: that the misrepresentations as to the value of the improvements and their available documentation were material to the underwriter's decision to bind additional coverage.  In our circuit, "[t]o decide whether a fact is material, we inquire whether it could 'possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk.'" *AIG Centennial,* 782 F.3d at 1303 (quoting *Kilpatrick,* 795 F.2d at 942-43).  Materiality in this respect is thus a concept "broadly defined." *HIH Marine,* 211 F.3d at 1363–64.

Arguably, this matter was laid to rest in the Court's summary judgment Order [D.E. 101 at 20] that found that materiality was fixed as a matter of law as to the alleged misrepresentations involving the purchase price and the cost of vessel improvements.  In the interests of judicial economy, however, we expressly disclaim reliance on our summary judgment finding, which was a legal conclusion that, while quite sound, may unnecessarily prompt *de novo* review on appeal.  That is the case because the evidence of materiality, which presents a mixed question of law and fact, is overwhelming in this record and dispositive of the ultimate disposition of the case. *AIG Centennial*, 782 F.3d at 1303 ("Mixed questions of law and fact, such as questions of materiality, . . . involve assessments peculiarly within the province of the trier of

fact and hence are reviewable under the clearly erroneous rule.") (quoting *Lucas v. Fla. Power & Light Co.,* 765 F.2d 1039, 1040-41 (11th Cir. 1985)).

Accordingly, we proceed briefly to explain why the two misrepresentations involving the improvements to the vessel were indeed material in support of our ultimate conclusion that the doctrine of *uberrimae fidei* squarely governs this case.

As we noted from the outset of this section, SEA 21-21 was placed on express notice by the underwriter that it would not bind coverage for the additional amount requested in March 2019 absent proof with "receipts for the upgrades." SEA 21-21 then assured the underwriter that the value of the improvements was accurate and verifiable based on two years' worth of receipts maintained in storage boxes. And, for the time being, the nature and amount of those improvements were summarized for the underwriter in a detailed spreadsheet. After the underwriter's critical review of that document, which resulted in various items being excluded as maintenance items and not improvements, the underwriter approved a more limited increase in coverage to $560,000.

The law is well settled that, in circumstances like these, materiality is plainly satisfied. "The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law." *New Hampshire Ins.,* 519 F.3d at 939 (quotation omitted). But even if not as a matter of law, it certainly presents clear and convincing evidence to the trier of fact that the insurer deemed those answers material to the decision to bind coverage and assume the risk.

Here, a compelling case was made that the underwriter's decision to approve the 2019 endorsement was tethered to the assurances received from the broker that the improvements were indeed carried out on the vessel and that they could be documented.  Concept's lead underwriter and managing director credibly testified why proof of the amount of any improvements to the vessel was necessary, consistent with the underwriting manual's requirement that "receipts of genuine investment" were essential "to increase the vessel's value as opposed to the cost of routine maintenance . . . . " [D.E. 120-7 at 3].

Further the record evidence submitted documenting how the 2019 endorsement came to be demonstrably supports the Court's finding that materiality has been established as a matter of fact.  The underwriter explained to the insured's broker why proof of receipts was required and that an increase in coverage would not be possible without that proof.  The broker acknowledged that requirement and claimed that the insured could meet it.  Again, that is stark evidence of materiality and indeed reliance once the endorsement issued only after these assurances were transmitted.

All this evidence fully supports Great Lakes' prima facie burden of showing that the misrepresentations regarding the value of the improvements to the vessel were material to the underwriter's decision to accept the increased risk.  In response, SEA 21-21 asserts that the burden was on Great Lakes to confirm the type and amount of improvements that it relied upon to increase the coverage amount in the first place.  Having failed to make that showing, Great Lakes purportedly cannot rely

on the absence of documentary proof for any such improvements as a basis to deny coverage under the doctrine.

The problem with this theory is that the doctrine is enforced in cases like this precisely because an underwriter is entitled to rely on the insured's representations and does not have to calculate in the first instance how the coverage decision accounted for each specific item claimed by the insured.  "This duty to disclose is based on the rationale that requiring the marine insurer to investigate each and every claim made by those applying for coverage 'would be both time consuming and expensive.' . . . The law has placed the burden of good faith disclosure with the person in the best position to know all the facts: the insured." *HIH Marine,* 211 F.3d at 1363 (citation omitted).

Accordingly, we agree with Great Lakes that the record here supports its claim that SEA 21-21 misrepresented the value of, and the available documentation for, the improvements made to the vessel.  Such misrepresentations could, and indeed did, influence the prudent and intelligent objective insurer in determining whether or not to accept the risk.  Materiality, therefore, has been satisfied.  *See, e.g., AIG Centennial,* 782 F.2d at 1304-05 (affirming judgment after bench trial finding that misrepresentations as to value of vessel were material to the insurer's decision to bind coverage).

### III.  CONCLUSION

To summarize, the Court holds that SEA 21-21 did not misrepresent the amount of the initial purchase for the vessel.  But SEA 21-21 did later misrepresent the value of improvements made to the vessel, as well as its ability to document and verify such improvements, all in order to obtain an increase in coverage for the vessel in March 2019.  Based on these latter misrepresentations to the insurance carrier, that were material to an increase in coverage for the vessel, the doctrine of *uberrimae fidei* compels the Court to declare that the underlying policy was and is void *ab initio*.

For the foregoing reasons, it is hereby **ORDERED** and **ADJUDGED**:

1.      Judgment shall be entered by separate Order in favor of Plaintiff Great Lakes Insurance SE on the sole count of the Second Amended Complaint, and against Defendant SEA 21-21 LLC.

2.      It is hereby DECLARED that Great Lakes Marine Insurance Policy No. CSRYP/166843 is void a*b initio*.

3.      Judgment shall be entered in favor of Great Lakes Insurance SE on the sole count of the Amended Counterclaim, and against Counter-plaintiff SEA 21-21 LLC.

**DONE AND ORDERED** in Chambers at Miami, Florida this 12th day of November, 2024.

EDWIN G. TORRES
United States Magistrate Judge